Scott A. Gilmore (SBN 284961)
Amanda Lee-DasGupta* (D.C. Bar No. 1619712)
Mary S. Van Houten Harper* (D.C. Bar No. 1045137)
Amanda V. Boltax* (D.C. Bar No. 90013893)
**Hausfeld LLP**
888 16th Street N.W., Suite 300
Washington, DC 20006
(202) 540-7200
sgilmore@hausfeld.com
alee@hausfeld.com
mvanhouten@hausfeld.com
mboltax@hausfeld.com

Paul L. Hoffman (SBN 71244)
John C. Washington (SBN 315991)
**Schonbrun Seplow Harris Hoffman & Zeldes LLP**
200 Pier Avenue, Suite 226
Hermosa Beach, California 90254
(310) 717-7373
hoffpaul@aol.com
jwashington@sshhzlaw.com

*List of counsel continued below caption*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Padre (*alias*) and Junior (*alias*), *on behalf of themselves and all others similarly situated*,<br><br>    *Plaintiffs*,<br>    v.<br><br> MVM, Inc.,<br><br>    *Defendant*. | Case No.  **'24CV1265 BEN MSB**<br><br>**CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL**<br><br>1.  Violation of Safe Conduct (Alien Tort Statute, 28 U.S.C. § 1350)<br>2.  Enforced Disappearance (28 U.S.C. § 1350)<br>3.  Torture (28 U.S.C. § 1350)<br>4.  Cruel, Inhuman, or Degrading Treatment (28 U.S.C. § 1350)<br>5.  Civil Rights Conspiracy (42 |

U.S.C. § 1985)
6. Failure to Prevent Civil Rights Conspiracy (42 U.S.C. § 1986)
7. Child Abduction / Interference with Parent-Child Relations (Cal. Civ. Code § 49(a))
8. Intentional Infliction of Emotional Distress

Katie Beran* (PA Bar No. 313872)
**Hausfeld LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3270
kberan@hausfeld.com

James Gotz* (MA Bar No. 567157)
**Hausfeld LLP**
One Marina Park Drive, Suite 14010
Boston, MA 02210
(617) 207-0600
jgotz@hausfeld.com

Ashley Crooks* (NY Bar No. 5800776)
**Hausfeld LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
(646) 357-1100
acrooks@hausfeld.com

Andrew Fels* (TN 36005)
**Al Otro Lado**
3214 Fountain Park Blvd.
Knoxville, TN 37917
(865)-567-4881
andrew@alotrolado.com

Erin Anderson* (MN 0504518)
**Al Otro Lado**
10413 Nicollet Circle

2

Bloomington MN 55420
(323)-681-5422
erin@alotrolado.org

Natalie Cadwalader-Schultheis*
(TX 24106408)
**Al Otro Lado**
150 S Eastbourne Ave, Apt. A7
Tucson, AZ 85716
(323) 423-5310
natalie.cadwalader@alotrolado.org

*Attorneys for Plaintiffs*

* *pro hac vice pending*

**CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 6

JURISDICTION AND VENUE ..........................................................10

THE PARTIES ................................................................................... 11

PLAINTIFFS ......................................................................................11

DEFENDANT .....................................................................................11

FACTS.................................................................................................12

I.   "We Need to Take Children Away": The U.S. Government's Family Separation
     Campaign.......................................................................................12

   A.  Origins: White Nationalism and the *Great Replacement* Conspiracy Theory..12

   B.  Spring 2017: The Launch of the Family Separation Campaign. .....................15

   C.  Spring 2018: The Administration's "Zero Tolerance" Policy Adopts the
       Tactic of Pretextual Prosecutions. ................................................17

II.  MVM Separates and Forcibly Disappears Thousands of Children...................... 20

   A.  MVM Plays an Indispensable Role as DHS's Transport Contractor.  ...........20

   B.  MVM Knowingly Agrees to Execute the Family Separation Campaign. .......22

   C.  MVM Transports Abducted Children. .............................................24

   D.  "Family Unit Deleted": MVM Contributes to Rendering Separated Families
       Untraceable in Records. ..............................................................27

   E.  MVM Disregards Warnings that the Campaign Is Unlawful and Degrading......
       ..................................................................................................28

III.    MVM Forcibly Separates Plaintiffs Padre and Junior. .................................. 41

IV.    Family Separation Is a Form of Psychological Torture.................................45

4

CLASS ALLEGATIONS .........................................................................47

CAUSES OF ACTION ..........................................................................49

PRAYER FOR RELIEF ........................................................................56

**CLASS ACTION COMPLAINT**

Upon information and belief, Plaintiffs Padre and Junior (aliases), on behalf of themselves and others similarly situated, bring this class action against MVM, Inc. for committing, conspiring to commit, and aiding and abetting violations of safe conduct, torture, enforced disappearance, and cruel, inhuman, and degrading treatment under the Alien Tort Statute, 28 U.S.C. § 1350; conspiring to deprive Plaintiffs and the Class of constitutional rights under the Civil Rights Act of 1871, 42 U.S.C. §§ 1985-1986; and for common-law child abduction and intentional infliction of emotional distress.

## INTRODUCTION

1.      Between 2017 and 2021, the U.S. government unlawfully separated more than 4,500 migrant children from their parents at the southern border. These children, including breastfeeding infants and children with medical conditions or disabilities, were abducted from their parents without the minimum due process required under U.S. and international law—a finding that the parents were unfit or posed a danger to their child.



An asylum-seeking boy from Central America runs down a hallway in December 2018 after arriving at a shelter in San Diego from an immigration detention center. (Gregory Bull/AP)

2.      Within weeks of taking office, the Trump Administration launched an orchestrated campaign to deter non-white immigration to the United States by

abducting migrant children from their parents (the "Family Separation Campaign"). The goal of the campaign was to threaten asylum seekers with, in essence, state-sanctioned kidnapping.

3. This campaign was motivated by racial animus and an extremist anti-immigrant ideology. Proponents of the campaign, including political advisor Stephen Miller, echoed the "Great Replacement Theory"—a white nationalist conspiracy theory that claims there is an intentional effort to promote the immigration of non-white migrants to Europe and the United States to bring about the extinction of the "white race."

4. The Family Separation Campaign was open and notorious. On March 6, 2017, then Secretary of Homeland Security General John Kelly confirmed on CNN that the Administration was planning to "separate children from their moms and dads" to "deter more movement." A year later, he repeated on NPR this "would be a tough deterrent" and a "much faster turnaround on asylum seekers." When former Attorney General Jeff Sessions was asked if separating children was intended as a deterrent, he said, "Yes, hopefully people will get the message."

5. The cruelty was the point. The forced separations deliberately inflicted grievous harm on migrant children and their parents, even those who entered the United States lawfully, all to terrify other potential immigrants.

6. In the spring of 2017, agents from Customs and Border Patrol ("CBP" or "Border Patrol") and Immigration and Customs Enforcement ("ICE") began abducting children without due process along the length of the U.S. Mexico border, from San Diego through Texas.

7. These agents had a knowing and willing co-conspirator and accomplice: Defendant MVM, Inc. ("MVM"). MVM is a private security contractor that previously provided armed guards for security agencies, such as the CIA in Iraq. Since at least 2014, MVM has been awarded an exclusive contract by the Department of

Homeland Security ("DHS") to escort and transport "unaccompanied minor" children detained by ICE. An "unaccompanied minor" is a child who arrives at the U.S. border without a parent or legal guardian.

8.      MVM was aware of the Family Separation Campaign at least as early as March 6, 2017, when Secretary Kelly disclosed the plan on CNN.

9.      Beginning in or around March 2017, MVM knowingly agreed to carry out the Family Separation Campaign and began transporting thousands of abducted children away from their parents.

10.     MVM carried out or substantially contributed to all child abductions under the Family Separation Campaign. MVM physically took thousands of children away from their parents and transferred them to shelters. MVM transported and harbored these children using unmarked vehicles, commercial airlines, and makeshift detention centers. Children were even induced to acquiesce in their abduction through MVM's false promises that they would be taken to their parents.

11.     These families were separated *incommunicado*. Some parents were taken out of family detention cells for a few hours and returned to find their children vanished, transported without their knowledge by MVM thousands of miles away. Others were told their children would be gone for a few hours. In reality, they would not see them again for months or years—or ever.

12.     On June 26, 2018, this Court found that the Family Separation Campaign was *prima facie* unconstitutional and issued a preliminary injunction ordering the Government to reunite children under five within two weeks and older children within thirty days.[1] Then the horrible truth came out. The Administration never prepared to reunite children. DHS and MVM separated families without adequate measures to

---

[1] Weeks later, another federal district court reached the same conclusion, holding that the forcible separation of two migrant children was a violation of Fifth Amendment Due Process. *J.S.R. v. Sessions*, 330 F. Supp. 3d 731 (D. Conn. 2018).

locate, let alone link and reunite children to their parents.

13.     In DHS's bureaucratic lexicon, these "family units" were "deleted." In international law terms, these family members were forcibly disappeared. To date, more than 1,400 children have still not been confirmed reunited. Hundreds are likely permanently orphaned and will never see their parents again.

14.     Acting in concert with federal agents, MVM continued to transport forcibly separated children despite the national outcry. MVM did so despite grave warnings that this practice inflicted severe mental suffering on parents and children. MVM knowingly and willingly tortured and scarred these families for life.

15.     MVM's participation in the Family Separation Campaign was a violation of international human rights law. The widespread enforced disappearance of children is a grave breach of *jus cogens* norms. Following Russia's invasion of Ukraine in 2022, thousands of Ukrainian children were separated from their parents and transported to Russia, resulting in the International Criminal Court issuing an arrest warrant for Russian President Vladmir Putin. In Argentina in the 1970s and 1980s, the military junta abducted hundreds of children from accused dissidents. And in the United States, ending and preventing these atrocities against Black and Native American families has been foundational to the Fourteenth Amendment, the Ku Klux Klan Act of 1871, and other civil rights laws.

16.     The Family Separation Campaign violated the ancient principle of "safe conduct" under the law of nations—a doctrine under which foreign nationals from allied countries are entitled to a minimum standard of treatment and due process while in the United States. The First Congress ensured that violations of safe conduct could be remedied through tort suits in federal court by enacting the Alien Tort Statute of 1789, 28 U.S.C. § 1350.

17.     MVM, in concert with DHS agents, treated parents and children from allied states (including Guatemala, Honduras, El Salvador, and Mexico) as enemies

on American soil, depriving them, due to their national origin, race, and ethnicity, of due process and the right to family integrity.

18.    In December 2023, the United States entered into a settlement agreement in the certified class action *Ms. L. v. U.S. Immigration and Customs Enforcement*, which was ultimately approved by this Court. No. 3:18-cv-000428-DMS-AHG, ECF Nos. 721-1, 727 (S.D. Cal. 2023). The class settlement enjoined the practice of family separation and provided various mental health and legal benefits. But it did not financially compensate the thousands of victims for the trauma and lifelong damage caused by the Family Separation Campaign.

19.    Plaintiffs are members of the *Ms. L.* Class. Plaintiffs—individually and on behalf of all similarly situated members of the *Ms. L.* Class—bring this class action against MVM, seeking compensatory and punitive damages and the establishment of an equitable rehabilitation fund.

## JURISDICTION AND VENUE

20.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

21.    This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), as the amount in controversy exceeds $5 million, the Class includes citizens of foreign states, and MVM is a California corporation.

22.    This Court also has alien tort jurisdiction under 28 U.S.C. § 1350.

23.    This Court has general personal jurisdiction over Defendant under California's long-arm statute, CCP § 410.10, because MVM is incorporated in California and at home throughout this State.

24.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. MVM carried out the unlawful separation of Plaintiffs and other Class Members in this District. In addition,

**CLASS ACTION COMPLAINT**

it carried out other overt acts in furtherance of the conspiracy by transporting and harboring abducted child Class Members in this District, including through MVM's offices located in this District, vehicles and premises leased and/or operated in this District, and San Diego International Airport.

25.    In the alternative, venue is proper in this District under 28 U.S.C. § 1391(b)(1) because MVM is subject to both general personal jurisdiction, as a California corporation, and specific personal jurisdiction, based on its overt acts in furtherance of the Family Separation Campaign along the California-Mexico border, including through transportation and detention infrastructure in this District and MVM's offices in this District.

## THE PARTIES

## PLAINTIFFS

26.    Plaintiff Padre (an alias, a/k/a. J.L.F.) and his then sixteen-year-old son, Plaintiff Junior (an alias, a/k/a. J.N.L.F.) (DOB: April 11, 2001), were forcibly separated by or with the substantial assistance of MVM after crossing the U.S. border near Tecate, California, on November 3, 2017. After Junior was seized, MVM transported Junior thousands of miles away to a shelter operated by the Office of Refugee Resettlement ("ORR") in New York. Padre and his son remained separated until July 2023—almost six years later—when Padre was paroled into the United States through the *Ms. L.* injunction. Padre and Junior are nationals of Guatemala and currently reside in San Diego, California.

## DEFENDANT

27.    Defendant MVM, Inc. (a/k/a "M V M, Inc."; "MVM Security, Inc.") is a California corporation, incorporated in 1979 (Filing No. 936339), with its principal place of business at 44620 Guilford Drive, Suite 150, Ashburn, Virginia 20147. MVM maintains offices and substantial, continuous operations in and around San Diego, California, where it carried out the Family Separation Campaign and transported

children, including Plaintiff Junior.

28.     Founded by three former U.S. Secret Service agents in 1979, MVM is a private security contractor for U.S. intelligence and national security agencies.

29.     Previously, MVM held security contracts with military and intelligence agencies operating in war zones, including the CIA and National Security Agency in Iraq following the 2003 invasion. MVM lost the contract following reports of unsafe mismanagement and misconduct.

## FACTS

### I.     "We Need to Take Children Away": The U.S. Government's Family Separation Campaign.

### A.     Origins: White Nationalism and the *Great Replacement* Conspiracy Theory.

30.     On January 20, 2017, President Donald Trump was inaugurated as the forty-fifth president of the United States of America. Within days, the Trump Administration began preparing plans to deter immigration to the United States by forcibly removing children from their parents at the southern border.

31.     The architect of the Family Separation Campaign was Stephen Miller.[2] In 2016, Miller served as Senior Policy Advisor for the Trump presidential campaign and the newly elected president's transition team. According to the *New York Times*, *Washington Post*, and Southern Poverty Law Center ("SPLC"), Miller's anti-immigrant views echo the "Great Replacement" theory, a tenet of the 21st Century

---

[2] *See* Caitlin Dickerson, *The Secret History of the U.S. Government's Family Separation Policy,* The Atlantic (Aug. 7, 2022), https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/

white nationalist movement.[3] The "Great Replacement," also called "white genocide," is a racist, anti-immigrant conspiracy theory, positing that "liberal elites" (also called "globalists") are bringing non-white immigrants into the United States and Europe as part of a plot to replace or exterminate white populations.

32.    According to the SPLC, in the run-up to the 2016 elections, Miller promoted works of white nationalist propaganda in D.C. policy circles and the media.[4] Miller specifically promoted white supremacist websites such as "VDARE" and the obscure neo-Nazi novel *The Camp of the Saints*, a 1973 French dystopian work that portrays the destruction of western civilization through mass immigration from the south.[5] The novel depicts non-white immigrants as subhuman rapists, characterizes immigration as an invasion, and valorizes the murder of advocates for refugees.

33.    The SPLC reported that in September 2015, while serving as a staffer for Senator Jeff Sessions, Miller sent a series of emails to *Breitbart News* editors, calling on them to publish a story about *The Camp of the Saints* in response to a statement by

---

[3] *See, e.g.*, Katie Rogers and Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.

[4] Kim Bellware, *Leaked Stephen Miller Emails Show Trump's Point Man on Immigration Promoted White Nationalism, SPLC Reports*, Washington Post, November 13, 2019, https://www.washingtonpost.com/politics/2019/11/12/leaked-stephen-miller-emails-suggest-trumps-point-man-immigration-promotedwhite-nationalism/.

[5] Southern Poverty Law Center, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, Nov. 12, 2019, https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

**CLASS ACTION COMPLAINT**

Pope Francis: "you see the Pope saying west must, in effect, get rid of borders. Someone should point out the parallels to *Camp of the Saints*."[6]

34.     When Miller joined the Trump Administration as a key political advisor on immigration, he had the perfect platform to devise a campaign of anti-immigrant measures in line with *The Camp of the Saints* and the "Great Replacement" theory.

35.     In early January 2017, Miller assembled a team of advisors to prepare a raft of draconian measures to halt immigration. A key team member was Gene Hamilton. Like Miller, Hamilton was an alumnus of Senator Session's office, where he served as General Counsel. After the election, Hamilton became General Counsel of DHS and then special advisor to Attorney General Sessions.

36.     Miller made the Family Separation Campaign a centerpiece of the Administration's agenda. The Campaign was motivated by racial and xenophobic animus against non-white immigrants, in particular individuals of Latino origin and from Central America. Administration officials openly and repeatedly expressed this animus. On the first day of his presidential campaign, Candidate Trump echoed *The Camp of the Saints'* dehumanizing depiction of immigrants as rapists: "When Mexico sends its people, they're not sending their best . . . . They're bringing drugs. They're bringing crime. They're rapists."[7]

37.     At the impetus of Miller and Hamilton, DHS officials discussed the plan to separate families internally and began disseminating the goal to rank and file agents. On February 2, 2017, at a DHS "town hall" meeting, U.S. Citizenship and Immigration Services ("USCIS") asylum chief John Lafferty briefed asylum officers on the Family Separation Campaign. In an official statement to the Reuters news

---

[6] *Id.*

[7] *Donald Trump Announces a Presidential Bid*, Wash. Post (June 16, 2015, 1:03 PM EDT), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/.

agency, DHS officials admitted the goal was "to deter mothers from migrating to the United States with their children." A DHS official statement confirmed this: "With safety in mind, [DHS] continually explores options that may discourage those from even beginning the journey."

38.   Plans to separate families were reiterated at a February 14, 2017 meeting convened by Kevin K. McAleenan, Acting Commissioner of CBP. On the agenda were "joint DHS, DOJ, and HHS plans for addressing unaccompanied minors and their parents/sponsors."

39.   Reuters first broke the story on the family separation plan on March 3, 2017. Its reporting revealed that DHS officials and even rank-and-file employees were discussing using family separations as an intimidation tactic at least as early as February 2, 2017. [8] CNN covered the family separation plan the following day. [9]

40.   Weeks later, on March 6, 2017, Secretary General Kelly publicly confirmed on CNN that the federal government was developing a plan to separate migrant parents and children: "Yes, I am considering [that], in order to deter more movement along this terribly dangerous network, I am considering exactly that." [10]

**B.    Spring 2017: The Launch of the Family Separation Campaign.**

41.   Beginning in March 2017, the Administration began abducting migrant

---

[8] Julie Edwards Ainsley, *Exclusive - Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017, 5:32 PM PST), https://www.reuters.com/article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES/.

[9] Mary Kay Mallonee, *DHS Considering Proposal to Separate Children From Adults at Border*, CNN (Mar. 4, 2017, 3:31 AM EST), https://www.cnn.com/2017/03/03/politics/dhs-children-adults-border/.

[10] *Kelly: Separating Families Under Consideration*, CNN, https://www.cnn.com/videos/politics/2017/03/06/trump-travel-ban-separate-parents-children-kelly-tsr-bts.cnn (last visited Jul. 2, 2024).

**CLASS ACTION COMPLAINT**

children, specifically non-white migrant children, from their parents at or between ports of entry along the southern border, from California to Texas. By the summer of 2017, ORR staff and officials observed a steep increase in the number of children who had been separated from a parent or guardian by DHS.[11]

42.    The separations were executed in at least two methods. The first was through summary, administrative separation. Federal agents or contractors, including MVM, would take children away from their parents while they were held in immigration detention—including some who crossed lawfully at ports of entry and sought asylum—without the parents ever being criminally prosecuted or detained.

43.    Throughout 2017, victims were summarily separated by immigration agents across the southern border. San Diego was an early focal point for family separations, with well-documented incidents of migrant families being summarily separated in the fall of 2017.[12]

44.    The second separation method was under the pretext of criminal prosecution. Border Patrol would interdict families crossing the border between ports of entry and hold them in custody. Border Patrol would then refer the adults to be prosecuted for unlawful entry under 8 U.S.C. § 1325 or re-entry under 8 U.S.C.

---

[11] Off. Inspector Gen., U.S. Dept. of Health & Human Servs., OEI-BL-18-00511, Separated Children Placed in Office of Refugee Resettlement Care, at 1 (Jan. 2019), https://www.govinfo.gov/content/pkg/GOVPUB-HE-PURL-gpo115132/pdf/GOVPUB-HE-PURL-gpo115132.pdf.

[12] *See, e.g.*, URGENT ACTION, Border Officials Forcibly Separate Families, Amnesty International (Nov. 22, 2017), https://www.amnesty.org/en/wp-content/uploads/2021/05/AMR5174942017ENGLISH.pdf; *C.M. v. United States*, No. 2:19-cv-05217-PHX-SRB, (D. Ariz. Oct. 24, 2023), https://immigrantjustice.org/sites/default/files/uploaded-files/no-content-type/2023-10/434-CM-v-US_Summary-Judgment-decision_10-24-23.pdf.

§ 1326.[13] When a migrant parent was referred for prosecution, the child would be taken away and parental custody extinguished without a hearing and a finding the parents were unfit or otherwise presented a danger to their child.

45.     In the summer of 2017, the Administration tested out the second approach through a pilot program in El Paso, Texas, which would eventually lead to the formal adoption of the criminal referral method the following year.

46.     The trend was obvious. At a January 2018 hearing in one of the El Paso Pilot prosecutions, U.S. Magistrate Judge Miguel Torres noted on the record that something was amiss: an increasing number of defendants were being held "completely incommunicado" from their children "while being prosecuted for a very minor offense," with no apparent way to find each other after being separated.[14]

**C.     Spring 2018: The Administration's "Zero Tolerance" Policy Adopts the Tactic of Pretextual Prosecutions.**

47.     In early 2018, Stephen Miller and other administration officials deemed the El Paso Pilot Program a success and pushed to enshrine the second method of family separation—via pretextual prosecutions—as formal DHS and DOJ policy.

48.     On April 6, 2018, Attorney General Sessions issued a formal memorandum announcing a new "zero tolerance policy for all offenses referred for prosecution under section 1325(a)," ("Zero Tolerance") the unlawful entry statute.[15] That same day, a Presidential memorandum ordered the detention of all migrants

---

[13] Gov't Accountability Off., GAO-19-163 15, Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border (2018), https://www.gao.gov/assets/700/694963.pdf.

[14] *Id.* at 17.

[15] U.S. Attorney General, Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a) (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/dl.

apprehended between ports of entry, a drastic change from previous practice .[16]

49.    This memorandum followed remarks from the White House questioning why the United States would accept immigrants from Haiti and "shithole countries" in Africa, rather than places like Norway. The White House did not deny this remark but issued a statement saying the Administration supports immigration policies that welcome "those who can contribute to our society."

50.    On April 2018, Kevin McAleenan, a DHS official, prepared a decisional memorandum for Acting DHS Secretary Kirstjen Nielsen (who had replaced General Kelly). McAleenan proposed "increased prosecution (toward 100%) of all adults who cross illegally, whether they present as single adults or in family units."

51.    On or around May 3, 2018, Stephen Miller convened a meeting of cabinet level officials at the White House to push for the adoption of pretextual prosecution as a formal policy. The attendees included Secretary Nielsen, Attorney General Sessions, Health and Human Services Secretary Alex Azar, and Secretary of State Mike Pompeo. Talking points prepared for Attorney General Sessions praised the El Paso Pilot Program as a success and stated:

- An illegal alien should not get a free pass just because he or she crosses the border illegally with a child.

  . . .

- The prosecution of an adult member of a family unit will necessarily result in their transfer to the U.S. Marshals Service. Any minors in the family unit will remain in DHS custody, and likely eventually transferred [sic] to [ORR].[17]

---

[16] Memorandum from The President to Sec'y of State et al., Ending "Catch and Release" at the Border of the United States and Directing Other Enhancements to Immigration Enforcement, 83 Fed. Reg. 16179 (Apr. 13, 2018), https://www.govinfo.gov/content/pkg/FR-2018-04-13/pdf/2018-07962.pdf.

[17] Dep't of Justice, Office of the Inspector General, 21-028, Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland security and Health and

52.     Miller—in keeping with the "Great Replacement" conspiracy theory—accused anyone opposing family separation of being un-American: "If we don't enforce this, it is the end of our country as we know it." Miller called for a show of hands to vote on the fate of thousands of parents and children. The vote passed.

53.     The following day, on May 4, 2018, Secretary Nielsen signed McAleenan's memorandum and ordered DHS to "direct the separation of parents or legal guardians and minors held in immigration detention so that the parents or legal guardian can be prosecuted pursuant to these authorities."

54.     On May 7, 2018, standing at the border in San Diego, Attorney General Sessions and ICE Director Tom Homan held a press conference to announce that Zero Tolerance was going into effect nationwide.

55.     DHS, HHS, and the ORR were entirely unprepared for the nationwide rollout of family separations. Secretary Nielsen warned White House Chief of Staff Kelly: "We're not ready to do this. We don't have any facilities. We don't have any training."

56.     U.S. Attorneys from the border districts apprised DOJ leadership that the "change in policy would result in new referrals of 20 to 400 cases a day." They warned that DHS and Border Patrol would not be able to process the cases fast enough:

> The medical screening for TB, chicken pox, measles; much less the processing of these individuals in establishing identity, alienage, criminal and/or immigration history, etc. would be practically impossible to accomplish within the constitutionally mandated time constraints . . .[18]

57.     Attorney General Sessions was undeterred by these purported "excuses."[19] Instead, he reiterated the deterrent goal of the Family Separation

Human Services, at 31 (January 2021),
https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.
[18] *Id.* at 29.
[19] *Id.* at 40.

**CLASS ACTION COMPLAINT**

Campaign: "We need to take away children," so that "adult aliens" who "care about [their] kids" do not "bring them [to the United States]."[20]

58.    Attorney General Sessions' instructions were clear: regardless of the age of the child, regardless of whether a mother was breastfeeding, or a child was ill, disabled, or had special needs, there was no "discretion to decline prosecution based upon unique case-specific circumstances."[21]

59.    The White House justified the Family Separation Campaign by claiming "large, well-organized caravans of migrants are marching towards our southern border." Migrants, and specifically non-white migrants, lawfully seeking asylum at the U.S. border were likened to an "invasion," who had "violently overrun the Mexican border."

60.    Sessions, Miller, and other U.S. officials created and implemented the Family Separation Campaign based on invidious animus against those of foreign national origin, particularly those with a non-white racial background. From there, in San Diego and across the country, thousands of migrant parents and children were seized, separated, and forcibly disappeared from each other without a hearing and without procedures in place to track and reunite families.

## II.    MVM Separates and Forcibly Disappears Thousands of Children.

### A.    MVM Plays an Indispensable Role as DHS's Transport Contractor.

61.    DHS would have been unable to execute the Family Separation Campaign without the willing assistance of a key private contractor: MVM.

62.    Since at least 2014, MVM has had the exclusive contract with ICE to transport "unaccompanied minors," *i.e.*, "UACs," from DHS custody to ORR.

---

[20] *Id.* at 37, 39.

[21] *Id.* at 37.

**CLASS ACTION COMPLAINT**

63. As specified in the 2014 solicitation, '[t]he Contractor shall provide unarmed escort staff . . . to provide on-demand escort services for non-criminal/non-delinquent UAC ranging from infants to 17 years of age, seven (7) days a week, 365 days a year."[22]

64. These escort services included:

1. transferring physical custody of UAC from DHS to Health and Human Services (HHS) care via ground or air methods of transportation (charter or commercial carrier);
2. coordinating/communicating with DHS and HHS staff;
3. travel coordination;
4. generating transport documents, records, and reports;
5. providing UAC with timely meals, snacks, and drinks;
6. providing and issuing clothing and other articles as needed;
7. providing, seeking, or coordinating medical care if a UAC becomes ill while in transit;
8. property inventory;
9. maintaining/stocking daily supplies;
10. drafting reports; and
11. limited stationary guard services to accommodate for trip disruptions due to inclement weather, faulty equipment, transport disruptions, or other exigent circumstances.[23]

65. It further instructed that "[t]he Contractor shall develop and implement a service plan and perform services in accordance with the requirements of this [Performance Work Statement]" at ORR locations across the United States, including San Diego, and "shall provide management oversight for the

---

[22] Off. of Det. Compliance and Removals, U.S. Immigr. and Customs Enf't, Dept. of Homeland Sec., Notice HSCEDM-14-R-00010, Transportation Services for Unaccompanied Children, SAM.GOV; *Id.* at attachment "UAC_Transportaton_Servies-_RFP.docx" at 6 (Aug. 25, 2014), https://sam.gov/opp/c034600119dbc0692772a2cd9393d652/view ("Solicitation 2014").

[23] *Id.*

1   implementation and operations."[24]

2   66.   Undertaking the responsibility for children, the contractor was required

3   to act in the best interests of the children. "In all cases, the best interest of the child

4   is to be the primary consideration, and children are to be treated with special

5   consideration for their unique needs—to include their safety, security, well-being, and

6   immediate physical health needs." Children under the age of fourteen were defined

7   as "particularly vulnerable" and entitled to heightened considerations.

8   67.   The contractor was also required to comply with federal laws and

9   regulations, as well as applicable DHS guidance, policies, and procedures.

10   68.   MVM sought and received the bid with ICE, signing a five-year

11   Indefinite Delivery, Indefinite Quantity (IDIQ) contract for "unaccompanied alien

12   children [] transportation services" in 2014.

13   69.   Under the IDIQ contract, MVM signed dozens of multi-million dollar

14   "task orders" (and modifications) for transportation and escort services, month after

15   month and year after year during the Class Period. When that contract ended, MVM

16   immediately sought and won another.

17   **B.   MVM Knowingly Agrees to Execute the Family Separation**

18   **Campaign.**

19   70.   As the sole contractor tasked with transporting unaccompanied minors,

20   MVM was aware that it would be carrying out a plan to terrorize migrants by abducting

21   children at least as early as Secretary Kelly's appearance on CNN on March 6, 2017.

22   71.   MVM specifically knew it was transporting abducted children because it

23   was required to review and maintain official documents accompanying the children,

24   including records indicating that the child had arrived with a family member and had

25   been separated.

26

27   _____

28   [24] *Id.* at 17.

**CLASS ACTION COMPLAINT**

72.     MVM was also aware of the growing scale of abductions throughout 2017. Beginning that spring, the number of "unaccompanied minors" significantly increased, removing any doubt that MVM was acutely aware of the policy. These children were typically younger than traditional unaccompanied minors, normally old enough to travel to the United States without their parents. Babies and toddlers, however, do not cross the border alone. Forcibly separated "unaccompanied minors" were also more traumatized, often pleading for their parents directly to MVM employees, as Plaintiffs themselves observed.

73.     MVM was also aware of the discriminatory intent animating the Family Separation Campaign. News outlets specifically reported on the discriminatory animus against those of foreign national origin and against immigrants with a non-white racial background that was driving the Campaign.[25] For example, Newsweek published an entire article dedicated to the former presidential administration's "Racist Comments About Immigrants."[26]

74.     News coverage exploded throughout 2017, reaching a fever pitch by spring 2018. On March 8, 2018, *Time* magazine ran a cover story, *How Donald Trump's Immigration Policy Is Separating Families*.[27]

75.     Despite this knowledge, MVM agreed with DHS to transport and harbor all or nearly all children forcibly disappeared from their parents under the Family

---

[25] Alan Fram and Jonathan Lemire, *Trump: Why Allow Immigrants from 'Shithole Countries'?*, AP News (Jan. 11, 2018, 9:09 AM PDT), https://apnews.com/article/immigration-north-america-donald-trump-ap-top-news-international-news-fdda2ff0b877416c8ae1c1a77a3cc425.

[26] Christianna Silva, *Trump's Full List of 'Racist' Comments About Immigrants, Muslims and Others*, Newsweek (Jan. 11, 2018, 7:42 PM EST), https://www.newsweek.com/trumps-full-list-racist-comments-about-immigrants-muslims-and-others-779061.

[27] Haley Sweetland Edwards, *How Donald Trump's Immigration Policy Is Separating Families*, Time (Mar. 8, 2018, 7:47 AM EST), https://time.com/longform/donald-trump-immigration-policy-splitting-families/.

Separation Campaign between March 7, 2017 and January 1, 2021.

C.    **MVM Transports Abducted Children.**

76.    MVM and DHS carried out the Family Separation Campaign through a coordinated modus operandi.

77.    For many children, the disappearance began with DHS agents or MVM staff physically removing them from their parents. Children were generally given no opportunity to embrace their parents one last time or say goodbye. DHS agents or MVM staff often lied to families and promised that they would see each other again soon. In general, parents were given no information on the welfare or whereabouts of their children and no means to reunite with them.

78.    Once separated, the children were often detained, sometimes for days. In one harrowing media report, an audio recording documented the horrific circumstances of separated toddlers screaming for their parents. The recording contains the "desperate sobbing of 10 Central American children, separated from their parents."[28] Many "sound like they're crying so hard, they can barely breathe," screaming "Mami" and "Papá" "over and over again, as if those are the only words they know."

79.    In documented instances, MVM employees physically separated children from their parents.[29] As the Center for Investigative Reporting described it: "MVM is the hammer. They are the tool that is actually going out and separating

---

[28] Ginger Thompson, *Listen to Children Who've Just Been Separated From Their Parents at the Border*, ProPublica (Jun. 18, 2018, 3:51 p.m. EDT), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.

[29] Auro Bogado & Neena Satija, *When They Took My Son,* Reveal News (Sept. 29, 2018), https://revealnews.org/podcast/when-they-took-my-son/. ("Q: Okay, so let me get this straight. Back when family separation was still happening this summer, MVM, a private contractor, was actually the one physically separating some children from their parents. Is that right? A: Correct")

1 these children from their parents. Basically, the people who got their hands dirty was

2 MVM."[30]

3       80.     After the initial separation, MVM transported children to ORR-operated

4 shelters around the country. In playing this central role, MVM corralled groups of

5 children ranging from infants to 17-year-olds into unmarked cars or vans. MVM

6 booked flights for children on commercial airlines and escorted them through airports

7 and onto planes. Some children were flown thousands of miles away from their

8 parents, from the southwest to the east coast.

9       81.     The following charts, from a DHS Office of the Inspector General

10 Report, illustrates the critical role of MVM—identified as the "Transport

11 Contractor"—in the separation process.[31]



**Figure 5: Manual Processes for Requesting UAC Placement with HHS**

*Source: OIG-generated from DHS data*

---

30 *Id.*

31 Off. of Inspector Gen., U.S. Dept. of Homeland Sec., Rep. No. OIG-20-06, DHS
Lacked Technology Needed to Successfully Account for Separated Migrant
Families, at 9 (Nov. 25, 2019),
https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf
("DHS OIG Rep.").



*Source:* OIG-generated from DHS data

82.     During longer trips, MVM would harbor some children incognito in makeshift detention centers, including in vacant office buildings or hotel rooms. For example, the Center for Investigative Reporting discovered that in June 2018, MVM was harboring children in a vacant office building in Arizona, in violation of MVM's policies, Arizona licensing laws, and the terms of MVM's contract with ICE. It had no bedrooms, showers, kitchen, or a yard.

83.     On June 11, 2018, an observer recorded videos on his mobile phone showing "20 boys of various ages being led by adults" into the building. "They operate six 12-passenger vans," the observer noted. He also observed children bathing in bathroom sinks. [32]

84.     Another observer, an alarmed neighbor, also shared videos with the investigators which revealed "workers pulling up in white vans and leading dazed children into the building." The video showed "children dressed in sweatsuits being led – one so young she was carried," into the office building.

---

[32] Aura Bogado, Ziva Branstetter & Vanessa Swales, *Exclusive: Immigrant kids held in second Phoenix office seen bathing in sinks,* Reveal News (Jul. 17, 2018), https://revealnews.org/blog/exclusive-immigrant-kids-held-in-second-phoenix-office-seen-bathing-in-sinks/.



A cellphone video shows immigrant children being led into a vacant office building in Phoenix. The defense contractor leasing the building, MVM Inc., claims publicly that it does not operate "shelters or any other type of housing for minors." Credit: Lianna Dunlap

85.    The investigation revealed that MVM signed a lease for one of the office buildings on March 9, 2017—two days after the Family Separation Campaign was announced by DHS Secretary Kelly.

**D.    "Family Unit Deleted": MVM Contributes to Rendering Separated Families Untraceable in Records.**

86.    MVM also participated in a bureaucratic record-keeping system that intentionally "deleted" family units and prevented their reunification.

87.    As part of the separation process, DHS agents "deleted" the family unit from agency databases, and the child was re-designated as an "unaccompanied minor." The family units were eliminated without a formal mechanism to track the fate of family members or reunify them.[33]

**Figure 4: Deleting a Family Unit in e3**



*Source*: Screenshot from CBP documentation following the e3 April 2018 update

---

[33] DOJ OIG Rep. at 10.

88.     According to a report by the DHS Office of the Inspector General, the databases used to log and track these arrests, detention, and transfers "lacked critical capabilities to (1) separate grouped family members, (2) track separations once a family unit was deleted from the e3 system, and (3) reunite family members."[34] After "the family unit was deleted from the system, the agent could no longer view or retrieve the family unit tracking number." DHS then transferred the children to MVM.

89.     MVM was responsible for tracking the children it transported and for transferring transport manifests from ICE/CBP to ORR shelters. Yet it failed to adopt effective mechanisms to keep track of children in their custody.

90.     Border Patrol agents manually requested the transfer of thousands of children by MVM to ORR shelters via email. Each "placement" request entailed five or more emails, meaning that the fate of children and details of their transportation were buried in inboxes rather than logged in a database. This "resulted in errors, such as Border Patrol receiving incorrect travel itineraries for some children." MVM manifests logging transported children were similarly irregular, ad hoc, and disorganized, often consisting of notes on emailed word documents.

91.     Once in the hands of MVM, separated children vanished without a trace from their parents, "essentially orphaned." *Ms. L.*, 18-cv-00428-DMS-MDD, ECF No. 83 at 7. The average separation period was 154 days. For many families, the separations lasted years. Hundreds of children remain forcibly disappeared from their parents to this day.

**E.     MVM Disregards Warnings that the Campaign Is Unlawful and Degrading.**

92.     MVM agreed to execute the Family Separation Campaign despite knowing that the plan was, on its face, cruel and degrading and in violation of

---

[34] *Id.* at 9.

international law, U.S. law, DHS policy, and professional standards.

### 1. MVM Knew It Was Violating International Human Rights Law.

93. As of at least March 2017, MVM was on notice that seizing children to deter asylum seekers was a violation of international human rights law.

94. In a March 3, 2017 public statement, U.S. Representative Henry Cuellar (D-TX), whose district borders Mexico, condemned the proposed family separation plan publicly. "Bottom line: separating mothers and children is wrong," he stated. "That type of thing is where we depart from border security and get into violating human rights."[35]

95. MVM was also on notice that state-sanctioned child abduction was historically condemned as a serious violation of international human rights law.

96. A March 6, 2017 article on the popular news site, *Slate*, warned, "[i]f the policy does go through, the detrimental effects on potentially hundreds of thousands of children and families would be enormous." It continued:

> Family separation has been used as a compliance tactic and a method of dehumanizing individuals in almost every system of state-sanctioned forced labor and detention, from slave plantations to concentration camps in Nazi Germany. "If the U.S. starts [separating mothers from their children] on a wide-scale basis . . . we're going to see an impact on the people that happened to for years into the future," Laura Polstein [senior staff attorney at the Centro Legal de la Raza] said. "You hear stories now of much older adults who lived through Japanese internment, for example, as children. That experience had a huge impact on who they became. Mentally, emotionally—that kind of experience is really lasting."[36]

---

[35] Ainsley, *supra* note 8.

[36] Christina Cauterucci, *Under Proposed DHS Policy, Detained Immigrant Mothers Would Be Separated from Their Kids*, Slate (Mar. 6, 2017, 6:21 PM), https://slate.com/human-interest/2017/03/under-proposed-dhs-policy-detained-immigrant-mothers-would-be-separated-from-their-kids.html.

97.     Similarly, on March 17, 2017, the *Washington Post* ran an article by historian Nara Milnich titled *Nations have separated children from parents before. It never ends well.*[37] Cautioning that the proposed policy of mass family separation would be "cruel," Milnich catalogued instances of "state-sponsored 'child appropriation.'" She specifically noted that:

> [i]n the 1970s, Argentina's right-wing military government waged a murderous "dirty war" against its political opponents, detaining thousands of people on charges of subversion.[38]

The dictatorship seized the children of detained or killed parents, designating them "orphaned" or "abandoned" and placed them with adoptive families. Argentina's campaign of family separation led to the development of "international child rights norms and spurred ongoing criminal investigations." A "truth commission denounced the military's 'perfidious usurpation' in the name of child welfare."

98.     The condemnation of family separation as a human rights violation grew throughout the year. In November 2017, Amnesty International issued a public alert: "URGENT ACTION: Border Officials Forcibly Separating Families."[39]

99.     These public warnings put MVM on notice that it would be violating international law if it agreed to carry out the punitive Family Separation Campaign. As a March 2, 2018 amicus brief filed in the *Ms. L.* litigation explained:

> Unnecessary family separation violates long-standing, internationally accepted human rights: the right to privacy and family life, rights of the child, the right to have the

---

[37] Nara B. Milanich, *Nations Have Separated Children from Parents Before. It Never Ends Well.*, Wash. Post (Mar. 17, 2017, 6:00 AM EDT), https://www.washingtonpost.com/posteverything/wp/2017/03/17/nations-have-separated-children-from-parents-before-it-never-ends-well/.

[38] *Id.*

[39] *USA: Border Officials Forcibly Separate Families*, Amnesty Int'l (Nov. 22, 2017), https://www.amnesty.org/en/documents/amr51/7494/2017/en/.

child's "best interests" prioritized, parental rights, and the rights of the family. International law uniformly upholds the precept that the primary consideration in any custody decision should be the best interests of the child.[40]

100.     The right "to be free from arbitrary interference with family life" is "part of customary international law."[41] The right to family integrity is enshrined in the International Covenant on Civil and Political Rights ("ICCPR"). ICCPR Article 17(1) provides: "No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation." Article 23 provides: "The family is the natural and fundamental group unit of society and is entitled to protection by society and the State."

101.     MVM was also on notice that punitive family separation violates basic protections for children under customary international law, as codified in the Convention on the Rights of the Child, 1577 U.N.T.S. 3 (1989) ("CRC"). The CRC provides that every child has the right "as far as possible . . . to know and be cared for by his or her parents," Article 7(1), and "to preserve his or her identity, including . . . family relations . . . without unlawful interference," Article 8(1). Article 9(1) specifically prohibits the separation of families unless "such separation is necessary for the best interests of the child," such as in instances of abuse or neglect, and is carried out with due process.

### 2.  MVM Knew It Was Violating U.S. Family Law Principles and Professional Standards of Child Welfare.

102.     MVM was on notice that the Family Separation Campaign was violative of basic norms of U.S. family law.

---

[40] *Ms. L.*, No. 3:18-cv-000428-DMS-MDD, ECF No. 17-3 at 10, https://www.childrensrights.org/wp-content/uploads/imported-files/Brief-by-Amici-Curiae-ECF-Stamped-1.pdf ("Children's Rights Amicus Brief").

[41] *Maria v. McElroy*, 68 F. Supp. 2d 206, 234 (E.D.N.Y. 1999), at *233, *abrogated on other grounds by Restrepo v. McElroy*, 369 F.3d 627 (2d Cir. 2004).

103.   On March 7, 2017, UNICEF—the United Nations body dedicated to child protection—issued a public statement that the "separation of children from their parents" to deter immigration "runs contrary to their best interests."[42]

104.   Every state in the union has enacted laws that prohibit removing children from their parents' care absent a prior determination that the parents endanger the life or well-being of the child.[43] In general, "children cannot be separated from their parents without court approval unless the child is at 'imminent' risk of harm."[44]

105.   Federal law also guards against the separation of families except under extreme circumstances. For example, as a condition for federal funding for child protective services, 42 U.S.C. § 671(a)(15)(B) requires states to use "reasonable efforts . . . to preserve and reunify families." Absent a showing that the child is in imminent danger, states must attempt "to prevent or eliminate the need for removing the child from the child's home" and "to make it possible for a child to safely return to the child's home." 42 U.S.C. § 671(a)(15)(B)(i)-(ii).

106.   MVM was also on notice that the Family Separation Campaign violated professional standards for child welfare and childcare workers. For example, the Child Welfare League of America's 2013 *National Blueprint for Excellence in Child Welfare* states that children have "the right to live with their families of origin" unless it is deemed "harmful" to the child. This standard-setting body is used by industry and courts alike as a "reliable basis for evaluating the performance of a state's child welfare system."[45]

---

[42] Caryl Stern, *UNICEF USA on the Proposed Separation of Families at the Border*, UNCIF USA (Mar. 7, 2017), https://www.unicefusa.org/stories/unicef-usa-proposed-separation-families-border.

[43] *See* Children's Rights Amicus Brief at 4-5 (collecting statutes).

[44] *Id.*

[45] *Kenny A. ex rel. Winn v. Perdue*, No. 1:02-cv-1686-MHS, 2004 WL 5503780, at *12 (N.D. Ga. Dec. 13, 2004).

### 3. MVM Knew It Was Violating Due Process and DHS Policies.

107.  Even before March 2017, MVM was on notice that using family separation as an intimidation tactic violated DHS standards. An official DHS October 2016 Report of the ICE Advisory Committee on Family Residential Centers concluded that "the separation of families for purposes of immigration enforcement or management are never in the best interest of children." [46] The Report found that:

- "threatening families with separation as means of control or retaliation breaks down the families and erodes the appropriate parent/child relationship."

- "[a]t no time should ICE or contractor personnel use the threat of family separation or actual family separation to discipline or retaliate against a parent or child."

- "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child – which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members." [47]

108.  Separating families as an intimidation tactic also violated DHS policies. MVM acted in concert with Border Patrol and ICE officers who breached their non-discretionary obligations to abide by their own internal policies and standards in their 'deletion' of family units. Section 1.9 of the CBP's National Standards on Transport, Escort, Detention, and Search "TEDS" states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." TEDS at 4. Section 5.6 of the TEDS on "Detention" states that "Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their

---

[46] U.S. Immigr. and Customs Enf't, Dept. of Homeland Sec., Report of the ICE Advisory Committee on Family Residential Centers (Oct. 7, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf at 2.

[47] *Id.* at 14, 33, 35.

operational office's policies and procedures." TEDS at 22. Because CBP, with MVM's support, separated children without a finding of health or safety risks requiring separation, their concerted practice violated agency standards.

109.   MVM also knew it was acting outside the scope of its contract with DHS by agreeing to transport children who were not unaccompanied minors.

110.   Under that contract, MVM was engaged to provide "escort services for non-criminal/non-delinquent [unaccompanied children]."[48] But the children targeted for family separation were not unaccompanied minors. They were *accompanied* minors, unlawfully separated from their parents by DHS and MVM.

111.   MVM was also on notice of the unconstitutionality of the Family Separation Campaign. Given the public outcry over family separation since March 2017, basic due diligence and legal compliance review would have raised serious doubts about the constitutionality of the plan.

112.   Specifically, MVM should have known that the Fifth Amendment to the United States Constitution enshrines the right to Equal Protection and to substantive and procedural due process to all persons present in the United States. The U.S. Government cannot temporarily or permanently extinguish a person's right to family integrity absent a compelling interest, notably a finding that a parent is unfit or a danger to their child. *See Troxel v. Granville*, 530 U.S. 57, 66-67, 72 (2000). In reaching that finding, the U.S. Government must adhere to procedural due process protections. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

113.   Had MVM conducted legal due diligence, it would have similarly flagged concerns raised by DHS's own Office for Civil Rights and Civil Liberties. Scott Schuchart, a former senior advisor at that office, explained that as of spring 2017, "[m]any senior civil servants at DHS believed that the policy violated civil and human

---

[48] Solicitation 2014, *supra* note 22.

**CLASS ACTION COMPLAINT**

rights of migrants."[49] He added:

> Crossing the border to surrender immediately to authorities and claim asylum is protected by the United Nations refugee protocol signed by the United States. Even for families outside that protection, the substantive due process principle in the Constitution suggests that it is illegitimate to threaten to harm or abscond with someone's children to deter the commission of a misdemeanor. (First-time unlawful entry is the lowest level of federal crime.)

114.   Similarly, an internal HHS memorandum, dated March 15, 2017, warned that "[t]he separation of children from their families could be considered a human rights abuse, resulting in the refusal to participate by grantees, contractors, or staff on the grounds that the practice is illegal, immoral, or unethical." Yet MVM had no qualms participating.

115.   These constitutional concerns were publicly amplified on February 26, 2018, when the *Ms. L.* litigation was filed. *Ms. L.* sought to reunite an asylum-seeking mother and her 7-year-old daughter who were fleeing violence in the Democratic Republic of Congo, only to be forcibly torn from each other in the U.S. and detained separately 2,000 miles apart. The ACLU expanded the *Ms. L.* case into a nationwide class action seeking to enjoin the practice of separating families as a violation of the Fifth Amendment Due Process Clause.

116.   The injunction was granted on June 26, 2018, in an opinion which recognized that the practice was unconstitutional, prohibited further separations except in limited circumstances, and ordered the reunification of families. *See Ms. L.*, No. 3:18-cv-000428-DMS-MDD, ECF No. 83 at 17 ("A practice of this sort implemented in this way is likely to be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, interferes with rights implicit in the

---

[49] Scott Shuchart, *Civil Servants Said Separating Families Was Illegal. The Administration Ignored Us.* Wash. Post (Oct. 25, 2018), https://www.washingtonpost.com/news/posteverything/wp/2018/10/25/feature/civil-servants-said-separating-families-was-illegal-the-administration-ignored-us/.

concept of ordered liberty[,] and is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency.") (internal quotation marks and citations omitted).

117.    MVM was on notice that the Administration separated migrant families for racialized, ideological reasons, rather than constitutionally legitimate reasons of child welfare. Nevertheless, MVM agreed to it.

### 4. MVM Knew It Was Inflicting Severe Harm.

118.    As early as March 2017, MVM was on notice from medical professionals that separating children as an intimidation tactic caused severe mental suffering to children and parents.

119.    On March 13, 2017, the American Academy of Pediatricians announced a new policy warning of the severe suffering that forcible family separation inflicted on children. The policy declared: "Children in the custody of their parents should never be detained or separated from a parent unless a competent family court makes that determination."[50]

120.    By early 2018, with widespread public outcry, MVM knew that the separations it was performing were decried by medical professionals as cruel, inhumane, and degrading.

121.    In an open letter sent to Secretary Nielsen on January 11, 2018, the American Academy of Pediatrics warned that plans to separate children as a "tool" to "deter immigration are inhumane" and would "harm the developing brain and harm short- and long-term health."[51]

---

[50] Julie M. Linton et al., *AAP Policy Says No Child Should Be in Detention Centers or Separated from Parents*, AAP News (Mar. 13, 2017), https://publications.aap.org/aapnews/news/6961/AAP-policy-says-no-child-should-be-in-detention?autologincheck=redirected.

[51] Letter from Colleen A. Kraft, President, Am. Acad. Pediatrics, to Kirstjen M. Nielsen, Sec'y, U.S. Dept. Homeland Sec. (Jan. 11, 2018),

122.   Six months later, the National Academies of Sciences Engineering Medicine issued a statement condemning the Family Separation Campaign and warning that "[y]oung children who are separated from their primary caregivers may potentially suffer mental health disorders and other adverse outcomes over the course of their lives."[52] Due to "complex interactions among genetic, biological, psychological, and social processes" a traumatic event "such as family disruption" impairs "healthy development and increases the risk of for future disorders" including "suicidal behavior."

123.   This Court likewise catalogued the evidence showing that the Family Separation Campaign caused irreparable harm, "agonizing for the parents who have endured them" and creating "a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." *Ms. L.*, No. 3:18-cv-000428-DMS-MDD, ECF No. 83 at 19.

124.   Studies have only since proved the long-term debilitating impacts the Family Separation Campaign inflicted.

### 5. Despite the Warnings, MVM Continued to Enable the Family Separation Campaign.

125.   Despite months of public condemnation of the Family Separation Campaign, MVM agreed in September 2017 to take on *more* unaccompanied minor transportation services through a one-year delivery order under its contract with ICE.

---

https://downloads.aap.org/DOFA/AAP%20Letter%20to%20Secretary%20Nielsen%20Meeting%20Request%2001-11-18.pdf.

[52] Marcia McNutt et al., *Statement on Harmful Consequences of Separating Families at the US Border*, Nat'l Acads. of Scis., Eng'g, & Med. (Jun. 20, 2018), https://www.nationalacademies.org/news/2018/06/statement-on-harmful-consequences-of-separating-families-at-the-us-border#:~:text=We%20urge%20the%20U.S.%20Department,based%20on%20human%20rights%20considerations.

1 It then agreed to provide $19 million in services months later in January 2018.

2     126.  And less than two weeks after the plaintiffs in *Ms. L.* filed the widely
3 publicized litigation to enjoin family separations on February 26, 2018, MVM agreed
4 to provide up to $5.7 million in additional transportation services.

5     127.  MVM agreed to provide another $5.35 million worth of child
6 transportation services the following month on April 20, 2018, and another $9 million
7 on May 24, 2018—covering a period when thousands of children were abducted from
8 their parents.

9     128.  In early June 2018, MVM's use of commercial airlines to transport
10 separated children around the country sparked a backlash from the airline industry.
11 American, Frontier, and United all issued statements refusing to participate in the
12 Family Separation Campaign. American Airlines stated: "We have no desire to be
13 associated with separating families, or worse, to profit from it." Frontier stated: "we
14 will not knowingly allow our flights to be used to transport migrant children away from
15 their families."

16     129.  MVM had no such concerns. Instead, it posted job listings for various
17 roles such as "youth travel escort[s]" on June 11, 2018. The qualifications for these
18 roles were threadbare. There was no requirement that the individual be trained in
19 childcare or trauma-informed services or possess other appropriate experiences
20 unique to vulnerable children, much less abducted children.

21     130.  Meanwhile, these employees were transporting abducted children
22 sometimes thousands of miles away from their parents, often involving lengthy,
23 arduous, and traumatic journeys.

24     131.  After further public outcry directed specifically at MVM for separating
25 families, MVM "removed job postings related to readiness operations under the
26 current zero tolerance policy." Embarrassed, MVM falsely claimed it "has not
27 pursued any new contracts associated with undocumented families and children since

28

the implementation of the current policy." It later clarified that this statement referred to shelters, not transportation—which continued unabated throughout the Class Period.

132. MVM continued to transport and harbor abducted Class Members even at the height of public condemnation. For example, on June 9, 2018, the *Washington Post* published an article titled, *A family was separated at the border, and this distraught father took his own life*.[53] The article details how a Honduran father strangled himself in DHS custody after he was separated from his wife and 3-year-old son. The family was apprehended by Border Patrol after crossing the Rio Grande in Texas. The father was so distraught the Border Patrol "had to use physical force to take the child out of his hands." The next morning, he was found hanged to death.

133. No matter. MVM still persisted in transporting abducted children, even after this Court issued a preliminary injunction in *Ms. L.* on June 26, 2018.

134. A July 2019 motion filed in *Ms. L* asked the Court to block the Trump administration from continuing to separate hundreds of families in defiance of the previous injunction.[54] According to DHS and HHS information, at least 1,142 children—including babies—were separated from their parents *after* the injunction.[55]

---

[53] Nick Miroff, *A Family Was Separated at the Border, and This Distraught Father Took His Own Life*, Wash. Post (June. 9, 2018, 7:00 AM EDT), https://www.washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html

[54] Press Release, ACLU, *ACLU Asks Federal Court to Halt Unlawful Ongoing Family Separations* (Jul. 30, 2019, 11:45 AM), https://www.aclu.org/press-releases/aclu-asks-federal-court-halt-unlawful-ongoing-family-separations.

[55] Hajar Habbach et al., *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation*, Physicians for Hum. Rts. (Feb. 25, 2020), https://phr.org/our-work/resources/you-will-never-see-your-child-again-the-persistent-psychological-effects-of-family-separation/.

135.   The horror stories did not prevent MVM from seeking more lucrative contracts. In July 2019, ICE solicited bids for another five-year contract to transport unaccompanied minors, broadcasting its vast transportation needs in a leaked draft RFP.

136.   ICE estimated that the contractor—singular, not plural—would transport 225,000 unaccompanied minors from "'infants to 17 years of age,' as well as adults with families, and will be responsible for everything from buying plane tickets to supplying food, clothing, and procuring healthcare while in transit."[56]

137.   The final solicitation confirmed that "ICE estimates that approximately 60,000 commercial airline tickets will be acquired by the [c]ontractor," in addition to ground transport.

138.   MVM sought the work and won the contract. The contract had an obligated award amount of over $780 million, with over $60 million of services provided from March 2020 through January 2021.

139.   In August 2020, public reporting widely condemned MVM for holding children at hotel chains, again in violation of its internal policies and the terms of its contract with ICE.[57]

---

[56] Justin Rohrlich & Heather Timmons, *ICE Plans to Transport 225,000 Immigrant Kids to Shelters Over the Next Five Years*, Quartz (May 16, 2019), https://qz.com/1620064/ice-plans-to-transport-225000-immigrant-kids#:~:text=Over%20the%20course%20of%20a,procuring%20healthcare%20while%20in%20transit.

[57] Caitlin Dickerson, *A Private Security Company is Detaining Migrant Children at Hotels*, N.Y. Times (Oct. 21, 2020), https://www.nytimes.com/2020/08/16/us/migrant-children-hotels-coronavirus.html#:~:text=108-,A%20Private%20Security%20Company%20Is%20Detaining%20Migrant%20Children%20at%20Hotels,and%20families%20before%20expelling%20them.

**CLASS ACTION COMPLAINT**

140.   "A transportation vendor should not be in charge of changing the diaper of a 1-year old, giving bottles to babies or dealing with the traumatic effects they might be dealing with," said Andrew Lorenzen-Strait, an ICE official who worked with MVM during his time at the agency.[58]

### III.   MVM Forcibly Separates Plaintiffs Padre and Junior.

141.   MVM willingly carried out the separation of Plaintiffs and the Class Members despite knowing that the Family Separation Campaign was unlawful, contrary to child welfare, and cruel and degrading.

142.   Padre and his son, Junior, fled Guatemala and the constant fear that Junior would be forcibly recruited into gangs under threat of violence. To avoid that fate, they made the difficult journey to seek asylum in the United States.

143.   On or around November 3, 2017, Padre and Junior crossed the U.S. border between ports of entry near Tecate, California, intending to seek asylum. At the time, Junior was sixteen years old.

144.   Shortly after crossing the border, Padre and Junior were apprehended by Border Patrol. They were detained at the Forrest Gate Processing Center in Campo, California. There they were placed into a cramped cell referred to as an "icebox," a short-term holding facility known for its bitterly cold temperatures. They were held with other migrants, including women with small children.

145.   In the icebox, a non-uniformed woman entered the room without identifying herself and announced that she was taking the children away.

146.   The woman called out each child's name, including Junior, separating each one from their parent. The children were crying, screaming, and begging not to be separated. The woman tore the small children out of their mothers' arms, kicking and screaming.

---

[58] *Id.*

147. The woman did not communicate where she was taking the children, why they were being separated, or how they could remain in contact. She falsely assured Padre and the other parents that they would be reunited with their children in two days.

148. Junior was terrified. He was put into a small, windowless cell with other minors of a similar age. No information was provided to Junior about where he was being taken or why he was separated from his father.

149. Meanwhile, Padre continued to be held in Border Patrol custody. Two days passed with no word on his son's welfare or whereabouts. Then Padre was transferred to the Otay Mesa Detention Center in San Diego, California.

150. Padre was never prosecuted for any crime and never transferred out of immigration detention until, on or around December 26, 2017, he was removed to Guatemala without his son.

151. Padre was never given a hearing of any sort to determine whether he was unfit or posed a danger to his son. To the contrary, DHS records indicated that he had no criminal history and posed no risk of communicable disease or other threat to health or safety. He was never given an opportunity to contest the separation. He was not even informed that he was losing custody of his child. His son vanished and his parental rights were summarily extinguished.

152. Back at the Border Patrol facility, Junior remained in the windowless cell for what seemed like several days. Then, Junior was removed from the cell and brought to a patrol car. Junior pleaded to be reunited with his father. The authorities assured him that they would. Once in the car, Junior was not told where he was being taken, but eventually arrived at the San Diego Airport.

153. At the airport, Junior was transferred to the custody of two MVM employees, along with a 16-year-old girl and two toddlers who were around three or four years old. The MVM employees falsely promised the children that they were

being brought to their parents.

154. The MVM employees led the children to the gate. They forced the toddlers to get through the airport without offering any assistance. Junior and the other teenager—who were complete strangers—had to carry them.

155. The MVM employees forced them to board an aircraft without telling them their destination.

156. The toddlers were sobbing uncontrollably, crying out "mommy" and "daddy." The MVM employees made no effort to calm or console them.

157. On the aircraft, the children were seated several rows ahead of the MVM employees and were given no care or assistance by the employees. Junior attempted to attend to the toddlers himself.

158. The flight lasted hours. On several occasions, Junior asked the escorts where he was being taken. But they only repeated the false promise that he was being taken to his father.

159. After landing, the MVM employees escorted the children off the plane and out of the airport. Another MVM employee arrived and took the two sobbing toddlers away. The other MVM employees drove Junior and the 16-year-old girl away in an unmarked car.

160. As they drove, Junior saw the city skyline and a sign saying "Manhattan." He learned for the first time that he was in New York—over 2,000 miles away from his father. Junior asked the escorts to confirm that he was in New York, but they refused. They claimed the children would receive more information about their parents at the next location.

161. Finally, the car arrived at a small, unidentified house that had an office inside. The escorts told Junior to get out of the car and go inside to hear news about his father. Then they left.

**CLASS ACTION COMPLAINT**

162.   Once inside, Junior began sobbing and explained to the man inside that he needed to find his father. The man said he had no information about Junior's father. Instead, the man explained that Junior would be taken to a shelter called Lincoln Hall Boys Haven.

163.   Junior was held in the house for roughly a week with several other minors. Junior still had no idea what was happening to him or where his father was located. Junior was so scared and agonized, he could not sleep.

164.   Eventually, Junior was brought to Lincoln Hall. For several weeks, he was there *incommunicado*, with no way to communicate with his family. His family was not informed of his whereabouts.

165.   He was finally allowed a fifteen-minute phone call to his mother in Guatemala. His mother had no idea what had happened and did not know where his father was. The call cut off before he could say goodbye.

166.   Weeks later, Junior learned that his father had been removed to Guatemala. He pleaded with his caseworker to help him get back to his father, but the social worker told him there was nothing she could do. He lost hope of ever seeing his father again and felt near constant devastation. He struggled with sleep and felt hopeless, highly vigilant, and unsafe.

167.   On February 10, 2018, Junior was released by ORR to live with an uncle, whom he had never met before, in San Diego.

168.   Nearly six years after his forced separation from his father, Junior was finally reunified with his father on or around July 20, 2023, after Padre received a grant of parole through the *Ms. L.* litigation and re-entered the United States.

169.   Padre's separation from his son caused him severe distress, humiliation, and emotional pain and suffering. Padre still struggles with the trauma of the disappearance of his son.

**CLASS ACTION COMPLAINT**

170.    Junior's forcible separation and inability to reunite with his father caused him to suffer severe distress, loss of dignity, and emotional pain and suffering. He still struggles with the ongoing trauma.

### IV.    Family Separation Is a Form of Psychological Torture.

171.    The forcible separation of children from their parents, under coercive circumstances and without knowledge of their whereabouts and well-being, constitutes a form of psychological torture.

172.    The Family Separation Campaign deliberately inflicted mental suffering on children to deter their parents, or other adults, from migrating to the United States. That suffering—the infliction of fear and anxiety—was the intended consequence of the Family Separation Campaign and the desired deterrent effect.

173.    That mental suffering was particularly severe and prolonged for MVM's child victims. Scientific literature confirms that coercive family separation can have lasting effects on a child's psychological health, brain development, and neurological functioning.[59]

174.    Children who experience such trauma during their formative years are at a significantly elevated risk of developing lasting mental health problems, including post-traumatic stress disorder (PTSD), mood disorders, anxiety disorders, learning disorders, and personality disorders. Such children can manifest behavioral problems such as fearfulness, nervousness, restlessness, and impulsivity. Children can also manifest depression, an inability to feel happiness or pleasure, changes in appetite or weight, panic, excessive worry, difficulty concentrating, insomnia, fatigue, disassociation and emotional numbness, intrusive thoughts, nightmares, muscle tension, feelings of guilt or worthlessness, and suicidal ideation.

---

[59] Kathryn Hampton et al., *The Psychological Effects of Forced Family Separation on Asylum-seeking Children and Parents at the US-Mexico Border: A Qualitative Analysis of Medico-legal Documents*, PLOS One (Nov. 24, 2021), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0259576.

175.   Exposure to such childhood trauma is associated with deleterious psycho-social outcomes, including increased risk of self-harm, substance abuse, domestic violence, and suicide. Childhood trauma can lead to functional impairment of social skills, including isolation, unstable relationships, and a heightened vulnerability to further trauma or victimization. It can also impair the brain's executive control and emotional regulation, placing the individual in a maladaptive, prolonged fight or flight mode.

176.   Scientific literature shows that even temporary coercive separation can trigger psychiatric symptoms in children—and even physiological changes—that persist through adulthood. For example, a study of traumatic separations experienced by children during World War II found that survivors had elevated levels of the cortisol stress hormone nearly 60 years later.[60] Such separations can impair the child's central nervous system from effectively responding to and recovering from stress. That impairment can be lifelong.

177.   Padre and the Class Member parents of disappeared children also endured profound and sustained mental suffering. By being forcibly and arbitrarily deprived of custody of their children, they were stripped of human dignity and reduced to a degrading state of powerlessness.

178.   Scientific literature reveals that forms of psychological torture—such as the Family Separation Campaign—are capable of inflicting harm equally severe and long-lasting as torture techniques that produce physical pain. As one psychiatric study concluded: "Ill treatment during captivity," including "psychological manipulations" and "humiliating treatment . . . does not seem to be substantially different from physical torture in terms of the severity of mental suffering they cause,

---

[60] Anu-Katriina Pesonen et al., *Childhood Separation Experience Predicts HPA Axis Hormonal Responses in Late Adulthood: A Natural Experiment of World War II*, Psychoneuroendocrinology, Vol. 35, Issue 5, 758 (2010), https://pubmed.ncbi.nlm.nih.gov/19963324/.

1  the underlying mechanism of traumatic stress, and their long-term psychological

2  outcome."[61]

3      179.  For Plaintiffs and the Class, such trauma is compounded by the practice

4  of enforced disappearance—being deprived of information on where one's loved ones

5  are, whether they are alive and well, and whether or when they will be returned.

6  **CLASS ALLEGATIONS**

7      180.  Plaintiffs bring this action on behalf of themselves and all others similarly

8  situated pursuant to Federal Rule of Civil Procedure 23 as representatives of a Class

9  defined as follows:

> All persons who were eligible for inclusion as class members
> of the Settlement Class certified in *Ms. L. v. I.C.E.* and were
> separated from their parents or child between March 7,
> 2017 and January 1, 2021.[62]

13      181.  The Class is so numerous that joinder of all members is impracticable.

14  The estimated number of Class Members is over 6,000.

15      182.  Plaintiffs' claims are typical of the Class.

16      183.  Plaintiffs and all members of the Class suffered the same common injury

17  of being separated from their children or parents, as a result of the same unlawful

18  conduct by MVM and its accomplices and co-conspirators pursuant to the Family

19  Separation Campaign.

20      184.  The members of the Class are ascertainable—including names,

21  identities, and contact information contained in records produced or generated in the

22  *Ms. L.* litigation and settlement administration, maintained by the Court-appointed

---

[61] Metin Başoğlu et al., *Torture vs Other Cruel, Inhuman, and Degrading Treatment Is
the Distinction Real or Apparent?* Arch Gen Psychiatry, Vol. 64, No. 3, 277 (Mar.
2007), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/482225.

[62] *See Ms. L.*, No. 3:18-cv-000428-DMS-AHG, ECF No. 727 (order granting final
approval of settlement agreement and certifying the settlement classes as defined in
the Settlement Agreement at ECF No. 721-1 at 3–4).

**CLASS ACTION COMPLAINT**

Steering Committee and the government's Family Reunification Task Force, a U.S. interagency task force created through Executive Order to facilitate and enable reunifications of each separated families. In addition, the identities of children transported by MVM pursuant to the Family Separation Campaign are in the possession or control of Defendant.

185.   Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be particular to individual class members, since MVM has acted on grounds generally applicable to the Class.

186.   Questions of law and fact common to the Class include, but are not limited to:

a. Whether MVM intentionally participated in the Family Separation Campaign;

b. Whether MVM knowingly and substantially aided and abetted the Family Separation Campaign by transporting separated children;

c. Whether the U.S. government and MVM conspired to carry out the Family Separation Campaign;

d. Whether, as part of the Family Separation Campaign, the U.S. government forcibly separated Class Members from their parents and children and maintained that separation without a hearing and determination that the parents were unfit or presented a danger to their children;

e. Whether the Family Separation Campaign violated Class Members' right to safe conduct and the minimum standard of treatment of foreign nationals under international law;

f. Whether the Family Separation Campaign constituted an enforced disappearance under international law;

g.  Whether the Family Separation Campaign constituted torture under international law;

h.  Whether the Family Separation Campaign constituted cruel, inhuman, or degrading treatment under international law;

i.  Whether the Family Separation Campaign violated Class Members' right to family integrity under the Due Process Clause;

j.  Whether the Family Separation Campaign constituted the tort of child abduction or interference with parent-child relations;

k.  Whether the Class Members suffered a common injury, namely separation from their parents or children;

l.  Whether MVM's transportation and escort services caused or contributed to the separation of Class Members from their parents and children;

m. Whether Class Members experienced an affront to human dignity as a result of the Family Separation Campaign;

n.  Whether Class Members are entitled to general or presumed damages for the affront to human dignity caused by the Family Separation Campaign;

o.  The proper measure of damages; and

p.  The contours of appropriate equitable relief to remediate the effects of the challenged conduct.

## CAUSES OF ACTION

### COUNT I – VIOLATIONS OF SAFE CONDUCT
### ALIEN TORT STATUTE, 28 U.S.C. § 1350

187. Plaintiffs reallege and reincorporate by reference the preceding paragraphs.

188.   The acts alleged herein, from March 7, 2017 to January 1, 2021, constitute violations of safe conducts under customary international law as reflected and expressed in international instruments, international and domestic judicial decisions, and other authorities.

189.   Under contemporary customary international law, as well as the "law of nations" in force at the time of the Alien Tort Statute's enactment in 1789, foreign nationals from allied, friendly, or neutral nations are entitled to protection of their person and property, to due process, to equal treatment as nationals, and to a minimum standard of treatment.

190.   Plaintiffs and the Class Members are nationals of allied, friendly, or neutral states that are not at war with the United States.

191.   Defendant intentionally and knowingly participated in, conspired in, and aided and abetted the violations of safe conduct alleged herein.

192.   Defendant's acts alleged herein violated safe conducts by interfering with Plaintiffs' and Class Members' rights to bodily and family integrity without due process, in violation of the international minimum standard of treatment of foreign nationals.

193.   Defendant's acts alleged herein also violated safe conducts by depriving Plaintiffs and the Class of the basic protections of family law accorded to U.S. nationals, in violation of the principle of equal treatment required under customary international law. Depriving parents of the care and custody of their child absent a prior finding of unfitness is a violation of fundamental rights under the 5th and 14th Amendments of the U.S. Constitution. *See Troxel v. Granville*, 530 U.S. 57 (2000). It is also a violation of the "best interests of the child" standard enshrined in customary international law, as reflected in international treaties, judicial decisions, and other authorities.

194.   Defendant's actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

195.   Defendant acted willfully, callously, and wantonly and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

## COUNT II – ENFORCED DISAPPEARANCE
## ALIEN TORT STATUTE, 28 U.S.C. § 1350

196.   Plaintiffs reallege and reincorporate the preceding paragraphs.

197.   The acts alleged herein constitute enforced disappearance in violation of customary international law as reflected and expressed in international instruments, international and domestic judicial decisions, and other authorities.

198.   Under customary international law, enforced disappearance is the deprivation of an individual's liberty by agents of the State ostensibly under law, followed by the refusal or incapacity of the State to explain what occurred to the victim or to provide information regarding his or her whereabouts.

199.   Defendant intentionally and knowingly participated in, conspired in, and aided and abetted the enforced disappearance of Plaintiffs and the Class.

200.   Defendant's actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

201.   Defendant acted willfully, callously, and wantonly and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

202.   The forcible separation of families alleged herein were continuing violations that did not cease until the reunification of the family.

## COUNT III – TORTURE
## ALIEN TORT STATUTE, 28 U.S.C. § 1350

203.   Plaintiffs reallege and reincorporate the preceding paragraphs.

204. The acts alleged herein constitute torture in violation of customary international law and *jus cogens* as reflected and expressed in the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("Convention Against Torture") and other international instruments, international and domestic judicial decisions, and other authorities.

205. Defendant intentionally and knowingly participated in, conspired in, and aided and abetted the infliction of severe mental suffering on Plaintiffs and the Class.

206. The Administration's public statements as early as January 2017 reveal that cruelty and harm to children and their parents was the specifically intended consequence of the Family Separation Campaign.

207. This deliberate suffering was inflicted for the specific purpose of punishing Plaintiffs and the Class for attempting to migrate to the United States and to intimidate and coerce other families from following suit.

208. The Family Separation Campaign was also disproportionately applied to families crossing the Southern border and was discriminatorily aimed at intimidating migrants from Central American states.

209. This suffering was inflicted by public officials and by MVM in coordination with public officials.

210. This suffering was not inherent in or incidental to lawful sanctions.

211. Defendant's actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

212. Defendant acted willfully, callously, and wantonly and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

213. The forcible separation of families alleged herein were continuing violations that did not cease until the reunification of the family.

**CLASS ACTION COMPLAINT**

## COUNT IV – CRUEL, INHUMAN, OR DEGRADING TREATMENT
### ALIEN TORT STATUTE, 28 U.S.C. § 1350

214.   Plaintiffs reallege and reincorporate the preceding paragraphs.

215.   The acts alleged herein constitute cruel, inhuman, or degrading treatment in violation of customary international law as reflected and expressed in the Convention Against Torture and other international instruments, international and domestic judicial decisions, and other authorities.

216.   Defendant intentionally and knowingly participated in, conspired in, and aided and abetted the cruel, inhuman, or degrading treatment of Plaintiffs and the Class.

217.   Defendant's actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

218.   Defendant acted willfully, callously, and wantonly and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

219.   The forcible separation of families alleged herein were continuing violations that did not cease until the reunification of the family.

### COUNT V – CIVIL RIGHTS CONSPIRACY
### 42 U.S.C. § 1985

220.   Plaintiffs reallege and reincorporate the preceding paragraphs.

221.   By agreeing with the U.S. government and its agents to transport children abducted from their parents without due process and on the basis of their race, ethnicity, alienage, or national origin, Defendant conspired to deprive Plaintiffs and the Class of the equal protection of the laws of the United States and of constitutionally protected liberty interests in family integrity, in violation of 42 U.S.C. § 1985(3).

**CLASS ACTION COMPLAINT**

222.   Defendant's actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

223.   Defendant acted willfully, callously, and wantonly and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

224.   The forcible separation of families alleged herein were continuing violations that did not cease until the reunification of the family.

## COUNT VI – FAILURE TO PREVENT CIVIL RIGHTS CONSPIRACY
## 42 U.S.C. § 1986

225.   Plaintiffs reallege and reincorporate the preceding paragraphs.

226.   Having knowledge of the conspiracy to violate the civil rights of Plaintiffs and the Class, as alleged above in Count IV, Defendant willfully or negligently failed to take reasonable and available efforts to prevent the wrongful acts alleged herein, in violation of 42 U.S.C. § 1986.

227.   Defendant's actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

228.   Defendant acted willfully, callously, and wantonly and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

229.   The forcible separation of families alleged herein were continuing violations that did not cease until the reunification of the family.

## COUNT VII – CHILD ABDUCTION AND INTERFERENCE WITH
## PARENT-CHILD RELATIONS
## CAL. CIV. CODE § 49(A) AND COMMON LAW

230.   Plaintiffs reallege and reincorporate the preceding paragraphs.

231.   Defendant willfully and knowingly abducted, harbored, concealed, and carried away all Class Members who were minor children at the time of separation,

**CLASS ACTION COMPLAINT**

1 | including Plaintiff Junior.

2 | 232.   Defendant also conspired with DHS agents to abduct, harbor, conceal,

3 | and carry out all Class Members who were minor children at the time of separation,

4 | including Plaintiff Junior.

5 | 233.   Defendant's actions alleged herein violated both Cal. Civ. Code § 49(a),

6 | which prohibits the "abduction or enticement of a child from a parent, or from a

7 | guardian entitled to its custody," as well as the common law right to freedom from

8 | tortious interference with parent-child relations.

9 | 234.   Defendant's actions substantially and proximately caused or contributed

10 | to Plaintiffs' and Class Members' injuries, including but not limited to harm to human

11 | dignity, loss of liberty, humiliation, fear, and emotional distress.

12 | 235.   Defendant acted willfully, callously, and wantonly and Plaintiffs and the

13 | Class are entitled to an award of compensatory and punitive damages.

14 | 236.   The forcible separations of families alleged herein were continuing

15 | violations that did not cease until the reunification of the family.

16 | ## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL

17 | ## DISTRESS

18 | 237.   Plaintiffs reallege and reincorporate the preceding paragraphs.

19 | 238.   Defendant willfully agreed to carry out the Family Separation Campaign

20 | knowing it was intended to deter immigration and terrorize migrants through state-

21 | sanctioned kidnapping.

22 | 239.   Defendant's transportation of abducted children was extreme,

23 | outrageous, and designed to inflict severe emotional distress on Plaintiffs and Class

24 | Members to achieve a deterrent effect.

25 | 240.   Defendants' actions were a substantial factor in causing Plaintiffs' and

26 | Class Members' emotional distress. As a result, Plaintiffs and Class Members suffered

27 | damages, including but not limited to harm to human dignity, loss of liberty,

28 |

1 | humiliation, fear, and emotional distress.

2 | 241. Defendant acted willfully, callously, and wantonly and Plaintiffs and the

3 | Class are entitled to an award of compensatory and punitive damages.

4 | 242. The forcible separation of families alleged herein were continuing

5 | violations that did not cease until the reunification of the family.

6 | **PRAYER FOR RELIEF**

7 | 243. Plaintiffs and the Class Members pray for judgments against the

8 | Defendant and for the awarding of:

a. Compensatory general damages for the violations of the human and civil rights of all Plaintiffs and Class Members, in an amount to be determined at trial;

b. Compensatory special damages for aggravating injuries suffered by Plaintiffs and Class Members, in an amount to be determined at trial;

c. Punitive damages for all Plaintiffs and Class Members, in an amount to be determined at trial;

d. Pre-judgment and post-judgment interest;

e. Costs of suit, including attorneys' fees;

f. Equitable relief in the form of a rehabilitation fund to provide for mental health, education, child development, and other services for the benefit of Class Members; and

g. Such other relief as the Court may deem just and proper.

Dated: July 23, 2024.      Respectfully Submitted,

*/s/Scott A. Gilmore*
Scott A. Gilmore (SBN 284961)
Amanda Lee-DasGupta* (D.C. Bar No. 1619712)
Mary S. Van Houten Harper* (D.C. Bar No. 1045137)

Amanda V. Boltax (D.C. Bar No.
90013893)
**Hausfeld LLP**
888 16th Street N.W., Suite 300
Washington, DC 20006
(202) 540-7200
sgilmore@hausfeld.com
alee@hausfeld.com
mvanhouten@hausfeld.com
mboltax@hausfeld.com

Paul L. Hoffman (SBN 71244)
John C. Washington (SBN 315991)
**Schonbrun Seplow Harris Hoffman &
Zeldes LLP**
200 Pier Avenue, Suite 226
Hermosa Beach, California 90254
(310) 717-7373
hoffpaul@aol.com
jwashington@sshhzlaw.com

Katie Beran* (PA Bar No. 313872)
**Hausfeld LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3270
kberan@hausfeld.com

James Gotz* (MA Bar No. 567157)
**Hausfeld LLP**
One Marina Park Drive, Suite 14010
Boston, MA 02210
(617) 207-0600
jgotz@hausfeld.com

Ashley Crooks* (N.Y. Bar No.
5800776)
**Hausfeld LLP**
33 Whitehall Street, 14th Floor

New York, NY 10004
(646) 357-1100
acrooks@hausfeld.com

Andrew Fels* (TN 36005)
**Al Otro Lado**
3214 Fountain Park Blvd.
Knoxville, TN 37917
(865)-567-4881
andrew@alotrolado.com

Erin Anderson* (MN 0504518)
**Al Otro Lado**
10413 Nicollet Circle
Bloomington MN 55420
(323)-681-5422
erin@alotrolado.org

Natalie Cadwalader-Schultheis*
(TX 24106408)
**Al Otro Lado**
150 S Eastbourne Ave, Apt. A7
Tucson, AZ 85716
(323) 423-5310
natalie.cadwalader@alotrolado.org

*Attorneys for Plaintiffs*

*\* pro hac vice pending*