Amanda Lee-DasGupta (D.C. Bar No. 1619712)*
Mary S. Van Houten Harper (D.C. Bar No. 1045137)*
Mandy V. Boltax (D.C. Bar No. 90013893)*
Shana R. Herman (D.C. Bar No. 337541)*
**Hausfeld LLP**
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
alee@hausfeld.com
mvanhouten@hausfeld.com
mboltax@hausfeld.com
sherman@hausfeld.com

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Padre (*alias*), Junior (*alias*), I.V.S. (*alias*) and A.V.L. (*alias*), by and through I.V.S. *on behalf of themselves and all others similarly situated*,<br><br>*Plaintiffs*,<br>v.<br><br>MVM, Inc.,<br><br>*Defendant*. | Case No.: 3:24-cv-01265-DMS-AHG<br><br>**DECLARATION OF SHANA R. HERMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. Dana M. Sabraw<br>Courtroom: 13A |

I, Shana R. Herman, hereby certify under penalty of perjury, that the following is true and correct and within my personal knowledge:

1. I am over the age of 18, have personal knowledge of all facts contained in this affidavit, and am competent to testify as a witness to those facts.

2. I am an attorney admitted to practice in the District of Columbia and am admitted *pro hac vice* in the above-captioned matter. I am an Associate at Hausfeld LLP, 1200 17th Street NW, Suite 600, Washington, D.C. 20036.

3. I make this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.

4. Attached as **Exhibit A** is a true and accurate copy of the proposed Settlement Agreement between Plaintiffs and MVM, Inc. ("MVM").

5. Attached as **Exhibit B** is a true and accurate copy of the proposed Supplemental Agreement between Plaintiffs and MVM.

6. Attached as **Exhibit C** is a true and accurate copy of the Mediator Statement.

7. Attached as **Exhibit D** is a true and accurate copy of the proposed Settlement Allocation Plan.

8. Attached as **Exhibit E** is a true and accurate copy of the Joint Affidavit of Dylan Gee, Ph.D., Andrew Rasmussen, Ph.D., and Barry Rosenfeld, Ph.D. in Support of Settlement Allocation Plan.

9. Attached as **Exhibit F** is a true and accurate copy of the Declaration of Gina Intrepido-Bowden Regarding Notice Program.

10. Attached as **Exhibit G** is a true and accurate copy of the Hausfeld Firm Resume.

11. I and the other attorneys at my firm who have worked on this case are experienced attorneys who have litigated many prior complex class actions such as this

one. We have successfully resolved many of those cases in districts within this Circuit. We have brought that experience and knowledge to bear on behalf of the Class and in this proposed Settlement. As described below, the negotiations leading to the Settlement with MVM were vigorous, informed, and thorough, and occurred over a span of many months. The parties conducted their negotiations in good faith under the supervision of the Honorable Allison H. Goddard, a United States Magistrate Judge for this Court.

12. Class Counsel believe that the proposed Settlement provides fair compensation to the Settlement Class and that the Settlement amount is adequate and reasonable. Plaintiffs maintain that the liability claims for violations under the Alien Tort Statute, civil rights statutes, and California state laws are strong, given MVM's alleged role in facilitating the separation of migrant families pursuant to the unlawful Family Separation Campaign. MVM disputed Plaintiffs' claims against it by vigorously opposing the lack of joinder of the Government and maintaining that it was acting pursuant to its contractual obligations. MVM has refuted liability altogether.

13. With this Settlement having been achieved only two years after Plaintiffs filed their initial complaint and prior to significant fact discovery, briefing and disputes involving class certification and summary judgment, and trial preparation, this result has saved years in litigation and related expenses for the Parties. Even if Plaintiffs obtained class certification, successfully opposed a motion for summary judgment, and subsequently proved liability at trial, they still would face the significant risk of uncertain recovery for the Class because the fact and amount of damages are uncertain.

14. The timing of this Settlement also minimizes further trauma to the Class Representatives and Class Members by avoiding the adversarial process of requiring witnesses to recount and be interrogated about their experiences, at deposition and trial, as well as the risk of having testimony and personal documents publicized. The timing also allows for Class Counsel and the Settlement Administrator to utilize third-party

resources that are uniquely connected to the Settlement Class given the parallel litigation of *Ms. L. v. U.S. Immigration & Customs Enforcement*, No. 18-cv-00428-DMS-AHG (S.D. Cal.) ("*Ms. L.*"), and that would possibly no longer be available if the Parties continued to litigate the case.

15. The Settlement was achieved only after aggressive litigation, significant discovery and development of the case, and prolonged, well-informed, and extensive arm's-length negotiations.

16. Following an April 11, 2025 Case Management Conference before Judge Goddard, the Plaintiffs began engaging in fact discovery, including conducting extensive forensic collections, document review, and productions for the Named Plaintiffs. MVM likewise completed class certification-related document productions. Among other things, Class Counsel have engaged in extensive motion practice across two rounds of dismissal briefing, overseen thorough forensic collections and document review, successfully advocated for MVM's production of documents concerning its government contracts, executed third-party subpoenas for evidence, and coordinated with subject matter experts pertinent to Plaintiffs' claims.

17. This discovery and motion practice has given Class Counsel more than sufficient information to evaluate the Plaintiffs' claims. In light of Class Counsel's significant investigation, discovery, research, and work with experts throughout the litigation, Class Counsel is well-positioned to make an informed decision as to the value of the Settlement compared to the risks of continued litigation.

18. The Settlement negotiations included numerous conferences between the Parties' counsel, which were supervised by Judge Goddard.

19. In March 2026, the Parties exchanged comprehensive mediation briefs in advance of a two-day in-person Settlement Conference before Judge Goddard, which the Named Plaintiffs virtually attended. Class Counsel attended the session in person

and prepared video testimony from Plaintiffs that Class Counsel played during a detailed presentation concerning settlement. The Parties were unable to reach agreement at that session but continued negotiating over the following months with the assistance of Judge Goddard. On June 19, 2026, Judge Goddard issued a mediator's proposal. On July 13, 2026, Plaintiffs and MVM accepted the proposal and reached an agreement in principle to settle the case for $48,750,000.00. The Settlement Agreement was negotiated over multiple in-person, video conference, and telephonic mediation sessions, which Judge Goddard oversaw. The Parties ultimately signed the Settlement Agreement now before the Court on August 20, 2026.

20. The proposed Settlement Class refers to the approximately 8,900 individual parents and children who were allegedly separated pursuant to a federal government campaign that aimed to deter immigration to the United States by abducting migrant children from their parents ("Family Separation Campaign").

21. The Department of Homeland Security (DHS) and the International Organization for Migration (IOM), one of the non-profit entities that were subcontracted by the government to administer the related *Ms. L.* ("Benefit Administrators") possess contact information for the largest number of proposed Class Members. Every class member who registered for inclusion in the *Ms. L.* settlement was asked to provide contact information to DHS and/or IOM. Two other Benefit Administrators, Acacia and Seneca, also retains contact information for a portion of the proposed Class Members. After corresponding with DHS and the Benefit Administrators, Plaintiffs served subpoenas on DHS, Acacia, and Seneca on August 26, 2026, August 27, 2026, and August 28, 2026, respectively. After receiving the subpoena, DHS agreed to provide all *Ms. L.* class contact information in its and IOM's possession, upon receiving a court order requiring them to do so. DHS also agreed to work with other government agencies to determine whether Seneca and Acacia could provide the contact information in their

possession. On September 18, 2026, DHS confirmed that HHS would consent to Seneca releasing the *Ms. L.* contact information, subject to the protective orders in *Ms. L.* and this Action. Class Counsel is in the process of working with Seneca to obtain this data. Class Counsel and DHS are still working to obtain permission for Acacia to release the contact information for proposed Class Members that it maintains. Further, Al Otro Lado, a legal services provider in the *Ms. L.* settlement, has also provided contact information for almost 500 proposed Settlement Class Members. Class Counsel will ensure that JND receives all of this contact information so that they can synthesize it and use it for direct notice to proposed Class Members.

22. The Settlement Fund will be used to pay for (i) Notice and Settlement Administration Costs; (ii) Service Awards approved by the Court; (iii) Attorneys' Fees and Expenses approved by the Court; (iv) Settlement benefits for the Settlement Class Members, and (v) any expenses, taxes, and tax-related expenses related to the maintenance of the Escrow Account.

23. Settlement Agreement provides that Class Counsel may withdraw funds as necessary for notice and administration from the Settlement Fund up to $1,000,000.

24. MVM has never promised the Class Representatives preferential treatment in exchange for the Settlement.

25. Class Counsel has worked to design a Settlement Allocation Plan that will exhaust the Settlement Fund. Following allocation of payments to verified Class Members for Baseline, Criteria-Based and Extraordinary Injury claims, residual funds will be distributed *pro rata* across verified Settlement Class Members. Where not feasible given the remaining Settlement Fund balance, or if an additional distribution is made and there are funds remaining after, Plaintiffs plan to distribute any residual funds by mutual agreement of the Parties to a Court-approved *cy pres* recipient.

26. All Settlement Class Member awards may be subject to a *pro rata* adjustment, depending on the number of valid claims and the value of all cash payments claimed.

27. As part of the claims process, the Claim Form will be a user-friendly dynamic webpage, available in English and Spanish and accessible on any smart phone, whereby Class Members will respond to a few questions regarding their separation by selecting relevant options from drop-down menus.

28. After the Settlement Administrator finalizes the points and dollar value attributed to each Class Member, Class Counsel will submit a motion to the Court seeking an order for disbursement of the Settlement Fund to Class Members. This motion will present the Settlement claims data to the Court and detail the method for disbursing payments to minor Class Members.

29. Class Counsel has litigated this case vigorously for over two years on contingency, advancing hundreds of thousands of dollars in costs. Among other things, Class Counsel have engaged in extensive motion practice across two rounds of dismissal briefing, overseen thorough forensic collections and document review, successfully advocated for MVM's production of documents concerning its government contracts, executed third-party subpoenas for evidence, coordinated with subject matter experts pertinent to Plaintiffs' claims, and prepared video testimony from Plaintiffs for an in-person Settlement Conference. Class Counsel will continue to litigate this case through final approval. Class Counsel will request 25% of the Settlement Fund as attorneys' fees and will also ask the Court for unreimbursed costs, all of which will be detailed in a forthcoming motion for an award of fees and reimbursement of costs.

30. The Plaintiffs will respectfully request a service award of $15,000 for each of the following Class Representatives: Padre, Junior, I.V.S., and A.V.L., by and through I.V.S. (aliases). The Class Representatives have faithfully represented the Class

for over two years, providing valuable insight and facts, answering discovery, and monitoring the progress of the case. Class Counsel communicated with Class Representatives multiple times by video conference, in person, and by telephone. Class Counsel worked with Class Representatives to prepare them for depositions, including practicing potential deposition questions and reviewing potential deposition exhibits with them. All of the Class Representatives were essential to Class Counsel in advancing this case for the betterment of the entire Settlement Class, and the Settlement Agreement would not have been possible had Plaintiffs not stepped forward to represent the interests of the Settlement Class. Moreover, Plaintiffs' participation in this litigation exposed them to unique and tangible risks of persecution, deportation, detainment, and targeted violence. These proposed service awards do not fully reflect the contribution these parties have made over the course of this litigation. Nevertheless, it is a nominal acknowledgment of their service on behalf of the entire Class. Neither Class Counsel nor MVM made any promises about requesting such awards.

31. I declare under penalty of perjury that the foregoing facts are true and correct and that this declaration was executed in Washington, DC on September 18, 2026.

By:
Shana R. Herman
**HAUSFELD LLP**
sherman@hausfeld.com

*Attorney for Plaintiffs*

# EXHIBIT A

## REDACTED

Amanda Lee-DasGupta (D.C. Bar No. 1619712)*
Mary S. Van Houten Harper (D.C. Bar No. 1045137)*
Mandy V. Boltax (D.C. Bar No. 90013893)*
Shana R. Herman (D.C. Bar No. 90020161)*
**Hausfeld LLP**
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
alee@hausfeld.com
mvanhouten@hausfeld.com
mboltax@hausfeld.com
sherman@hausfeld.com

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*
*(additional counsel on signature page)*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Padre (*alias*), Junior (*alias*), I.V.S. (*alias*) and A.V.L. (*alias*), by and through I.V.S. *on behalf of themselves and all others similarly situated*,<br><br>*Plaintiffs*,<br>v.<br><br>MVM, Inc.,<br><br>*Defendant*. | Case No.: 3:24-cv-01265-DMS-AHG<br><br>**SETTLEMENT AGREEMENT BETWEEN PLAINTIFFS AND DEFENDANT MVM, INC.** |

This Settlement Agreement ("Settlement Agreement"), dated August 20, 2026 ("Execution Date"), is made and entered into by and among Plaintiffs Padre, Junior, I.V.S., and A.V.L., by and through I.V.S. (aliases), on behalf of themselves and others similarly situated, and as representatives of the Settlement Class defined herein (collectively, "Plaintiffs"), and Defendant MVM, Inc. ("MVM"). This Settlement Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims, upon and subject to the terms and conditions hereof.

WHEREAS, Plaintiffs, on behalf of themselves and as representatives of a proposed class of similarly situated persons, have brought claims in the Action, *Padre v. MVM, Inc.*, No. 3:24-cv-01265-DMS-AHG (S.D. Cal.), among other things, arising from alleged conduct relating to the transportation, custody, supervision, and/or treatment of certain individuals who Plaintiffs allege were separated from family members during the period March 7, 2017 through January 20, 2021;

WHEREAS, MVM denies each and every allegation of wrongdoing, liability, causation, injury, damages, and entitlement to relief alleged in the Action; denies that Plaintiffs or any Settlement Class Member would prevail on the merits; and enters into this Agreement solely to avoid the burden, expense, inconvenience, uncertainty, and disruption of further litigation. Neither this Agreement, the Settlement Amount, the certification of a Settlement Class, nor any act performed or document executed in connection with this Agreement shall constitute, be construed as, or be admissible as evidence of any admission of liability, wrongdoing, fault, damages, or the validity of any Claim;

WHEREAS, counsel for the Parties have engaged in multiple arm's-length settlement negotiations, assisted by Magistrate Judges Allison Goddard and Michael Berg, and this Settlement Agreement embodies all of the terms and conditions of the Parties' settlement;

WHEREAS, Class Counsel have concluded after carefully considering Plaintiffs' Claims and the possible legal and factual defenses thereto that it is in Plaintiffs' best interests to enter into this Settlement Agreement with MVM to avoid the uncertainties and risks of further litigation and trial, and that the settlement set forth herein is fair, reasonable, adequate, and in the best interests of the Settlement Class;

WHEREAS, MVM, having maintained that there is no legal or factual basis for its liability in this matter and that it has valid defenses to the Claims alleged, has nevertheless agreed to enter into this Settlement Agreement to avoid the expense, inconvenience, and uncertainty of trial and further protracted litigation;

WHEREAS, both Parties wish to preserve all arguments, defenses, and responses to all Claims in the Action, in the event this Settlement Agreement does not obtain Final Approval;

NOW, THEREFORE, in consideration of the promises, covenants, agreements, and releases set forth herein and for other good and valuable consideration, subject to the approval of the Court, it is agreed by the undersigned counsel, on behalf of Plaintiffs, Settlement Class Members, and MVM, that the Claims that have been or could have been asserted by Plaintiffs in the Action be settled, compromised, and dismissed on the merits and with prejudice, and, except as hereafter provided, without costs as to Plaintiffs and/or MVM, on the following terms and conditions:

**1. Definitions**

As used herein, the following terms have the meanings set forth below:

1.1 "Action" means the class action captioned *Padre v. MVM, Inc.*, No. 3:24-cv-01265-DMS-AHG (S.D. Cal.), currently pending before the Honorable Dana M. Sabraw in the United States District Court for the Southern District of California.

1.2 "Attorneys' Fees and Expenses" means any attorneys' fees, costs, and expenses of any kind or description incurred by attorneys for Plaintiffs in this Action.

1.3 "Claims" shall mean any and all actions, suits, claims, rights, demands, assertions, allegations, causes of action, controversies, proceedings, losses, damages, injuries, Attorneys' Fees and Expenses, debts, liabilities, judgments, or remedies, whether equitable or legal.

1.4 "Class Counsel" means the law firm of Hausfeld LLP, which has any and all authority and capacity necessary to execute this Settlement Agreement and bind all of the Plaintiffs who have not personally signed this Settlement Agreement, as if each of those individuals had personally executed this Settlement Agreement. For avoidance of doubt, Class Counsel is included within the definition of Plaintiffs' Counsel, and any obligation imposed on Plaintiffs' Counsel applies to Class Counsel.

1.5 "Complaint" means the Plaintiffs' First Amended Class Action Complaint filed in the Action [ECF No. 150].

1.6 "Court" means the United States District Court for the Southern District of California.

1.7 "Defendant" means MVM, Inc.

1.8 "Defense Counsel" means the law firm of Pillsbury Winthrop Shaw Pittman LLP.

1.9 "Effective Date" means the first business day after which all of the following events and conditions of this Settlement Agreement have been met or occurred:

(a) MVM, Class Counsel, and Defense Counsel have executed this Settlement Agreement; and

(b) The Final Approval Order (as defined below) has become a final, non-appealable judgment approving the Settlement Agreement in

all respects and is no longer subject to review, reconsideration, rehearing, appeal, petition for permission to appeal, petition for writ of certiorari, or any other appellate review of any kind.

1.10 "Escrow Account" means the interest-bearing escrow account established with the Escrow Agent to receive and maintain funds paid for the benefit of the Settlement Class.

1.11 "Escrow Agent" means Huntington Bank, which will establish and maintain an account in which to hold the Settlement Fund (the "Escrow Account").

1.12 "Final Approval Order" means a final judgment and order entered by the Court approving the Plaintiffs' class settlement and dismissing the Action with prejudice and without costs (other than those provided for in this Settlement Agreement), to be rendered by the Court in the Action.

1.13 "Final Judgment" means a final judgment and dismissal of the Action with prejudice.

1.14 "Funding Source" means MVM and any insurer that funds or deposits any amount toward the Settlement Amount or into the Settlement Fund on MVM's behalf.

1.15 "Notice" means the notice of this Settlement Agreement in a form approved by the Court to be attached as an exhibit to the motion for preliminary approval and disseminated to Settlement Class Members in accordance with this Settlement Agreement.

1.16 "Settlement Administrator" shall mean one or more third-party class action notice providers and/or settlement claims administrators approved by the Court for the purposes of providing settlement Notice and administration services pursuant to the terms of this Settlement Agreement.

1.17 "Parties" means MVM and the Plaintiffs, individually and on behalf of the Settlement Class.

1.18 "Plaintiffs" means Padre, Junior, I.V.S., and A.V.L., by and through I.V.S. (aliases), on behalf of themselves and others similarly situated.

1.19 "Plaintiffs' Counsel" means Class Counsel as defined herein; the law firms of Hausfeld LLP; Schonbrun Seplow Harris Hoffman & Zeldes, LLP; Al Otro Lado; and any other attorney or law firm that has appeared for, represented, advised, assisted, or acted on behalf of Plaintiffs, any Named Plaintiff, the Settlement Class, or any Settlement Class Member in connection with the Action, the Settlement, or the approval or administration of the Settlement. Plaintiffs' Counsel includes each such attorney's or law firm's respective attorneys, partners, members, employees, agents, consultants, vendors, successors, and assigns.

1.20 "Preliminary Approval Order" means an order preliminarily approving the Settlement Agreement, providing for Notice to the Settlement Class, and preliminarily approving a proposed allocation plan for distribution of the Settlement Fund, to be rendered by the Court in the Action.

1.21 "Released Claims" means any and all Claims, whether class, individual, or otherwise, that the Releasing Parties (defined below) or any of them ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, against the Released Parties (defined below) or any of them, whether such Claims are based on federal, state, local, statutory, or common law, or any other law, code, rule, or regulation of any country or other jurisdiction worldwide, whether such Claims are known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, or Claims that have been, could have been, or in the future might have been, claimed in law or in equity, on account of, arising out of, resulting from, or in any way related to any conduct regardless of legal theory, and regardless of the type or amount

of relief or damages claimed, or Claims that have been, could have been, or in the future might have been, claimed in law or in equity, on account of, arising out of, resulting from, or in any way related to the facts as alleged in the Action. The Released Claims also include all Claims that could have been brought based, in whole or in part, on the facts, occurrences, or other matters that were alleged in the Complaint.

1.22 "Released Parties" means, collectively, MVM, its past, present, and future parents (including, but not limited to, KG&P Strategies, Inc.), subsidiaries, divisions, affiliates, departments, related entities, predecessors, successors, merged or acquired entities, and assigns, and each of the foregoing persons' or entities' respective past, present, and future owners, shareholders, members, partners, principals, officers, directors, managers, employees, agents, representatives, attorneys, servants, consultants, advisors, accountants, auditors, insurers, excess insurers, umbrella insurers, reinsurers, insurance brokers, insurance adjusters, claims administrators, third-party administrators, indemnitors, indemnitees, contractors, subcontractors, vendors, service providers, and all other persons or entities acting or alleged to have acted for, by, through, under, on behalf of, at the direction of, in concert with, or in any agency, contractual, employment, representative, insured, insurer, indemnitor, indemnitee, successor, predecessor, alter ego, or other capacity with MVM or any of the foregoing, together with the heirs, executors, administrators, estates, beneficiaries, trustees, personal representatives, successors, and assigns of each of the foregoing. For purposes of this definition, "affiliates" means entities or persons that directly or indirectly control, are controlled by, or are under common control with MVM or any Released Party. Each Released Party is included in this definition whether acting or alleged to have acted in an individual, corporate, official, representative, fiduciary, agency, insured, insurer, indemnitor, indemnitee, employee, employer, contractor, subcontractor, principal, agent, predecessor, successor, or any other capacity.

1.23 "Releasing Parties" means Plaintiffs Padre, Junior, I.V.S., and A.V.L., by and through I.V.S. (aliases), and Settlement Class Members, and their respective heirs, executors, administrators, representatives, agents, partners, successors, and assigns.

1.24 "Service Award" means a payment from the Settlement Fund to any or all of the Plaintiffs, in an amount to be approved by the Court, in recognition of their service in prosecuting this Action, exclusive of any other payments to which they might be entitled under this Settlement Agreement, if approved by the Court.

1.25 "Settlement Amount" means Forty-Eight Million Seven Hundred and Fifty Thousand Dollars ($48,750,000.00) in United States currency.

1.26 "Settlement Class" means all persons who qualify for inclusion as class members of the settlement class certified in *Ms. L. v. I.C.E.*, No. 3:18-cv-00428-DMS-AHG (S.D. Cal.) (hereafter "*Ms. L.*"), as referred to in Section 2 herein, and were separated from their parent or child between March 7, 2017, and January 20, 2021.

1.27 "Settlement Class Member" means each member of the Settlement Class as defined in Section 1.26 and referred to in Section 2 herein.

1.28 "Settlement Fund" shall mean the amounts deposited into the Escrow Account pursuant to Section 5 of this Settlement Agreement and any income earned on amounts in the fund.

## 2. Stipulation to Settlement Class Certification

The Parties stipulate and agree for the purpose of this settlement only and subject to Court approval, that the requirements of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied. The Parties further stipulate and agree that the following Settlement Class shall be certified for settlement purposes only:

> All persons who qualify for inclusion as class members of the settlement class certified in *Ms. L. v. I.C.E.*, No. 3:18-cv-00428-DMS-AHG (S.D. Cal.), and were separated from their parent or child between March 7,

2017, and January 20, 2021.

The class definition that is set forth in the settlement agreement reached in *Ms. L.* [ECF No. 721-1] (*see also* Order Granting Final Approval of Settlement Agreement and Certifying the Settlement Class [ECF No. 727]) (hereafter the "*Ms. L.* Class Definition") is incorporated by reference herein.

Certification of the Settlement Class is for settlement purposes only. If this Settlement Agreement is terminated, not approved, materially modified without Parties' written consent, or otherwise does not become effective, the certification of the Settlement Class shall be automatically vacated, the Action shall proceed as though no settlement class had been certified, and no Party may contend that this Settlement Agreement, MVM's agreement to settlement-only certification, or any order concerning settlement-only certification supports certification of any litigation class.

**3. Approval of this Settlement Agreement, Notice, and Dismissal of Claims**

3.1 The Parties shall use all reasonable efforts to effectuate this Settlement Agreement, including cooperating in Plaintiffs' effort to obtain the Court's approval of the settlement (including the giving of class notice under Rules 23(c) and 23(e) of the Federal Rules of Civil Procedure) and to secure certification of the Settlement Class for settlement purposes and the prompt, complete, and final dismissal with prejudice of the Action as to the Released Parties.

Subject to Sections 3.8 and 10, MVM agrees not to oppose Class Counsel's filed Motion for Preliminary Approval or Motion for Final Approval; MVM agrees not to take a position on Class Counsel's filed Motion for Attorneys' Fees and Expenses. This agreement is not an admission and does not limit MVM's rights under Sections 3.8 and 10 or otherwise to protect its rights and respond to the Court, class members, objectors, Class Action Fairness Act ("CAFA") recipients, insurers, regulators, or other third parties.

3.2 Promptly after the Execution Date of this Settlement Agreement, Plaintiffs shall submit to the Court a motion for preliminary approval of the settlement. The motion shall:

(a) seek certification of the Settlement Class solely for settlement purposes, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure;

(b) request preliminary approval of the settlement set forth in this Settlement Agreement as fair, reasonable, and adequate;

(c) seek the appointment of Plaintiffs as representatives of the Settlement Class, and Hausfeld LLP as Class Counsel under Rule 23(g) of the Federal Rules of Civil Procedure;

(d) seek approval, or explain that Plaintiffs will submit a separate application seeking approval, of the form and method of dissemination of Notice to the Settlement Class.

(e) seek appointment of a qualified Settlement Administrator;

(f) seek appointment of Huntington Bank as a qualified Escrow Agent;

(g) stay all proceedings in the Action (except for the Notice and exclusion process) until the Court renders a final decision on approval of the settlement set forth in this Settlement Agreement; and

(h) attach a proposed form of order, which includes such other provisions as are typical in such orders, including: (1) setting a date for a fairness hearing, and (2) a provision that, if final approval of the settlement is not obtained, the settlement is null and void, and the Parties will revert to their positions ex ante without prejudice to their rights, Claims, or defenses.

3.3 If the Court preliminarily approves this Settlement Agreement, Plaintiffs shall seek entry of a Final Approval Order and Final Judgment, the text of which shall be agreed upon by Plaintiffs and MVM before submission to the Court:

(a) approving this Settlement Agreement and its terms as being a fair, reasonable, and adequate settlement as to the Settlement Class within the meaning of Rule 23 of the Federal Rules of Civil Procedure, and directing its consummation according to its terms;

(b) reserving to the Court exclusive jurisdiction over the settlement and this Settlement Agreement, including the administration and consummation of this settlement;

(c) attaching a record of potential Settlement Class Members who timely and validly excluded themselves from the Settlement Class; and

(d) dismissing the Action with prejudice as to the Released Parties.

3.4 This Settlement Agreement shall become final only upon occurrence of the Effective Date.

3.5 Subject to MVM's review rights under Sections 3.6 and 3.8 and the dispute-resolution procedures in Section 10, Class Counsel shall submit for Court approval a proposed Notice that is crafted in good faith to satisfy Rule 23, due process, and other applicable requirements and is written in plain, neutral, and understandable language. The Notice shall fairly describe: (a) the Action, Settlement Class, and parties' claims and defenses, including MVM's denial of liability as provided in Section 9; (b) the material Settlement terms, Settlement Amount, proposed allocation or distribution plan, and maximum requested Attorneys' Fees and Expenses and Service Awards; (c) the rights, procedures, and deadlines for exclusion, objection, appearance, or other response; and (d) the binding effect of the Settlement, release, covenant not to sue, bar

order, and Final Judgment. No Notice or other class communication may be disseminated if it is inconsistent with this Settlement Agreement, including Section 9, the Preliminary Approval Order, the Court's orders, or the protective orders entered in this Action or in *Ms. L*.

3.6 The Settlement Administrator shall implement the Notice plan approved by the Court. Class Counsel will provide Defense Counsel with the proposed forms of Notice and other class communications included with the Motion for Preliminary Approval pursuant to Section 3.8 and subject to Section 10. The Settlement Administrator shall maintain records sufficient to establish compliance with the Court-approved Notice plan. Every thirty days, the Settlement Administrator shall provide Class Counsel and Defense Counsel with high-level reports concerning implementation of the Notice plan, including aggregate delivery, response, exclusion, and objection, and shall submit a declaration in support of final approval describing the implementation and results of the Notice plan.

3.7 Any Settlement Class Member who wishes to be excluded from the Settlement Class must submit a timely and valid request for exclusion in the manner and by the deadline approved by the Court. Mass opt-out forms will not be accepted. To be valid, a request for exclusion must:

(a) sufficiently identify the Settlement Class Member requesting exclusion by name or other Court-approved identifier;

(b) clearly state that the person wishes to be excluded from the Settlement Class and does not wish to participate in the Settlement;

(c) be limited to one individual class member per submitted request;

(d) be signed or otherwise verified in a manner approved by the Court; and

(e) be submitted by the exclusion deadline established by the Court.

Any Settlement Class Member who timely and validly requests exclusion shall not be entitled to receive any payment or other benefit from the Settlement Fund, shall not be bound by the release, the covenant not to sue, the bar order or the Final Judgment, except to the extent the Court orders otherwise. Any Settlement Class Member who does not timely and validly request exclusion shall be bound by this Settlement Agreement, the release, the covenant not to sue, the bar order, and the Final Judgment, regardless of whether that Settlement Class Member objects to the Settlement or receives a payment from the Settlement Fund. The Settlement Administrator shall provide Class Counsel and Defense Counsel with copies of all requests for exclusion promptly after receipt and shall identify those requests that facially satisfy the requirements of Section 3.7 and the Court-approved Notice. The Settlement Administrator shall separately identify any untimely, deficient, duplicate, disputed, or otherwise unresolved request, without making a final legal determination regarding its validity. Following the exclusion deadline established by the Court, Class Counsel has 60 days to contact those who have submitted opt-out requests and verify their intention. Plaintiffs' Counsel are prohibited from soliciting opt-outs for individual litigation against MVM prior to the Final Approval Order. Any dispute concerning whether a request is effective shall be submitted to the Court for resolution. Following resolution of any such disputes and the end of the exclusion verification period, the Settlement Administrator shall provide Class Counsel and Defense Counsel with a final list of all effective exclusions. Requests included on that final list shall constitute "timely and valid requests for exclusion" for purposes of Section 7.2. The final list shall be provided sufficiently in advance of the deadline for final-approval papers to permit MVM to determine whether to exercise its termination rights under Section 7.2.

3.8 Class Counsel will provide drafts of Motion for Preliminary Approval, Motion for Final Approval and Motion for Attorney Fees and Expenses, and respective

accompanying documents, to MVM according to deadlines to be set by Judge Goddard. MVM may review and comment on such materials for consistency with this Settlement Agreement, the Court's orders, the applicable protective orders, and Section 9, but shall not otherwise control Class Counsel's drafts. MVM must provide any comments or raise any disputes regarding the materials according to deadlines set by Judge Goddard. No material shall attribute any statement, admission, position, or agreement to MVM or any Released Party without Defense Counsel's written approval. Any unresolved relevant dispute shall be addressed pursuant to Section 10 before filing or dissemination, and MVM may respond to or seek correction of any material that was not provided as required, differs materially from the reviewed or resolved draft, or is inconsistent with this Settlement Agreement.

**4. Releases, Covenant Not to Sue, and Dismissal of Action**

4.1 As of the Effective Date, the Releasing Parties shall have fully, finally, and forever released, relinquished, and discharged any and all past, present, and future Claims, actions, demands, causes of action, suits, debts, obligations, damages, rights and liabilities, that were brought, could have been brought, or arise from the same facts underlying the Claims asserted in the Action, known or unknown, recognized now or hereafter, existing or preexisting, expected or unexpected, pursuant to any theory of recovery recognized or available now or hereafter (including, but not limited to, those based in contract or tort, common law or equity, federal, state, territorial, or local law, statute, ordinance, or regulation), against the Released Parties, for any type of relief that can be released as a matter of law, including, without limitation, Claims for monetary relief, damages (whether compensatory, consequential, punitive, exemplary, liquidated, and/or statutory), penalties, interest, Attorneys' Fees and Expenses, litigation costs, restitution, or equitable relief. Notwithstanding the foregoing, the release shall not include any action relating to the continued enforcement of the

Settlement Agreement or the Amended Protective Order [ECF No. 105], or the Stipulation and Revised Protective Order in *Ms. L.* [ECF No. 726].

4.2 In consideration of the monetary relief provided under this Settlement Agreement, and as of the Effective Date, the Releasing Parties covenant and agree that they shall not sue, commence, maintain, participate in, assign, or otherwise pursue, cause, direct, or control another person in pursuing any action, claim, or other proceeding against any Released Party that asserts or seeks relief based on, arising out of, or concerning any Released Claim.

4.3 After entering into this Settlement Agreement, the Releasing Parties may discover facts other than, different from, or in addition to, those that they know or believe to be true with respect to the Claims released by this Settlement Agreement, but they intend to release fully, finally, and forever any and all such Claims. The Releasing Parties expressly agree that, upon the Effective Date, they waive and forever release any and all provisions, rights, and benefits conferred by:

(a) Section 1542 of the California Civil Code, which reads:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

(b) any law of any state, territory, or possession of the United States (or for any non-U.S. entity or person, their respective country, province, or state), or principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

4.4 Upon the Effective Date, the Action shall be dismissed with prejudice. Class Counsel shall have the responsibility for ensuring that the Action is dismissed with prejudice in accordance with the terms of this Settlement Agreement.

4.5 Subject to Section 10, the Court shall retain jurisdiction over this Action to enforce the terms of this Settlement Agreement. In the event that any applications for relief are made, such applications shall be made to the Court. To avoid doubt, the Final Judgment shall apply to, bind, and be enforceable against the Parties, the Releasing Parties, including all Settlement Class Members who do not timely and validly request exclusion, and Released Parties solely to the extent that the Final Judgment expressly confers rights or protections upon them; and shall be enforceable by same. Nothing herein shall impose any obligation upon a Released Party other than MVM unless that Released Party expressly agrees to such obligation in writing.

4.6 The Final Judgment shall include an express bar order consistent with Section 4 and the releases and covenant not to sue set forth in this Settlement Agreement.

**5. Payments**

5.1 Within twenty-one calendar days of entry of the Preliminary Approval Order, MVM (itself or through its Funding Sources) will transfer $1,000,000 into the Escrow Account to be drawn on for Court-approved Notice and administration expenses. No class-member payments, allocation payments, Attorneys' Fees and Expenses, Service Awards, settlement-administration payments other than those authorized to be drawn on for Court-approved Notice and administration expenses, or other distributions may be made before the Effective Date absent MVM's written consent.

5.2 Within thirty business days of the entry of the Final Approval Order, MVM (itself or through other Funding Sources) shall transfer the remainder of the

Settlement Amount, less any amounts previously funded under Section 5.1, into the Escrow Account. Any amount funded by a Funding Source on MVM's behalf shall be credited dollar-for-dollar against, and shall satisfy to the same extent, MVM's funding obligations under this Settlement Agreement. The Escrow Agent shall maintain records identifying the amount contributed by each Funding Source.

5.3 Class Counsel may at an appropriate time submit a motion seeking approval of the payment of Attorneys' Fees and Expenses and Service Awards from the Settlement Fund. Class Counsel's pre-filing draft of this motion will be subject to the procedures outlined in Sections 3.8 and 10.

5.4 MVM's and the Released Parties' aggregate financial obligation arising from or relating to this Settlement Agreement, the Settlement Fund, or any payment from the Settlement Fund shall not exceed the Settlement Amount.

**6. Settlement Fund**

6.1 The Parties agree to treat the Settlement Fund as being at all times a "Qualified Settlement Fund" within the meaning of Treas. Reg. § 1.468B-1, and to that end, the Parties shall cooperate with each other and shall not take a position in any filing or before any tax authority that is inconsistent with such treatment. In addition, Class Counsel shall timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter cause the appropriate filing to occur. All provisions of this Settlement Agreement shall be interpreted in a manner that is consistent with the Settlement Fund being a "Qualified Settlement Fund" within the meaning of Treas. Reg. § 1.468B-1. Class Counsel shall timely and properly file all information and other tax returns necessary or advisable with respect to the Settlement Fund (including without limitation the returns described in Treas. Reg. § 1.468B-2(k), (k)(1)). Such returns shall reflect that all taxes (including any estimated taxes, interest, or penalties) on the income earned by the Settlement Fund

shall be paid out of the Settlement Fund. MVM shall have no liability, obligation, or responsibility with respect to the investment, disbursement, or other administration or oversight of the Settlement Fund.

6.2 Except for costs related to compliance with CAFA that Defendant expends as described in Section 11, all costs associated with the Settlement Class notification and claims administration process shall be paid out of the Settlement Fund.

6.3 Any Court-approved Attorneys' Fees and Expenses and Service Awards shall be payable solely from the Settlement Fund and only after the Effective Date, unless MVM agrees otherwise in writing. Following such Court approval, Attorneys' Fees and Expenses shall be payable from the Settlement Fund upon award notwithstanding the existence of any timely-filed objections thereto, or potential for appeal therefrom, or collateral attack on the settlement or any part thereof, subject to Class Counsel's obligation to make appropriate refunds or repayments to the Settlement Fund, if and when, as a result of any appeal and/or further proceedings on remand, or successful collateral attack, the fee or cost award is reduced or reversed. Class Counsel shall be solely responsible for allocating any fee award among Plaintiffs' Counsel and agree to hold MVM and Defense Counsel harmless from any related claim, cost, or expense.

6.4 The Court's award of Attorneys' Fees and Expenses shall be separate from its determination of whether to approve the Settlement. In the event the Court approves the Settlement but declines to award Class Counsel's Attorneys' Fees and Expenses in the amounts requested by Class Counsel, the Settlement will nevertheless be binding on the Parties.

6.5 Following the Effective Date, under no circumstances will there be any reversion of the Settlement Fund to MVM or any other Funding Source. Before the

Effective Date, any return, repayment, or reimbursement of Settlement Fund amounts shall be governed by Section 7.

6.6 The Parties agree that no portion of the Settlement Fund is intended to reimburse Settlement Class Members for medical expenses or lost income. Nothing in the foregoing sentence is intended as an exception or limitation to the releases given by the Releasing Parties in Section 4.

**7. Effect of Disapproval**

7.1 In the event that the Settlement Agreement is not approved (following the exhaustion of any appellate review), then (a) this Settlement Agreement shall be null and void and of no force or effect; (b) with the exception of any monies from the Settlement Fund actually expended for Notice and administration expenses pursuant to Sections 5.1 and 6.2 (including payment of taxes pursuant to Section 6.1), the Settlement Fund, shall be returned or reimbursed directly to the applicable Funding Source in accordance with written instructions provided by MVM or Defense Counsel to the Escrow Agent; (c) any release shall be of no force or effect; and (d) neither the Settlement Agreement nor any facts concerning its negotiation, discussion, terms, or documentation shall be referred to or used as evidence or for any other purpose whatsoever in the Action or in any other action or proceeding. In such event, the Action will proceed as if no settlement has been attempted, and the Parties shall be returned to their respective procedural postures existing on July 13, 2026, so that the Parties may take such litigation steps that they otherwise would have been able to take absent the pendency of this Settlement Agreement. However, any reversal, vacatur, or modification on appeal of (a) any amount of the Attorneys' Fees and Expenses awarded by the Court, or (b) any determination by the Court to award less than the amounts requested in Attorneys' Fees and Expenses or Service Awards shall not give rise to any right of termination or otherwise serve as a basis for termination of this Settlement

Agreement. The Escrow Agent shall maintain records identifying the amount contributed by each Funding Source. Any amount previously disbursed that is required to be returned under Section 7.1 shall be repaid by the recipient to the Escrow Account for return to the applicable Funding Source. This repayment obligation shall survive any disapproval, termination, or nullification of this Settlement Agreement until fully performed. If this Settlement Agreement is terminated, finally disapproved, or otherwise does not become effective, the settlement-only class certification and all related findings shall be automatically vacated, and neither the Parties nor their counsel may rely on them or any agreement to settlement-only certification to support certification of a litigation class.

7.2 MVM shall have the right to terminate this Settlement Agreement under the terms of the Confidential Supplement, executed in conjunction with this Settlement Agreement. If MVM timely exercises this right, Section 7.1 shall apply, the non-reversion provision in Section 6.5 shall not apply, and all remaining amounts in the Settlement Fund shall be returned as provided in Section 7.1.

**8. Confidentiality**

8.1 The Parties must comply with all portions of the Court's August 12, 2025 Amended Protective Order [ECF No. 105], and the Court's December 11, 2023 Stipulation and Revised Protective Order in *Ms. L.* [ECF No. 726].

8.2 This Settlement Agreement and its terms shall remain confidential until the motion for preliminary approval is filed with the Court. Before the filing of that motion, Class Counsel and Defense Counsel may disclose this Settlement Agreement and its terms only to their respective clients, the Parties' insurers, counsel to the Parties' insurers, any person a Party retains to serve as an outside consultant or expert witness in the Action, the Escrow Agent, and any outside vendors or service providers engaged

by a Party's counsel to furnish notice and claims administration services, or as otherwise required by law, court order, or applicable reporting obligation.

8.3 Before the filing of the motion for preliminary approval, no Party, Class Counsel, Defense Counsel, Settlement Class Member, Settlement Administrator, Escrow Agent, or person acting on behalf of any of them shall issue, publish, disseminate, authorize, or encourage any press release, public statement, website statement, social-media post, media communication, or other public communication concerning this Settlement Agreement, the Settlement Amount, the negotiations, or the terms of the Settlement, except as permitted by Section 8.2. After the motion for preliminary approval is filed, any public statement or communication concerning the Settlement by the Parties, Class Counsel, Defense Counsel, Settlement Class Members, Settlement Administrator, Escrow Agent, or any person acting on their behalf shall be accurate, not misleading, consistent with this Settlement Agreement and the Court's orders. Nothing in Section 8.3 prohibits Plaintiffs or Class Counsel from accurately describing the allegations asserted in the Action, the procedural history of the Action, the terms of this Settlement Agreement, or the Court's orders, provided that any such description complies with Section 8.3 and Section 9.

8.4 Any violation of Sections 8.2 or 8.3 shall constitute a material breach of this Settlement Agreement. Because such a violation may cause harm not adequately remedied by monetary relief, the injured party shall be entitled to seek all available relief from the Court, including injunctive relief and correction, removal, or revision of the challenged communication.

**9. No Admission and Required Communications**

9.1 This Settlement Agreement, the Settlement Amount, any certification of a Settlement Class for settlement purposes, any act performed or document executed in connection with this Settlement Agreement, and any proceedings taken to implement

or obtain approval of this Settlement Agreement are not, and shall not be construed as, offered as, received as, or deemed to be evidence of any admission, concession, presumption, or finding of liability, wrongdoing, fault, violation of law, causation, injury, damages, class certification, or the validity of any Claim or defense by MVM or any Released Party. MVM denies all allegations of wrongdoing, liability, causation, injury, damages, and entitlement to relief asserted in the Action.

9.2 The Notice, any long-form notice, summary notice, preliminary-approval papers, final-approval papers, proposed Final Approval Order, proposed Final Judgment, settlement website, and other material disseminated pursuant to notice or settlement administration that includes text describing case allegations or merits shall include the following statement:

> "MVM denies all allegations of wrongdoing, liability, causation, injury, damages, and entitlement to relief. The Court has not decided who is right or wrong. The Settlement is simply a compromise to avoid the burden, expense, uncertainty, and disruption of continued litigation and is not an admission of liability, wrongdoing, fault, damages, or the validity of any claim or defense."

Where such material is included in a publication subject to character limits, the foregoing statement may be condensed but shall include, at a minimum: "MVM denies liability and settled to avoid the cost of litigation."

9.3 No Party, Class Counsel, Settlement Class Member, Settlement Administrator, or person acting on their behalf shall issue, publish, disseminate, or file any statement, notice, motion, proposed order, or other communication concerning this Settlement that states or implies that MVM or any Released Party has admitted liability, wrongdoing, fault, causation, injury, damages, class certification, or the validity of any Claim. No communication concerning the Settlement shall state or imply that any court

has made a finding of liability, wrongdoing, fault, causation, injury, damages, or entitlement to relief against MVM or any Released Party. Nothing in Section 9 limits any Party's ability to describe accurately the allegations asserted in the Action, the terms of this Settlement Agreement, or the Court's orders, provided that any such description is consistent with Section 9.

**10. Dispute Resolution**

Any and all disputes arising from or related to this Settlement Agreement must be brought by the Parties, Class Counsel, Defense Counsel, and/or Settlement Class Members exclusively to Magistrate Judge Allison H. Goddard, Magistrate Judge Michael S. Berg, or another mutually agreeable neutral to resolve any disputes, fully and finally without appeal. The Parties, Class Counsel, Defense Counsel and Settlement Class Members irrevocably submit to the exclusive and continuing jurisdiction of the Court for any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement. All terms of this Settlement Agreement and any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement shall be governed by and interpreted according to the substantive laws of the State of California without regard to choice of law or conflicts of laws principles; however, nothing in this Settlement Agreement shall operate as a waiver of any Party's position regarding the applicable law governing the underlying Claims at issue in the Action.

**11. Class Action Fairness Act**

MVM shall serve, or cause to be served, all notices required by 28 U.S.C. § 1715. Class Counsel or Settlement Administrator shall provide MVM, no later than five business days before the preliminary-approval filing, all information reasonably necessary to prepare the CAFA notice, including the best available state-by-state class-member residence information or reasonable estimates. Class Counsel or the

Settlement Administrator shall otherwise cooperate with MVM in preparing and serving such notices, including by providing information reasonably necessary to identify the appropriate officials and class-member residency information to the extent available. Any delay in service caused by Class Counsel's or the Settlement Administrator's failure to timely provide such information shall not constitute a breach by MVM as between the Parties. Class Counsel and the Settlement Administrator shall cooperate promptly with MVM in taking any corrective action reasonably necessary to comply with 28 U.S.C. § 1715, including serving supplemental or corrected notice and seeking any appropriate relief from the Court. The Parties shall not seek final approval before the expiration of the period required by 28 U.S.C. § 1715(d).

**12. Miscellaneous Provisions**

12.1 This Settlement Agreement may be modified or amended only by a writing executed by Class Counsel and MVM or Defense Counsel and, after the entry of the Preliminary Approval Order, with approval by the Court.

12.2 The undersigned each represent and warrant that each has authority to enter into this Settlement Agreement on behalf of the Party indicated below his or her name.

12.3 Class Counsel and Plaintiffs' Counsel shall take all reasonable steps to ensure that persons acting at their direction and on their behalf are aware of and comply with the provisions concerning confidentiality, public communications, no admission, Notice and settlement materials, cooperation, and settlement implementation. No Plaintiffs' Counsel may take any action, make any statement, authorize any communication, or direct any third party to act in a manner that Plaintiffs or Class Counsel would be prohibited from taking under this Settlement Agreement.

12.4 Class Counsel and the Plaintiffs represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any

Claim or any portion thereof or interest therein, including, but not limited to, any interest in the Action or any related action, and they further represent and warrant that they know of no such assignments or transfers on the part of any member of the Settlement Class.

12.5 The Parties, together with Class Counsel and Defense Counsel, have jointly participated in the drafting of this Settlement Agreement. No Party hereto shall be considered the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

12.6 As used in this Settlement Agreement, the masculine, feminine, or neutral gender, and the singular or plural wording, shall each be deemed to include the others whenever the context so indicates.

12.7 Unless otherwise noted, all references to “days” in this Settlement Agreement shall be to calendar days. In the event any date or deadline set forth in this Settlement Agreement falls on a weekend or federal legal holiday, such date or deadline shall be on the first business day thereafter that is not a federal legal holiday.

12.8 Unless otherwise ordered by the Court, all motions, discovery, and other proceedings in the Action shall be stayed until the Court enters the Final Approval Order and Final Judgment, or this Settlement Agreement is otherwise terminated.

12.9 Nothing in this Settlement Agreement shall alter or abrogate any prior Court orders entered in the Action.

12.10 This Settlement Agreement may be executed in counterparts. Facsimile or PDF signatures shall be considered valid as of the date they bear.

12.11 The Parties, together with Class Counsel and Defense Counsel, shall cooperate reasonably and in good faith to prepare, execute, submit, and support documents reasonably necessary to obtain Court approval of the Settlement and to

implement the Settlement in accordance with this Settlement Agreement. Plaintiffs and Class Counsel shall have responsibility for preparing and filing the motions for preliminary approval and final approval, subject to the review procedures in Section 3.8.

12.12 This Settlement Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part of, or on behalf of, any of them. The Parties represent and warrant to each other that they have read and fully understand the provisions of this Settlement Agreement and have relied on the advice and representation of legal counsel of their own choosing.

12.13 For the sake of clarity, it is the Parties' agreement that each Released Party is an intended third-party beneficiary of the Settlement Agreement and may enforce the releases, covenant not to sue, bar order, dismissal, and any other provisions of this Settlement Agreement, the Final Approval Order, or the Final Judgment that expressly confer rights or protections upon them.

IN WITNESS WHEREOF, the Parties, through their fully authorized representatives, have agreed to this Settlement Agreement as of the date first written above.

[*signature pages follow*]

Dated: August 20, 2026

______________________________

Amanda Lee-DasGupta *
Mary Sameera Van Houten Harper*
Mandy Boltax*
Shana R. Herman*
**Hausfeld LLP**
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
alee@hausfeld.com
mvanhouten@hausfeld.com
mboltax@hausfeld.com
sherman@hausfeld.com

Katie R. Beran*
**Hausfeld LLP**
325 Chestnut Street
Philadelphia, PA 19106
Tel.: (215) 985-3270
kberan@hausfeld.com

James Gotz*
**Hausfeld LLP**
One Marina Park Drive, Suite 14010
Boston, MA 02210
Tel.: (617) 207-0600
jgotz@hausfeld.com

Ashley Crooks*
Erika A. Inwald*
**Hausfeld LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
acrooks@hausfeld.com
einwald@hausfeld.com

Paul L. Hoffman (SBN 71244)
John C. Washington (SBN 315991)
**Schonbrun Seplow Harris Hoffman & Zeldes LLP**
200 Pier Avenue, #226
Hermosa Beach, CA 90254
Tel.: (310) 717-7373
hoffpaul@aol.com
jwashington@sshhzlaw.com

Helen I. Zeldes (SBN 220051)
**Schonbrun Seplow Harris Hoffman & Zeldes LLP**
501 West Broadway, Suite 800
San Diego, CA 92101
Tel.: (619) 400-4990
hzeldes@sshhzlaw.com

Andrew Fels*
**Al Otro Lado**
511 E. San Ysidro Boulevard, #333
San Ysidro, CA 92173
Tel.: (323) 238-9935
andrew@alotrolado.com

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

Dated: August 20, 2026

Paul J. Fraidenburgh (280354)
Michelle A. Herrera (209842)
Dylan M. Aste (281341)
Alexander P. Carroll (339890)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
11682 El Camino Real, Suite 200
San Diego, CA 92130
Tel: (858) 509-4000
paul.fraidenburgh@pillsburylaw.com
michelle.herrera@pillsburylaw.com
dylan.aste@pillsburylaw.com
alexander.carroll@pillsburylaw.com

Thomas C. Hill (D.C. Bar No. 242974)*
Jeffrey J. Izant (D.C. Bar No. 1510804)*
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 17th Street NW
Washington, DC 20036
Tel: (202) 663-8000
thomas.hill@pillsburylaw.com
jeffrey.izant@pillsburylaw.com

Robert L. Wallan (126480)
David L. Stanton (208079)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017
Tel: (213) 488-7100
robert.wallan@pillsburylaw.com
david.stanton@pillsburylaw.com

* *Admitted pro hac vice*

*Attorneys for Defendant MVM, Inc.*

Dated: August 20, 2026

Signed by:
Joseph Arabit
62F86B9FEC174A3

Joe Arabit, CEO
MVM, Inc.

Dated: Aug 20, 2026

[redacted]ug 20, 2026 17:20:00 PDT)

[redacted]

*Plaintiff Padre*

Dated: Aug 20, 2026

[redacted]Aug 20, 2026 12:16:18 PDT)

[redacted]

*Plaintiff Junior*

Dated: Aug 20, 2026

[redacted] (Aug 20, 2026 13:25:52 EDT)

[redacted], custodial parent and guardian of minor Plaintiff "A.V.L", on behalf of "A.V.L."

Dated: August 20, 2026

Amanda Lee-DasGupta*, on behalf of and with the express consent of [redacted] *Plaintiff "I.V.S."*, who is in physical extremis but who has been made aware of, understands, and consents to be bound by this agreement through counsel's signature.

* *Admitted pro hac vice*

# EXHIBIT B

**Lodged**
**Under Seal**

# EXHIBIT C

Mary S. Van Houten Harper (D.C. Bar No. 1045137)*
Amanda Lee-DasGupta (D.C. Bar No. 1619712)*
Mandy V. Boltax (D.C. Bar No. 90013893)*
Shana Herman (D.C. Bar No. 337541)*
**Hausfeld LLP**
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
mvanhouten@hausfeld.com
alee@hausfeld.com
mboltax@hausfeld.com
sherman@hausfeld.com

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Padre (*alias*), Junior (*alias*), I.V.S. (*alias*) and A.V.L. (*alias*), by and through I.V.S. *on behalf of themselves and all others similarly situated*,

*Plaintiffs*,

v.

MVM, Inc.,

*Defendant*.

Case No.: 3:24-cv-01265-DMS-AHG

**MEDIATOR'S STATEMENT**

Judge: Hon. Dana M. Sabraw
Courtroom: 13A

I provide the following statement as the principal mediator of the settlement agreement between Plaintiffs Padre, Junior, I.V.S., and A.V.L. by and through I.V.S. (*aliases*) ("Plaintiffs") and Defendant MVM, Inc. ("MVM"):

1. One of my responsibilities on the bench is to oversee settlement conferences in civil matters. I have overseen many settlement conferences, involving many different types of legal disputes, and involving many different counsel. This litigation (the "Action") was particularly challenging given the complexities at stake. The legal issues involved in the Action include state and federal law; the settlement dynamic involved a complex interplay of Plaintiffs, Defendant, and insurers; and the the law governing the underlying claims has been in flux. The ultimate settlement was reached when all parties accepted a mediator's proposal that I made following multiple settlement conferences. My mediator's proposal sought to balance the risk to both sides of continued litigation with the benefits of reaching a settlement that would allow Class Members to receive a certain and substantial payment and Defendant to put a cap on the liability it would face as a result of the Action.

2. Plaintiffs and MVM first participated in an early neutral evaluation conference before me on October 10, 2024. *See* Dkt. Nos. 32-33. No settlement was reached at that time, but I was able to assess the parties' positions and I encouraged them to keep an open mind to settlement as the case progressed.

3. Over time, I have held numerous settlement conferences with the various parties involved in this Action, including settlement videoconferences on January 8, 2025, October 27, 2025, October 31, 2025, March 30, 2026, April 6, 2026, April 8, 2026, April 20, 2026, April 27, 2026, May 14, 2026, May 20, 2026, May 27, 2026, June 3, 2026, and June 8, 2026. *See* Dkt. Nos. 52, 139, 160, 209. I also held a two-day in-person settlement conference with Plaintiffs, MVM, and MVM's insurers on March 11-12, 2026. *See* Dkt. No. 181, 186, 189-90.

4. I issued my mediator's proposal on June 19, 2026. My proposal took into account my understanding of the legal and factual issues involved in the Action, the parties' ability to withstand the risks of prolonged litigation, the potential damages, and the practical benefits of settling the matter rather than continuing to litigate. *See* Dkt. No. 209. On July 13, 2026, Plaintiffs and MVM accepted the proposal and reached an agreement in principle to settle the case. *See* Dkt. No. 216. The parties agreed to resolve the claims in exchange for $48,750,000 ("Settlement Amount").

5. In addition to the settlement agreement, I also oversaw Plaintiffs and MVM entering into a supplemental confidential agreement, the only purpose of which is to ensure that the settlement agreement provides for classwide resolution and to give MVM related termination rights. I facilitated the parties' arm's length negotiations over this supplemental confidential agreement.

6. I also facilitated the formulation of an allocation plan for distributing the Settlement Amount fairly among the class members. Plaintiffs worked with experts to create the plan, which accounts for the impact that the separations had on each class member who was separated from their family members, while also accounting for differences in the ages of the children separated, the lengths of separation, and the amount of time during which a parent did not know the location of their child. The settlement allocation plan also provides compensation for related extraordinary circumstances that may have aggravated a class member's separation experience.

Date: August 24, 2026

Respectfully submitted,

Allison H. Goddard

Honorable Allison H. Goddard
United States Magistrate Judge

# EXHIBIT D

Mary S. Van Houten Harper (D.C. Bar No. 1045137)*
Amanda Lee-DasGupta (D.C. Bar No. 1619712)*
Mandy V. Boltax (D.C. Bar No. 90013893)*
Shana R. Herman (D.C. Bar No. 90020161)*
**Hausfeld LLP**
1200 17th Street NW, Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
mvanhouten@hausfeld.com
alee@hausfeld.com
mboltax@hausfeld.com
sherman@hausfeld.com

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Padre (*alias*), Junior (*alias*), I.V.S. (*alias*) and A.V.L. (*alias*), by and through I.V.S. *on behalf of themselves and all others similarly situated,*

*Plaintiffs,*

v.

MVM, Inc.,

*Defendant.*

Case No.: 3:24-cv-01265-DMS-AHG

**SETTLEMENT ALLOCATION PLAN**

# SETTLEMENT ALLOCATION PLAN

The overarching intention of the proposed allocation is:

1. Provide a baseline, meaningful, payment on a per capita basis to all verified class members who submit a claim form and to provide an additional compensatory award for those who provide further information in support of their claim.
   a. **Baseline Award:** Each class member who files a timely, valid claim shall be allocated ten points. No class member who files a timely, valid claim shall receive less than $3,000. The distribution formula for the Awards will be adjusted as needed so that all class members who submit a claim will receive at least this $3,000 Baseline Award. The dollar value of all other points awarded will be determined as set forth below.
   b. **Criteria-Based Award:** Additional points will be awarded to class members who, through the claims process explained below, demonstrate proof of certain objective criteria set forth below as reliable indicia of harm resulting from the separation based upon age of the child, length of separation, and how long the parent did not have knowledge of their child's location.
   c. **Extraordinary Injury Award:** Additional points will be awarded to class members who demonstrate sufficient proof of extraordinary harm beyond the age of the child, length of separation, and length of time the parent did not have knowledge of their child's location criteria.
2. In submitting a claim for a Baseline Award, class members must enter the:
   a. Names of registering class members;
   b. Dates of birth of registering class members;
   c. Contact information (mailing address, email address, cell phone number) for registering class members; and
   d. A-number of registering class members.

3. The Settlement Administrator will verify class members by checking the information in each registration against the Class List (which contains the identifying data in 2(a), 2(b) and 2(d) above). Family members will need to provide contact information so that the Settlement Administrator can perform verification, address questions concerning the information input, and support settlement distributions.

4. Families seeking an additional Criteria-Based Award based on length of separation and length of time the parent did not have knowledge of their child's location[1] will need to enter the following additional data in the claim form and acknowledge that they are providing the information under penalties of perjury:

   a. Length of total separation (selection of applicable time band, including an option for whether they are still separated); and

   b. Whether the amount of time a parent was unaware of the location of his or her child was two or more months (yes/no).

5. Families seeking an additional Extraordinary Injury Award will need to further enter a narrative statement explaining the extraordinary circumstances that justify an additional award and acknowledge that they are providing the information under penalties of perjury.

6. The Settlement Administrator will establish a process to analyze the data for error and manage against fraud.

7. With the assistance of experts retained by class counsel, an evidence-based tier system has been developed for the Criteria-Based Award, so that objective criteria will be used to distinguish between comparative levels of harm, resulting in comparatively lower or higher levels of awards based on age of the child, length of separation, and how long the parent did not have knowledge of their child's

[1] Class Counsel do not possess this data.

location. An award for class members who were separated for more than two years or who have still not been reunited will be separately considered for compensation as an Extraordinary Injury Award.

8. With the assistance of experts, points have been assigned to each criterion to reflect the evidence-based distinctions.

9. From the perspective of both the parent and the child seeking compensation, research shows that on average, the longer the separation, the greater the harm to both parent and child, and thus for both types of claimants, more points are awarded for longer separations.

10. From the perspective of the parent seeking compensation, research demonstrates that on average, there is greater harm to the parent when the separated child is younger, and greater harm to the parent if they do not know the location of their child during the separation, and thus, more points are awarded for younger ages and for a longer period of time not knowing the location of the child, as follows:

| | | | | | |
|---|---|---|---|---|---|
| **Length of Time Without Knowledge of Your Child's Location** | Under 2 months<br>0pt | 2 or more months<br>0.5pt | | | |
| **Age of Child** | Under 2 years<br>1.5pts | 2-6 years<br>1pts | 7-12 years<br>0.5pt | 13 or more years<br>0pts | |
| **Length of Separation** | Under 1 week<br>0pt | 1 week-2 months<br>1pt | 3-5 months<br>2pt | 6-11 months<br>3pt | 1-2 years<br>4pt |

Parents separated from multiple children will receive one baseline award, though each separation will be compensated separately using the above criteria and added to the total award. For example, a parent with two children will submit two claims

for a Criteria-Based Award, one for each child. But that parent will receive only one Baseline Award.

11. From the perspective of the child seeking compensation, research demonstrates that, on average, there is greater harm when the separated child is younger and thus more points are awarded for younger ages, as follows:

| **Age of Child** | Under 2 years<br><br>2pts | 2-6 years<br><br>1pts | 7-12 years<br><br>0.5pt | 13 or more years<br><br>0pts | |
|---|---|---|---|---|---|
| **Length of Separation** | Under one week<br><br>0pt | 1 week-2 months<br><br>1pt | 3-5 months<br><br>2pt | 6-11 months<br><br>3pt | 1-2 years<br><br>4pt |

Each child, by and through their parent or guardian if they are not of majority age at the time the claim is made, will make their own claim for a Criteria-Based Award.

12. For the Extraordinary Injury Award, class members whose experience and harm are so extraordinary that additional compensation is warranted will provide a narrative statement. If there is a barrier to submitting a narrative statement (e.g, limited literacy), we will allow oral statements by phone or recording, if the Settlement Administrator deems it feasible. We may also consider a structured narrative form with checkbox driven prompts (e.g., yes/no questions about specific harms recommended by our experts, with optional short narrative descriptions). As needed, the Settlement Administrator may contact families applying for the Extraordinary Injury Award to verify the narrative. For sake of clarity, families who do not submit narratives due to language, literacy, or access barriers will still receive full consideration for Baseline and Criteria-Based Awards; Extraordinary Injury is an additional opportunity. Class members who

were separated for more than two years or who have still not been reunited with their parent or child will be considered for an Extraordinary Injury Award and no narrative is required to substantiate that injury.

13. Magistrate Judge Goddard will be available as needed to assist Class Counsel with resolving any disputes concerning the award of Criteria-Based points; and, will ultimately decide what points, if any, class members receive for an Extraordinary Injury Award.

14. The Settlement Administrator will calculate the total points per the Criteria-Based Award claimant and add any additional points per the Extraordinary Injury Award and add those to the points from the Baseline Award. Once the claims period closes and all points are finalized, the Settlement Administrator determines the dollar value of a point, and Class Counsel will submit a motion to the Court for distribution of the Settlement Fund.

15. For the Awards, the dollar value of a point will be determined by the Settlement Administrator by:

    a. Assessing the total number of points that have been assigned to class members; and

    b. Dividing the Settlement Fund by the total number of points assigned.

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Padre (*alias*), Junior (*alias*), I.V.S. (*alias*) and A.V.L. (*alias*), by and through I.V.S. *on behalf of themselves and all others similarly situated,*

*Plaintiffs*,

v.

MVM, Inc.,

*Defendant*.

Case No.: 3:24-cv-01265-DMS-AHG

**JOINT AFFIDAVIT OF DYLAN GEE, PH.D., ANDREW RASMUSSEN, PH.D., AND BARRY ROSENFELD, PH.D. IN SUPPORT OF SETTLEMENT ALLOCATION PLAN**

STATE OF NEW YORK )
) SS:
COUNTY OF NEW YORK )

We, the undersigned, affirm under the penalties of perjury under the laws of Connecticut and New York, which may include a fine or imprisonment, that the foregoing is true, and that this document may be filed in an action or proceeding in a court of law:

1. I, Dylan Gee, am a Professor of Psychology at Yale University, where I direct the Clinical Affective Neuroscience & Development Laboratory. I earned my doctorate in Clinical Psychology at the University of California, Los Angeles (UCLA) and completed my clinical internship and a postdoctoral fellowship in developmental psychobiology at Weill Cornell Medical College. For over fifteen years I have conducted research on stress exposure, the brain, and mental health, with a particular focus on how trauma exposure (including caregiving-related adversity and parent-child separation) confers risk for mental health disorders across the lifespan. I have published over 150 peer-reviewed publications that have been cited over 19,000 times, authored a dozen book chapters, and delivered scientific talks at the field's national and international society meetings. My teaching at Yale includes a focus on traumatic stress, caregiving adversity and parent-child separation, psychopathology, and developmental neuroscience. I have provided expertise for several legal cases related to childhood trauma and immigration. My *curriculum vitae* is annexed to this affidavit.

2. I, Andrew Rasmussen, am a clinical psychologist and Professor of Psychology at Fordham University. I earned my doctorate at the University of Illinois at Urbana-Champaign, Urbana, IL, in 2004. My areas of expertise are (1) forced migration, including psychological aspects of immigration processing; (2) cultural

psychology, with particular interest in measurement; and (3) the effects of trauma and stress in general. I have written over 75 peer-reviewed publications, as well as several book chapters, and have been invited for numerous presentations to scholarly and professional audiences. My work background includes eight years as Research Director at a hospital-based clinic at Bellevue Hospital and program evaluations of nongovernmental organizations that address mental health problems in low- and middle-income countries. In addition, I have over two decades of experience conducting forensic mental health assessments, primarily for Immigration Court, and have provided expertise for several civil cases related to immigration processing. My *curriculum vitae* is also annexed to this affidavit.

3. I, Barry Rosenfeld, am a clinical psychologist and Professor of Psychology at Fordham University. I obtained by PhD in Clinical Psychology from the University of Virginia and have over thirty years of experience in clinical psychology. In my years as a clinical psychologist and professor, I have published over 200 peer-reviewed articles along with several books and dozens of book chapters and other invited publications. In addition, I have conducted countless evaluations of individuals who have suffered traumatic experiences in diverse settings and countries across a range of different types of legal proceedings. A comprehensive summary of my education, experience, and qualifications may be found in my *curriculum vitae*, annexed to this affidavit.

4. In connection with this case, we were initially retained by Plaintiffs to provide background research regarding potential psychological damages resulting from the involuntary separation of parents and their children during the time period spanning 2017 to 2021. In light of a provisional settlement agreement, we were subsequently asked to provide input, based on the extant literature, as to what factors should be considered in distributing settlement funds. The paragraphs below outline our opinions

on this issue, which necessarily differ for parents and children (and are therefore addressed separately). It should be noted that our analysis of the effects of parent-child separation was grounded in four broad theoretical models and literatures: Ambiguous Loss theory, Conservation of Resources theory, Attachment theory, and the developmental psychobiology of the stress response, as well as the general psychological literature on child development and parenting.

a. The concept of Ambiguous Loss was developed in the context of family therapy to explain both acute distress and more lasting repercussions in response to situations in which a family member was "there, but not there" (Boss, 2007). For example, family members who are deployed to military service or a child who has disappeared may return and be reunited with their family but may also be changed—likely permanently. Hence, the separation lacks the opportunity for closure, such as might occur when a loved one has died, and leaves family members "frozen in both coping and grieving." Likewise, many of the coping strategies typically available to family members who have suffered a loss, such as social support, are unavailable since it is unclear what is being coped with. This construct is particularly salient in the context of family separations because the length of separation is unclear (until it ends, if it does), as are the conditions under which the child (or parent) is being held. In addition, because of the involuntary nature of separation, parents have no opportunity to provide the support or assistance that they would typically be motivated to provide and instead are likely to fear the worst for their child.

A substantial body of literature has addressed the repercussions of an "ambiguous loss" in a wide range of settings, including family members caring for a person with dementia (e.g., Boss & Yeats, 2014; Nathanson &

Rogers, 2020), parents of children who have disappeared or been placed into foster care (e.g., Hollander, 2016, Samuels, 2009), and children of parents who are incarcerated or deployed to military service (Bockneck, et al., 2009; Huebner et al., 2007). Much of this literature frames responses as a variation of grief and/or bereavement, since the person has no ability for closure or meaning-making that would typically help cope with an unambiguous loss. Moreover, many individuals maintain hope, whether realistic or unrealistic, for reunification and a resumption of prior relationships (which may be forever altered, if they occur).

b. Conservation of Resources theory (COR; Hobfoll, 1988, 1989, 2001) posits that the primary driver of stress and trauma is loss and the perception of loss. In other words, stress will occur "(1) when individuals' resources are threatened with loss, (2) when individuals' resources are actually lost, and (3) where individuals fail to gain sufficient resources following significant resource investment" (Hobfoll, 2001, pp. 341-342). This theory defines "resources" as anything that is valued in its own right, or is valued because it facilitates the achievement or protection of other valued resources (Diener & Fujita, 1995; Hobfoll, 1988). Resources may be objects (material things), but also include conditions (e.g., relationships), personal characteristics (e.g., skills), and energies (time, money, knowledge). A core tenet of COR theory is that loss often results in more loss, a phenomenon labeled "loss spirals." The loss of a loved one results in grief, which can lead to an inability to take care of everyday tasks, and may result in financial insecurity. Parent-child separation, specifically, disrupts parent-child attachment processes (discussed in more detail below), leading to strained familial relationships, developmental delays, behavioral disturbances, and mental health problems

such as anxiety and depression (Humphreys, 2019; Naseh et al., 2024; Wood, 2018).

Parent-child separation is, at its core, an extreme example of "resource loss." For both parent and child, the bond between them represents one of the most valued human conditions. Loss spirals triggered by parent-child separation include parents' losing the daily caregiving role, identity, and emotional reciprocity the relationship provides; children losing the attachment figures who supply safety, emotional regulation, and sense of continuity; and both losing the network of routines, shared meaning, and mutual support built around the relationship. These everyday aspects of parent-child relationships are fundamental to both parents' and children's development; they are the baseline conditions that provide both parties with expectations about the world around them. Separation sets off loss spirals related to anticipatory losses, thoughts parents might have about what might happen to their children when they are not cared for, from hunger and loneliness to sexual abuse and death. These cascades of worries can cause extreme physiological arousal, and if sustained can harm cardiovascular, immune, metabolic, as well as mental health (McEwen, 2012). Because resource loss is more impactful than resource gain (Cacioppo & Gardner, 1999), the trauma of breaking child-parent bonds is not wholly repaired by reunification.

c. Attachment theory posits that humans have a biologically preprogrammed need to form a close, secure emotional bond with at least one primary caregiver to ensure survival and healthy development (Ainsworth et al., 1974; Bowlby, 1969; Sroufe, 2005). Forcible separation involves a fundamental disruption of the attachment relationship (Cassidy & Shaver, 2002; Cohodes et al., 2021; Habbach et al., 2020; Kribakaran et al., 2023; Lieberman & Oliver

Bucio, 2018; Waddoups et al., 2019). Attachment relationships provide the developmental foundation from which children derive a sense of safety and develop expectations about themselves, other people, and the broader world (Bowlby, 1969; Sroufe, 2005). These internal representations shape the emergence of key developmental competencies including social and emotional functioning, self-regulation, and adaptive stress responding (Ainsworth et al., 1974; Calkins & Hill, 2007; Gunnar & Hostinar, 2015; Perry & Pollard, 1998; Spangler & Schieche, 1998; Tamis-LeMonda et al., 2004; Thompson & Meyer, 2014). Secure attachment relationships are characterized by a child's learned expectation that their caregiver will be available and responsive to their needs, particularly during times of distress (Ainsworth et al., 1974; Perry & Pollard, 1998; Spangler & Schieche, 1998). Forcible separation threatens this core developmental system that supports emotional security and healthy child development (Ainsworth & Bell, 1970; Cohodes et al., 2021; Hofer, 1978; Waddoups et al., 2019).

Caregiver presence becomes especially important during times of stress exposure. However, the importance of caregiver presence during stressful experiences extends beyond its impact on children alone. Parents and children engage in the process of co-regulation, whereby close individuals (particularly parents and children) mutually influence and modulate each other's emotional and physiological responses (Lobo & Lunkenheimer, 2020). While caregivers are the primary regulators of children's stress responses, children can also contribute to caregivers' emotion regulation and coping (Feldman, 2007). Thus, caregiving-related stressors disrupt this bidirectional regulatory system that is particularly important during periods of threat and uncertainty (Humphreys, 2019). In the context of forcible parent-child separation, parents

and children experience not only a significant traumatic event but also the loss of someone capable of helping them regulate their emotional and physiological stress responses to that event. This disruption of co-regulatory processes may amplify the immediate effects of separation and contribute to longer-term consequences. In effect, forcible parent-child separation removes a key protective factor precisely when it is most needed, increasing vulnerability to both acute distress as well as longer-term adverse psychological outcomes (Cohodes et al., 2021; Humphreys, 2019; Kribakaran et al., 2023; Teicher, 2018; Waddoups et al., 2019). Indeed, children facing major stressors without access to a caregiver are at greater risk for adverse consequences than children facing similar stressors in the presence of a caregiver. Consistent with this prediction, research following children exposed to natural disasters has shown that even brief separation from a parent is associated with elevated symptoms of posttraumatic stress disorder years later (McFarlane, 1987) and disruptions to attachment security in adulthood (Bryant et al., 2017).

d. A growing body of research delineates the neurobiological consequences of traumatic stress and the mechanisms through which these alterations contribute to mental health problems (Gee, 2021; McLaughlin et al., 2019). The brain is highly sensitive to stressful and traumatic experiences; from an evolutionary perspective, this sensitivity promotes adaptive responses that enhance survival, including the rapid detection of threat and the mobilization of physiological resources in response to threat (Godoy et al., 2018; McEwen & Akil, 2020). The specific mechanisms through which stressful experiences impact the brain and body centrally involve the hypothalamic-pituitary-adrenal (HPA) axis, a neuroendocrine system that regulates the production of

glucocorticoids (stress hormones) including cortisol (Loman & Gunnar, 2010; McEwen & Akil, 2020). The HPA axis interacts closely with key regions of frontolimbic circuitry including the hippocampus, amygdala, and medial prefrontal cortex (mPFC). Severe or chronic stress can have both short- and long-term neurobiological effects, and this research demonstrates how stress can "get under the skin" to become biologically embedded (McEwen, 2012). Consistent evidence across a range of studies has shown that caregiving-related adversity and caregiver deprivation alter the HPA axis and stress responding. A large body of research examining children exposed to caregiver deprivation, including those reared in institutionalized settings, has documented alterations in the function and development of the HPA axis (Flannery et al., 2017; Gunnar et al., 2001, 2009; McLaughlin et al., 2015). Importantly, these effects have been observed even years after the period of deprivation. Evidence further suggests that caregiver deprivation may impair children's ability to regulate stress responses through interactions with caregivers. In a study examining HPA axis function during parent-child interactions, children who had previously experienced caregiver deprivation displayed elevated cortisol levels for a longer period following interactions with caregivers, and greater attachment-related adversity was associated with both higher baseline cortisol levels and more pronounced cortisol dysregulation (Wismer Fries et al., 2008). Related findings have documented alterations in diurnal cortisol rhythms among children separated from their parents and placed in foster care, relative to non-separated children (Dozier et al., 2006; Fisher et al., 2000; M. Gunnar & Fisher, 2006). These findings suggest that caregiving disruptions not only affect acute stress reactivity but also the daily regulation of stress response systems and the development of

caregiver buffering processes that typically help children regulate physiological responses to stress.

Beyond alterations in physiological stress response systems, caregiver deprivation and separation have been associated with differences in brain structure and function. Children with a history of caregiver deprivation show alterations in brain structure as well as heightened amygdala activation in response to fearful stimuli (Gee et al., 2013; Malter Cohen et al., 2013; Tottenham et al., 2011) and alteration in the strength and development of frontolimbic connectivity (Callaghan & Tottenham, 2016a; Gee et al., 2013; Herzberg et al., 2021; McLaughlin et al., 2019; Miller et al., 2020; Silvers et al., 2016). Consistent with this evidence that caregiver deprivation is associated with disruptions to frontolimbic circuitry, a neuroimaging study that examined the functional brain networks of children separated from their parents due to their parents' migration showed alterations in frontolimbic functional organization, relative to children who had not been separated from their parents (Zhao et al., 2016). Taken together, the available evidence suggests that major disruptions to caregiving relationships can be associated with lasting dysregulation in the neurobiological systems that regulate stress and support mental health.

5. **Factors influencing children's responses to forcible separation:** Our analysis of the factors that influence the impact of forcible parent-child separations on children is drawn from multiple sources, including the limited research literature that has focused directly on this population along with a much more extensive literature on children's reactions to trauma and separation more generally. While numerous factors might impact children's adjustment in any individual case, the available research most

consistently points to two broad factors: the child's age at the time of separation and the length of that separation.

a. **Age of the Child:** The consequences of parent-child separation can vary depending on the child's age (Fox et al., 2010; Gee & Casey, 2015; Tottenham & Sheridan, 2009). Age can influence both the disruption of attachment and the potential impact of traumatic separation on the child's cognitive and emotional development (see e.g., Cohodes et al., 2021; Dreby, 2015; Fan & Kang, 2025; Monico et al., 2019; Wallace, 2024). Although parent-child separation is associated with poor outcomes across development (e.g., Sidamon-Eristoff et al., 2022; MacLean et al., 2019, 2020), the nature of these consequences differs by age. For example, adolescents often experience symptoms of depression and anxiety that are more similar to the symptoms observed among adults exposed to traumatic circumstances (Lovato, 2019; Von Werthern et al., 2018). During middle childhood, fear and externalizing behaviors (e.g., acting out, aggression) are common (MacLean et al., 2019). Younger children, on the other hand, are more likely to display regressive behaviors such as sleep disturbances, bedwetting, and crying (Von Werthern et al., 2018).

Beyond these distinctions in symptom presentations, developmental theory and empirical evidence suggest that separation during early childhood may have especially profound and lasting consequences (Cohodes et al., 2021). Early childhood is a period when the predictability and responsivity of caregivers is critical to children's attachment and their evolving expectations about the availability of caregivers, their own safety, and the world around them (Gee & Cohodes, 2021). Given that these early experiences and expectations set the foundation for children's emotional and cognitive

development (Bowlby, 1969; Sroufe, 2005), disruptions during this period can be particularly detrimental to children's development and later emotional and social functioning. For older children and adolescents, traumatic separation interrupts socioemotional and developmental processes that are already well underway, resulting in significant consequences but with less disruption to these foundational developmental processes relative to younger children.

We note that some of the youngest separated children may have been separated when they were too young to later retain explicit memories of many aspects of the separation. However, it is critical to note that the absence of explicit memory does not imply that the experience was inconsequential or without longer-term consequence (Alberini & Travaglia, 2017). Infancy and early childhood are periods of rapid brain and behavioral development when children depend heavily on their caregivers. For children younger than 2 years old, meeting key developmental milestones and healthy physiological regulation require intensive touch, attention, and responsiveness that are typically only provided by primary attachment figures. During the toddler and preschool years, developmental milestones associated with speech and language development and the consolidation of attachment relationships are particularly important. Consistent with the idea that disruption to the primary attachment relationship is particularly consequential in infancy, studies of children exposed to caregiver deprivation have shown that exposure before the age of 2, in particular, confers relatively greater risk for longer-term psychological and neurobiological consequences (Gunnar et al., 2009; McLaughlin et al., 2015).

While traumatic separation has consequences at every age, another factor to consider is the extent of a child's reliance on their caregivers for stress

regulation across development. The neurodevelopment of frontolimbic circuitry is notably protracted (e.g., Casey et al., 2019; Gee et al., 2018). Children undergo a corresponding protracted period of development before they become capable of independently regulating their emotions, physiology, and behavior in stressful contexts (Gee, 2016; Callaghan & Tottenham, 2016b). As a result, parents play a central role in helping children to regulate and cope with stressful experiences (Gunnar et al., 2015). They provide physical safety and security, as well as psychological cues of safety, help children interpret and make sense of stressful experiences, model adaptive coping strategies, and help to modulate children's emotional and physiological responses to stress (Eisenberg et al., 1998; Gunnar et al., 2015). Consistent with this role, caregivers' presence buffers children's responses to stress by reducing psychological distress as well as dampening activation of neurobiological stress response systems, including cortisol and amygdala reactivity (Gee et al., 2014; Hostinar et al., 2014, 2015). While caregivers continue to play a central role in children's emotional well-being during later childhood and adolescence, existing evidence suggests that the role of caregiver buffering in stress reactivity decreases with age, such that adolescents increasingly become more independent (Gee et al., 2014; Hostinar et al., 2014, 2015).

Based on these developmental considerations, we recommend four categories of child age of exposure when considering harm to children: under 2, 2-6, 7-12, 13 years or older (adolescence).

b. **Length of Separation:** The second factor that is particularly salient to our analysis is the length of separation. Simply put, longer periods of separation from a parent result in greater negative impact on a child's psychological well-

being. Research on voluntary separation and foster care suggests that children who are separated from their parents for shorter periods are less likely to develop both longer-term internalizing and externalizing problems than those separated for longer periods of time (e.g., Ling et al., 2023; Zhoo & Egger, 2020). Similarly, studies of caregiver deprivation show that children with longer durations of deprivation show more pronounced behavioral and neurobiological consequences (e.g., Tottenham et al., 2010; Bick et al., 2022). Research focused directly on this population of families separated likewise suggests that longer separations are associated with poorer mental health among children (Sidamon-Eristoff et al., 2022). Although existing research does not point to strict cut-offs concerning what constitutes short versus long separation, we anticipate a relatively linear relationship between the length of separation and its psychological impact on the child and have therefore recommended that length of separation be divided accordingly. This is consistent with some existing evidence of linear relationships between length of exposure and outcome (e.g., Bick et al., 2022; Sidamon-Eristoff et al., 2022; Tottenham et al., 2010). Finally, children who were never reunited with their parent experienced a qualitatively distinct form of loss that extends beyond prolonged separation, and thus we recommend that this be treated as an extraordinary circumstance and compensated as an additional damages award.

6. **Factors influencing parents' responses to forcible separation:** Analyzing the impact of forcible parent-child separation on parents also requires drawing from multiple sources, including the limited research literature that has focused directly on this population, as well as a much more extensive literature on parenting, child loss due to illness and kidnapping, and reactions to trauma more generally. As with children's outcomes, many factors might impact a parent's adjustment in any

individual case. However, our analysis identifies three specific factors that are particularly salient: the age of the child at the time of separation, the length of that separation, and how quickly parents learned the whereabouts of their children.

a. **Age of the Child:** The age of the child at the time of separation affects pain and suffering differently for parents than for children. Just as age of the child shapes their experience of separation, it also affects the nature of a parent's distress. Under typical conditions of parenting, the care demands and relational dynamics associated with young children (younger than two years old) differ meaningfully from those of older children (2-6 years). During infancy, the need for extensive physical proximity, direct regulation, and near-constant monitoring means that parents (typically mothers) are quite literally attached to their children for lengthy periods of time, making separation a profound disruption of typical caregiving conditions. As children become more independently mobile, the nature of parental involvement changes. While parents remain vigilant and continue to monitor and protect their children, proximity naturally decreases and parents recognize that their children are developing greater independence, self-regulation, and internal resources. Later childhood (7-12 years) represents another level of independence, when parents remain vigilant but recognize that children are increasingly developing the ability to understand safety and danger and a concrete sense of how the world generally works, as well as an increased ability to communicate about their experiences and needs. Finally, adolescence represents another major developmental transition characterized by greater capacity for independence, even as parents continue to attend to their children's emotional needs and to experience concerns about their well-being.

Based on these developmental differences, we propose four categories reflecting variation in parents' experiences of the violation of the normal conditions of caregiving relationships: under 2, 2-6, 7-12, 13 years or older (adolescence). Separation during each of these stages would have substantial psychological and physiological consequences for parents, although the nature and intensity of distress may vary, with more severity experienced when separated from younger children. Psychological consequences would likely include persistent fear and uncertainty regarding the child's safety and emotional state, horror at the prospect of not knowing where a child is or whether or not they were safe at any given moment, as well as intrusive thoughts about potential harm to their child. For many parents, these symptoms are likely to warrant mental health treatment for depression, anxiety, and/or posttraumatic stress disorder. Physiological consequences would likely include disrupted sleep, muscle tension, headaches, stomachaches, and heightened physiological arousal.

b. **Length of Separation:** Similar to our assessment of impact on children, the available literature suggests that a longer duration of separation would be associated with more severe and persistent stress and distress. Research has provided some support for an essentially linear relationship between length of traumatic experiences and suffering; persistent trauma leads to greater suffering and more lasting consequences, both physically and emotionally (Goral et al., 2017; Keller et al., 2003; von Werthen et al., 2018). Based on this literature, coupled with the evidence that the children of these parents are likely to experience more profound repercussions as length of separation increases, we have recommended comparable distinctions based on length of separation. Parents who were never reunited with their child experienced a

qualitatively distinct form of loss that extends beyond prolonged separation. Hence, we recommend that this be treated as an extraordinary circumstance and compensated as an additional damages award.

c. **Additional Factors That Warrant Consideration:** To these factors, we add one more factor that is likely to shape the stress of separation for parents: how long parents do not know the whereabouts of their child. Although there is little empirical research on this aspect of parent-child separation, not knowing a child's whereabouts is likely to amplify parents' distress. When parents do not know where their child is, they may fear their child thinks they have been abandoned or imagine other horrific scenarios, including serious harm to or the death of their child. Reports of the 2017 child separation policy and related litigation indicate that some parents experienced these fears and that it was not uncommon that parents were not informed of their children's whereabouts for over a month. We thus propose that knowledge of a child's whereabouts constitutes an important dimension of suffering, distinguishing between whether parents knew where their children were within two months of separation or longer.

7. **Consideration of extraordinary circumstances:** While the forcible separation of parents and children is inherently traumatic, some circumstances are so clearly unique as to fall outside of any typical compensation model. While it is not possible to determine in advance what all of these circumstances might be, we have proposed that parents and children be provided the opportunity to communicate their unique circumstances in a narrative form. These narratives will enable a determination of the extent to which supplemental compensation is warranted. One obvious example (already noted) are those parents who have not yet been reunited – or who were reunited after an exceptionally long period of time. However, other circumstances might include

separation from a parent or child who was undergoing (or needed) medical care for a life-threatening illness or severe physical injuries (or death) suffered during detention. In these cases, parents and children will continue to receive compensation commensurate with the proposed formula but will also be considered for additional compensation to the extent possible.

8. In recent weeks, we have worked closely with Hausfeld LLP to develop a settlement allocation plan consistent with the views set forth in this Affidavit. We have reviewed the allocation plan submitted by the Plaintiffs in support of their motion for preliminary approval of the class settlement with MVM and believe it is both consistent with the views set forth here and a scientifically appropriate evidence-based approach to settlement distribution.

Dated: August 8, 2026

New Haven, CT and New York, NY

Dylan Gee, PhD

Andrew Rasmussen, PhD

Barry Rosenfeld, PhD

## Works Cited


Ainsworth, M. D., & Bell, S. M. (1970). Attachment, exploration, and separation: Illustrated by the behavior of one-year-olds in a strange situation. *Child Development*, *41*(1), 49–67.

Ainsworth, M. D. S., Bell, S. M., & Stayton, D. F. (1974). Infant-mother attachment and social development: Socialization as a product of reciprocal responsiveness to signals. In *The Integration of a Child into a Social World* (pp. 99–135). Cambridge University Press.

Alberini, C. M., & Travaglia, A. (2017). Infantile Amnesia: A Critical Period of Learning to Learn and Remember. *The Journal of Neuroscience: The Official Journal of the Society for Neuroscience*, *37*(24), 5783–5795.

Bick, J., Lipschutz, R., Tabachnick, A., Biekman, B., Katz, D., Simons, R., & Dozier, M. (2022). Timing of Adoption is Associated with Electrophysiological Brain Activity and Externalizing Problems Among Children Adopted Internationally. *Developmental Psychobiology*, *64*(4), e22249.

Bocknek, E. L., Sanderson, J., & Britner IV, P. A. (2009). Ambiguous loss and posttraumatic stress in school-age children of prisoners. *Journal of Child and family Studies*, *18*(3), 323-333.

Boss, P. (2007). Ambiguous loss theory: Challenges for scholars and practitioners. *Family Relations*, *56*(2), 105–111.

Boss, P., & Yeats, J. R. (2014). Ambiguous loss: A complicated type of grief when loved ones disappear. *Bereavement Care*, *33*(2), 63-69.

Bowlby, J. (1969). *Attachment and Loss, Vol. 1: Attachment*. Basic Books.

Bryant, R. A., Creamer, M., O'Donnell, M., Forbes, D., Felmingham, K. L., Silove, D., Malhi, G., van Hoof, M., McFarlane, A. C., & Nickerson, A. (2017). Separation from parents during childhood trauma predicts adult attachment security and post-traumatic stress disorder. *Psychological Medicine*, *47*(11), 2028–2035.

Calkins, S. D., & Hill, A. (2007). Caregiver Influences on Emerging Emotion Regulation: Biological and Environmental Transations in Early Development. *Handbook of Emotion Regulation*, 229248, 229-248.

Callaghan, B. L., & Tottenham, N. (2016a). The Stress Acceleration Hypothesis: Effects of early-life adversity on emotion circuits and behavior. *Current Opinion in Behavioral Sciences*, *7*, 76–81. https://doi.org/10.1016/j.cobeha.2015.11.018

Callaghan, B. L., & Tottenham, N. (2016b). The Neuro-Environmental Loop of Plasticity: A Cross-Species Analysis of Parental Effects on Emotion Circuitry Development Following Typical and Adverse Caregiving. *Neuropsychopharmacology*, *41*(1), 163–176.

Cassidy, J., & Shaver, P. R. (Eds.). (2002). *Handbook of Attachment: Theory, Research, and Clinical Applications*. Rough Guides.

Cohodes, E. M., Kribakaran, S., Odriozola, P., Bakirci, S., McCauley, S., Hodges, H. R., Sisk, L. M., Zacharek, S. J., & Gee, D. G. (2021). Migration-related trauma and mental health among migrant children emigrating from Mexico and Central America to the United States: Effects on developmental neurobiology and implications for policy. *Developmental Psychobiology*, *63*(6), e22158. https://doi.org/10.1002/dev.22158

Dozier, M., Manni, M., Gordon, M. K., Peloso, E., Gunnar, M. R., Stovall-McClough, K. C., Eldreth, D., & Levine, S. (2006). Foster children's diurnal production of cortisol: An exploratory study. *Child Maltreatment*, *11*(2), 189–197.

Dreby, J. (2015). U.S. immigration policy and family separation: The consequences for children's well-being. *Social Science & Medicine*, *132*, 245–251.

Eisenberg, N., Cumberland, A., & Spinrad, T. L. (1998). Parental socialization of emotion. *Psychological Inquiry*, *9*(4), 241–273.

Fan, L., & Kang, T. (2025). Early childhood trauma and its long-term impact on cognitive and emotional development: A systematic review and meta-analysis. *Annals of Medicine*, *57*(1), 2536199.

Feldman, R. (2007). Parent–Infant Synchrony: Biological Foundations and Developmental Outcomes. *Current Directions in Psychological Science*, *16*(6), 340–345. https://doi.org/10.1111/j.1467-8721.2007.00532.x

Fisher, P. A., Gunnar, M. R., Chamberlain, P., & Reid, J. B. (2000). Preventive Intervention for Maltreated Preschool Children: Impact on Children's Behavior, Neuroendocrine Activity, and Foster Parent Functioning. *Journal of the American Academy of Child & Adolescent Psychiatry*, *39*(11), 1356–1364.

Flannery, J. E., Gabard-Durnam, L. J., Shapiro, M., Goff, B., Caldera, C., Louie, J., Gee, D. G., Telzer, E. H., Humphreys, K. L., Lumian, D. S., & Tottenham, N. (2017). Diurnal cortisol after early institutional care—Age matters. *Developmental Cognitive Neuroscience, Sensitive Periods across Development*, *25*, 160–166.

Fox, S. E., Levitt, P., & Nelson, C. A., III. (2010). How the Timing and Quality of Early Experiences Influence the Development of Brain Architecture. *Child Development*, *81*(1), 28–40.

Gee, D. G. (2016). Sensitive Periods of Emotion Regulation: Influences of Parental Care on Frontoamygdala Circuitry and Plasticity. *New Directions for Child and Adolescent Development*, *2016*(153), 87–110.

Gee, D. G. (2021). Early Adversity and Development: Parsing Heterogeneity and Identifying Pathways of Risk and Resilience. *The American Journal of Psychiatry*, *178*(11), 998–1013. https://doi.org/10.1176/appi.ajp.2021.21090944

Gee, D. G., Gabard-Durnam, L. J., Flannery, J., Goff, B., Humphreys, K. L., Telzer, E. H., Hare, T. A., Bookheimer, S. Y., & Tottenham, N. (2013). Early developmental emergence of human amygdala-prefrontal connectivity after maternal deprivation. *Proceedings of the National Academy of Sciences*, *110*(39), 15638–15643.

Gee, D. G., Gabard-Durnam, L., Telzer, E. H., Humphreys, K. L., Goff, B., Shapiro, M., Flannery, J., Lumian, D. S., Fareri, D. S., Caldera, C., & Tottenham, N. (2014). Maternal buffering of human amygdala-prefrontal circuitry during childhood but not during adolescence. *Psychological Science*, *25*(11), 2067–2078.

Gee, D. G., & Casey, B. J. (2015). The Impact of Developmental Timing for Stress and Recovery. *Neurobiology of Stress*, *1*, 184–194.

Gee, D. G., Bath, K. G., Johnson, C. M., Meyer, H. C., Murty, V. P., van den Bos, W., & Hartley, C. A. (2018). Neurocognitive Development of Motivated Behavior: Dynamic Changes across Childhood and Adolescence. *The Journal of Neuroscience: The Official Journal of the Society for Neuroscience*, *38*(44), 9433–9445.

Godoy, L. D., Rossignoli, M. T., Delfino-Pereira, P., Garcia-Cairasco, N., & de Lima Umeoka, E. H. (2018). A Comprehensive Overview on Stress Neurobiology: Basic Concepts and Clinical Implications. *Frontiers in Behavioral Neuroscience*, *12*.

Goral, A., Lahad, M., & Aharonson-Daniel, L. (2017). Differences in posttraumatic stress characteristics by duration of exposure to trauma. *Psychiatry Research, 258*, 101-107.

Gunnar, M., & Fisher, P. (2006). Bringing basic research on early experience and stress neurobiology to bear on preventive interventions for neglected and maltreated children. *Development and Psychopathology*. https://doi.org/10.1017/S0954579406060330

Gunnar, M. R., Frenn, K., Wewerka, S. S., & Van Ryzin, M. J. (2009). Moderate versus severe early life stress: Associations with stress reactivity and regulation in 10–12-year-old children. *Psychoneuroendocrinology*, *34*(1), 62–75.

Gunnar, M. R., & Hostinar, C. E. (2015). The social buffering of the hypothalamic-pituitary-adrenocortical axis in humans: Developmental and experiential determinants. *Social Neuroscience, 10*(5), 479–488. https://doi.org/10.1080/17470919.2015.1070747

Gunnar, M. R., Hostinar, C. E., Sanchez, M. M., Tottenham, N., & Sullivan, R. M. (2015). Parental buffering of fear and stress neurobiology: Reviewing parallels across rodent, monkey, and human models. *Social Neuroscience, 10*(5), 474–478. https://doi.org/10.1080/17470919.2015.1070198

Gunnar, M. R., Morison, S. J., Chisholm, K., & Schuder, M. (2001). Salivary cortisol levels in children adopted from Romanian orphanages. *Development and Psychopathology*, *13*(3), 611–628. https://doi.org/10.1017/S095457940100311X

Habbach, H., MA, Hampton, K., MSt, Mishori, R., MD, & MHS. (2020). *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation*. https://phr.org/our-work/resources/you-will-never-see-your-child-again-the-persistent-psychological-effects-of-family-separation/

Herzberg, M. P., McKenzie, K. J., Hodel, A. S., Hunt, R. H., Mueller, B. A., Gunnar, M. R., & Thomas, K. M. (2021). Accelerated maturation in functional connectivity following early life stress: Circuit specific or broadly distributed? *Developmental Cognitive Neuroscience, 48,* 100922. https://doi.org/10.1016/j.dcn.2021.100922

Hobfoll, Stevan E. "The conservation of resources: A new stress model." *The ecology of stress* (1988): 24-57.

Hobfoll, S. E. (1989). Conservation of resources: a new attempt at conceptualizing stress. *American Psychologist*, *44*(3), 513.

Hobfoll, S. E. (2001). The influence of culture, community, and the nested-self in the stress process: Advancing conservation of resources theory. *Applied Psychology*, *50*(3), 337-421.

Hofer, M. A. (1978). Hidden regulatory processes in early social relationships. In *Social Behavior* (pp. 135–166). Springer.

Hollander, T. (2016). Ambiguous loss and complicated grief: Understanding the grief of parents of the disappeared in northern Uganda. *Journal of Family Theory & Review*, *8*(3), 294-307.

Hostinar, C. E., Johnson, A. E., & Gunnar, M. R. (2015). Parent support is less effective in buffering cortisol stress reactivity for adolescents compared to children. *Developmental Science*, *18*(2), 281–297. https://doi.org/10.1111/desc.12195

Hostinar, C. E., Sullivan, R. M., & Gunnar, M. R. (2014). Psychobiological mechanisms underlying the social buffering of the hypothalamic-pituitary-adrenocortical axis: A review of animal models and human studies across development. *Psychological Bulletin*, *140*(1), 256–282. https://doi.org/10.1037/a0032671

Huebner, A. J., Mancini, J. A., Wilcox, R. M., Grass, S. R., & Grass, G. A. (2007). Parental deployment and youth in military families: Exploring uncertainty and ambiguous loss. *Family Relations*, *56*(2), 112-122.

Humphreys, K. L. (2019). Future Directions in the Study and Treatment of Parent-Child Separation. *Journal of Clinical Child and Adolescent Psychology*, *48*(1), 166–178.

Keller, A. S., Ford, D., Trinh-Shevrin, C., … & Rosenfeld, B. (2003). Mental health of detained asylum seekers. *Lancet*, *362*, 1271-1273.

Kribakaran, S., Cohodes, E. M., & Gee, D. G. (2023). Developmental neuroscience informs policy related to migrant and refugee children's mental health. *Policy Insights from the Behavioral and Brain Sciences*, *10*(2), 151–159.

Lieberman, A. F., & Oliver Bucio, G. (2018). When Migration Separates Children and Parents: Searching for Repair. *Zero to Three: The Trauma of Family Separation and Parental Loss in Early Childhood*, *39*(1).

Lobo, F. M., & Lunkenheimer, E. (2020). Understanding the Parent-Child Coregulation Patterns Shaping Child Self-Regulation. *Developmental Psychology*, *56*(6), 1121–1134. https://doi.org/10.1037/dev0000926

Loman, M. M., & Gunnar, M. R. (2010). Early experience and the development of stress reactivity and regulation in children. *Neuroscience & Biobehavioral Reviews*, *34*(6), 867–876. https://doi.org/10.1016/j.neubiorev.2009.05.007

Malter Cohen, M., Jing, D., Yang, R. R., Tottenham, N., Lee, F. S., & Casey, B. J. (2013). Early-life stress has persistent effects on amygdala function and development in mice and humans. *Proceedings of the National Academy of Sciences*, *110*(45), 18274–18278.

MacLean, S. A., Agyeman, P. O., Walther, J., Singer, E. K., Baranowski, K. A., & Katz, C. L. (2019). Mental health of children held at a United States immigration detention center. *Social Science & Medicine*, *230*, 303-308.

MacLean, S. A., Agyeman, P. O., Walther, J., Singer, E. K., Baranowski, K. A., & Katz, C. L. (2020). Characterization of the mental health of immigrant children separated from their mothers at the U.S.–Mexico border. *Psychiatry Research*, *286*, 112555.

McEwen, B. S. (2012). Brain on stress: How the social environment gets under the skin. *Proceedings of the National Academy of Sciences of the United States of America*, *109*(Suppl 2), 17180–17185. https://doi.org/10.1073/pnas.1121254109

McEwen, B. S., & Akil, H. (2020). Revisiting the Stress Concept: Implications for Affective Disorders. *The Journal of Neuroscience*, *40*(1), 12–21. https://doi.org/10.1523/JNEUROSCI.0733-19.2019

McFarlane, A. C. (1987). Posttraumatic phenomena in a longitudinal study of children following a natural disaster. *Journal of the American Academy of Child and Adolescent Psychiatry*, *26*(5), 764–769. https://doi.org/10.1097/00004583-198709000-00025

McLaughlin, K. A., Sheridan, M. A., Tibu, F., Fox, N. A., Zeanah, C. H., & Nelson, C. A. (2015). Causal effects of the early caregiving environment on development of stress response systems in children. *Proceedings of the National Academy of Sciences*, *112*(18), 5637–5642. https://doi.org/10.1073/pnas.1423363112

McLaughlin, K. A., Weissman, D., & Bitrán, D. (2019). Childhood Adversity and Neural Development: A Systematic Review. *Annual Review of Developmental*

*Psychology*, *1*(1), 277–312. https://doi.org/10.1146/annurev-devpsych-121318-084950

Miller, J. G., Ho, T. C., Humphreys, K. L., King, L. S., Foland-Ross, L. C., Colich, N. L., Ordaz, S. J., Lin, J., & Gotlib, I. H. (2020). Early Life Stress, Frontoamygdala Connectivity, and Biological Aging in Adolescence: A Longitudinal Investigation. *Cerebral Cortex*, *30*(7), 4269–4280.

Monico, C., Rotabi, K. S., & Lee, J. (2019). Forced Child–Family Separations in the Southwestern U.S. Border Under the "Zero-Tolerance" Policy: Preventing Human Rights Violations and Child Abduction into Adoption (Part 1). *Journal of Human Rights and Social Work*, *4*(3), 164–179.

Naseh, M., Zeng, Y., Ahn, E., Cohen, F., & Rfat, M. (2024). Mental health implications of family separation associated with migration policies in the United States: a systematic review. *Social Science & Medicine*, *352*, 116995.

Nathanson, A., & Rogers, M. (2020). When ambiguous loss becomes ambiguous grief: Clinical work with bereaved dementia caregivers. *Health & Social Work*, *45*(4), 268-275.

Perry, B. D., & Pollard, R. (1998). Homeostasis, stress, trauma, and adaptation. A neurodevelopmental view of childhood trauma. *Child and Adolescent Psychiatric Clinics of North America*, *7*(1), 33–51, viii.

Shonkoff, J. P., Garner, A. S., Health, T. C. on P. A. of C. and F., Childhood, C. on E., Adoption, Care, A. D., & Pediatrics, A. S. on D. and B. (2011). The Lifelong Effects of Early Childhood Adversity and Toxic Stress. *Pediatrics*, peds.2011-2663. https://doi.org/10.1542/peds.2011-2663

Silvers, J. A., Lumian, D. S., Gabard-Durnam, L., Gee, D. G., Goff, B., Fareri, D. S., Caldera, C., Flannery, J., Telzer, E. H., Humphreys, K. L., & Tottenham, N. (2016). Previous Institutionalization Is Followed by Broader Amygdala-Hippocampal-PFC Network Connectivity during Aversive Learning in Human Development. *The Journal of Neuroscience: The Official Journal of the Society for Neuroscience*, *36*(24), 6420–6430.

Spangler, G., & Schieche, M. (1998). Emotional and Adrenocortical Responses of Infants to the Strange Situation: The Differential Function of Emotional Expression. *International Journal of Behavioral Development*, *22*(4), 681–706. https://doi.org/10.1080/016502598384126

Sroufe, L. A. (2005). Attachment and development: A prospective, longitudinal study from birth to adulthood. *Attachment & Human Development*, *7*(4), 349–367. https://doi.org/10.1080/14616730500365928

Tamis-LeMonda, C. S., Shannon, J. D., Cabrera, N. J., & Lamb, M. E. (2004). Fathers and mothers at play with their 2- and 3-year-olds: Contributions to language and cognitive development. *Child Development*, *75*(6), 1806–1820. https://doi.org/10.1111/j.1467-8624.2004.00818.x

Teicher, M. H. (2018). Childhood trauma and the enduring consequences of forcibly separating children from parents at the United States border. *BMC Medicine*, *16*(1), 146. https://doi.org/10.1186/s12916-018-1147-y

Thompson, R. A., & Meyer, S. (2014). The socialization of emotion regulation in the family. In *Handbook of Emotion Regulation*.

Tottenham, N., Hare, T. A., Quinn, B. T., McCarry, T. W., Nurse, M., Gilhooly, T., Millner, A., Galvan, A., Davidson, M. C., Eigsti, I.-M., Thomas, K. M., Freed, P. J., Booma, E. S., Gunnar, M. R., Altemus, M., Aronson, J., & Casey, B. J. (2010). Prolonged institutional rearing is associated with atypically large amygdala volume and difficulties in emotion regulation. *Developmental Science*, *13*(1), 46–61.

Tottenham, N., Hare, T. A., Millner, A., Gilhooly, T., Zevin, J. D., & Casey, B. J. (2011). Elevated amygdala response to faces following early deprivation: Neurodevelopment and adversity. *Developmental Science*, *14*(2), 190–204.

Tottenham, N., & Sheridan, M. (2009). A review of adversity, the amygdala and the hippocampus: A consideration of developmental timing. *Frontiers in Human Neuroscience*, *3*, 68. https://doi.org/10.3389/neuro.09.068.2009

Von Werthern, M., Robjant, K., Chui, Z., Schon, R., Ottisova, L., Mason, C., & Katona, C. (2018). The impact of immigration detention on mental health: a systematic review. *BMC psychiatry*, *18*(1), 382.

Waddoups, A. B., Yoshikawa, H., & Strouf, K. (2019). Developmental Effects of Parent–Child Separation. *Annual Review of Developmental Psychology*, *1*(Volume 1, 2019), 387–410. https://doi.org/10.1146/annurev-devpsych-121318-085142

Wallace, C. (2024). The Trauma of Separation: Lifelong Health Implications on Children. *Pediatric Annals*, *53*(5), e167–e170.

Wismer Fries, A. B., Shirtcliff, E. A., & Pollak, S. D. (2008). Neuroendocrine dysregulation following early social deprivation in children. *Developmental Psychobiology*, *50*(6), 588–599. https://doi.org/10.1002/dev.20319

Wood, L. C. (2018). Impact of punitive immigration policies, parent-child separation and child detention on the mental health and development of children. *BMJ paediatrics open*, *2*(1), e000338.

Zhao, Y., Du, M., Gao, X., Xiao, Y., Shah, C., Sun, H., Chen, F., Yang, L., Yan, Z., Fu, Y., & Lui, S. (2016). Altered brain network topology in left-behind children: A resting-state functional magnetic resonance imaging study. *Child Abuse & Neglect*, *62*, 89–99. https://doi.org/10.1016/j.chiabu.2016.10.013

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Padre (*alias*), Junior (*alias*), I.V.S. (*alias*) and A.V.L. (*alias*), by and through I.V.S. *on behalf of themselves and all others similarly situated*,

*Plaintiffs*,

v.

MVM, Inc.,

*Defendant*.

Case No.: 3:24-cv-01265-DMS-AHG

**DECLARATION OF GINA INTREPIDO-BOWDEN REGARDING PROPOSED SETTLEMENT NOTICE PLAN**

I, GINA INTREPIDO-BOWDEN, declare and state as follows:

1. I am a Vice President at JND Legal Administration ("JND"). I am a judicially recognized legal notice expert with more than 20 years of experience designing and implementing class action legal notice programs. I have been involved in many of the largest and most complex class action notice programs, including all aspects of notice dissemination. A comprehensive description of my experience is attached as **Exhibit 1**.

2. I submit this Declaration based on my personal knowledge, as well as upon information provided to me by experienced JND employees and Counsel in the Action to describe the proposed Settlement Notice Plan and address why it is consistent with other best practicable court-approved notice plans and the requirements of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), the Due Process Clause of the United States Constitution, and any other applicable statute, law or rule, as well as the Federal Judicial Center ("FJC") guidelines for best practicable due process notice.

## BACKGROUND AND EXPERIENCE

3. ***Full-Service Provider***. JND is a leading legal administration services provider with offices throughout the United States and its headquarters in Seattle, Washington. JND has extensive experience with all aspects of legal administration and has administered hundreds of class action matters. JND's class action division provides all services necessary for the effective implementation of class actions including: (1) all facets of legal notice, such as outbound mailing, email notification, and the design and implementation of media programs; (2) website design and deployment, including online claim filing capabilities; (3) call center and other contact support; (4) secure class member data management; (5) paper and electronic claims processing; (6) calculation design and programming; (7) payment disbursements through check, wire, peer to peer payment services like PayPal, merchandise credits, and other means; (8) qualified

settlement fund tax reporting; (9) banking services and reporting; and (10) all other functions related to the secure and accurate administration of class actions.

4. ***Government Relationships***. JND is an approved vendor for the United States Securities and Exchange Commission ("SEC") and the Federal Trade Commission ("FTC") and holds long term contracts with both agencies. We are currently administering approximately thirty matters for the FTC and fifteen matters for the SEC, including the $455 million *GTV Media Fair Fund*. We are an approved vendor for the Consumer Financial Protection Bureau and are currently working to distribute over $1.8 billion to affected consumers in one of their matters. JND also routinely works on projects involving the Equal Employment Opportunity Commission, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency. We also have Master Services Agreements with various corporations and banks, which were awarded after we underwent rigorous reviews of our systems, privacy policies, and procedures. JND has been certified as SOC 2 Type 2 compliant by noted accounting firm Baker Tilly.[1]

5. ***Industry Recognition***. JND has been recognized by various publications, including the *National Law Journal*, the *Legal Times*, and the *New York Law Journal*, for excellence in class action administration. JND was named the #1 Class Action Claims Administrator in the U.S. by the national legal community for multiple consecutive years, and we were inducted into the *National Law Journal* Hall of Fame for having held this title for the fifth year in a row.

6. ***Complex Matters***. JND has built its reputation handling large, complex matters effectively and efficiently. We were appointed as the notice and claims administrator in the landmark $2.67 billion settlement for the *In re: Blue Cross Blue*

---

[1] As a SOC 2 Compliant organization, JND has passed an audit under AICPA criteria for providing data security.

*Shield Antitrust Litig.* in which we mailed over 100 million postcard notices; sent hundreds of millions of email notices and reminders; placed notice via print, television, radio, internet, and more; staffed a call center with 250 agents during the peak of the notice program; and received and processed more than eight million claims. JND was also appointed the settlement administrator in the $1.3 billion settlement for the *In re Equifax Inc. Customer Data Sec. Breach Litig.*, where we received more than 18 million claims and sent direct notice. JND sent email notice twice to over 140 million class members; the interactive website received more than 130 million hits; and the call center was staffed with approximately 500 agents at the peak of call volume.

7. Other large JND matters include a voluntary remediation program in Canada on behalf of over 30 million people; the $1.8 billion *Lexington Law Matter*; the $1.5 billion settlements in the *In re Mercedes-Benz Emissions Litig.*; the $120 million settlement in the *In re Gen. Motors LLC Ignition Switch Litig.*, where we sent nearly 30 million notices and processed over 1.5 million claims; the $227 million settlement in *Sidibe v. Sutter Health*; the $215 million settlement in the *In re USC Student Health Ctr. Litig.* on behalf of women who were sexually abused by a doctor at USC; the various *National Association of Realtors Settlements* totaling over $1 billion thus far; and the recent $1.5 billion copyright settlement in *Bartz v. Anthropic PBC*, as well as hundreds of other matters.

8. Additionally, JND has handled several matters involving notice to undocumented immigrants, including *Novoa v. GEO Grp., Inc.*, Case No. 17-cv-02514-JGB-SHK (C.D. Cal.); *Nwauzor v. GEO Grp., Inc.*, Case No. 17-cv-05769 (W.D. Wash.); and *Stout v. GEO Grp., Inc.*, Case No. 37-2019-00000650-CU-CR-CTL (Cal. Super. Ct.).

9. ***<u>Legal Notice Expertise</u>***. As a member of JND's Legal Notice Team, I research, design, develop, and implement a wide array of legal notice programs to meet the requirements of Rule 23 and relevant state court rules. In addition to providing notice

to potential class members through direct efforts, we have used a variety of media channels, including newspapers, press releases, magazines, trade journals, radio, television, social media, and the internet, depending upon the circumstances of the case, the demographics of the class, and the habits of its members, as reported by various research and analytic tools. Our media campaigns are regularly approved by courts throughout the United States.

10. During my career, I have submitted declarations to courts throughout the country attesting to the creation and launch of various notice programs.

## THE CLASS

11. The Class or Class Members consist of all persons who qualify for inclusion as a class member in the settlement class certified in *Ms. L. v. U.S. Immigration & Customs Enforcement*, No. 3:18-cv-00428-DMS-AHG (S.D. Cal.) and were separated from their parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021. In preliminary analysis of available class data, we have identified approximately 8,900 individuals, of which approximately 81% are over the age of 18 and approximately 19% are under the age of 18 as of September 4, 2026. Although this includes some potential duplication, JND will review any new class data provided to standardize and deduplicate, as necessary.

## TARGET ANALYSIS

12. JND analyzed the demographics of potential Class Members to understand *who* we are trying to reach so that we could then determine *how* best to reach them. Research indicates that Class Members are most likely mobile-first, Spanish-dominant, economically strained, and geographically dispersed after separation, release, reunification, or removal. Class Members may distrust institutions, relying on family and nonprofit networks, and engaging more readily with plain-language Spanish notice and familiar community intermediaries.

13. ***Economic Precarity Favors Mobile***. Potential Class Members are better served by mobile-heavy media.[2] Class Members skew toward low-income households,[3] which means prepaid phones, shared devices, changing addresses, and inconsistent email usage were considered and mobile placements emphasized.

14. ***Countries of Origin Indicate Need for Spanish Language***. Countries with the largest unauthorized immigrant population in the U.S. are primarily Spanish language countries—Mexico, Guatemala, El Salvador, and Honduras.[4] However, this matter involves both separated parents and separated children, creating a dual-audience notice need. Some Class Members will be reached through caregivers and sponsors, while others are now old enough to encounter notice directly through youth-oriented digital platforms. Spanish-first creative is recommended as the operational baseline, with English support for now-young-adult former minors and bilingual helpers. In addition, JND will provide operational pathways to add language support where data or response patterns show need.

15. ***Geographic Emphasis on Key States***. The six states with the largest unauthorized immigrant populations are California, Texas, Florida, New York, New

---

[2] 44% of Hispanic immigrants have NO computer access - https://www.migrationpolicy.org/journal/feature/digital-divide-hits-us-immigrant-households-disproportionately-during-covid-19.

[3] The average household income (HHI) for households composed exclusively of undocumented residents is $53,200 versus the average U.S. HHI of $76,800 - https://cmsny.org/publications/2024-mass-deportation-program-devastate-american-families-101024/.

[4] https://www.pewresearch.org/race-and-ethnicity/2025/08/21/u-s-unauthorized-immigrant-population-reached-a-record-14-million-in-2023/.

Jersey, and Illinois.[5] Additionally, it is our understanding that many Class Members were located in the Southeast per the *Ms. L*. settlement. As a result, JND recommends geographically concentrating the U.S. notice efforts to key states, as well as including notice abroad to Mexico and Northern Triangle of Central America (i.e., Guatemala, El Salvador, and Honduras).

**SETTLEMENT NOTICE PLAN OVERVIEW**

16. The objective of the proposed Settlement Notice Plan is to provide the best notice practicable, consistent with the methods and tools employed in other court-approved notice programs and to allow Class Members the opportunity to review a plain language notice with the ability to easily take the next step and learn more about the settlement. The FJC's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (the "*Checklist*") consider a notice plan with a high reach (above 70%) to be effective.[6]

17. The proposed Settlement Notice Plan includes the following components, as further described in the sections below.

a. Direct notice to all Class Members for whom contact information is provided or located;

b. Targeted digital notice with the leading digital network (Google Display Network – "GDN") and two popular social media platforms (Facebook and Instagram) to support the direct notice effort;

c. An internet search campaign;

---

[5] https://www.pewresearch.org/race-and-ethnicity/2025/08/21/u-s-unauthorized-immigrant-population-reached-a-record-14-million-in-2023/re_2025-08-21_unauthorized-immigrants_0-06/.

[6] The FJC's *Checklist* p. 3 states: "…the lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%."

d. The distribution of a press release to media outlets in the United States and Spanish Latin America;

e. Third-party outreach to the Benefit Administrators supporting the *Ms. L.* settlement;

f. Possible broadcast radio, video streaming, and/or audio streaming media efforts may be included if we do not have enough Class Member contact information;

g. Depending upon claims rates, reminder notices may be sent just prior to the claims deadline to remind Class Members of the impending deadline;

h. A settlement website that will provide detailed information about the case, including a page with answers to frequently asked questions, contact information, key dates, links to important case documents including the Long Form Notice, attached as **Exhibit 2**, and the Settlement Agreement, as well as audio clips in various languages to communicate to Class Members how to get more information about the settlement in their language; and

i. A settlement toll-free number with an interactive voice response (IVR), WhatsApp contact number with IVR and messaging ability, email address, and post office box.

18. Based on my experience in developing and implementing notice programs, I believe that a Settlement Notice Plan with these elements will provide the best notice practicable under the circumstances.

19. Each component of the proposed Settlement Notice Plan is described in more detail in the sections below.

## <u>DIRECT NOTICE</u>

20. An adequate notice program needs to satisfy "due process" when reaching a class. The United States Supreme Court, in *Eisen v. Carlisle & Jacquelin*, 417 U.S.

156 (1974), stated that direct notice (when possible) is the preferred method for reaching a class. In addition, Rule 23(c)(2) of the Federal Rules of Civil Procedure provides that "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means."

21. As a result, JND proposes sending direct notice to Class Members for whom contact information can be found or provided. Based on the expected Class data, we propose direct mail notice (U.S. and/or international, as appropriate) and/or WhatsApp messaging.

22. ***<u>Class Data</u>***. Upon receiving Class Member names, date of births (DOBs), date of arrival into the United States, and A-Numbers from Class Counsel, JND ran the names and DOBs through advanced skip-trace to identify addresses and phone numbers for potential Class Members. Utilizing the Name and DOB provided by Class Counsel, JND identified and obtained 3,152 records with either a potential Class Member phone number or address and 39 records with a potential Class Member with at least one phone number only. This number does not include current minor Class Members living with parents reached through this contact information.

23. Al Otro Lado, a legal services provider in the *Ms. L.* settlement, has also provided contact information for approximately 500 *Ms. L.* Class Members. Further, we understand that Counsel is working to get possible contact information through a subpoena to the U.S. government and non-profit entities that were subcontracted by the government to administer the related *Ms. L.* matter ("Benefit Administrators"). Some contact information may include international addresses, as some Class Members may not currently reside in the United States. Upon receiving a Court order, we understand the Department of Homeland Security (DHS) has agreed to provide any contact

information they have for the approximately 8,900 Class Members. The contact information will include any information that one of the Benefit Administrators, International Organization for Migration (IOM), has provided to DHS as well. Our understanding is that IOM has received contact information from a large majority of the Class Members. To the extent that two other Benefit Administrators, Acacia and Seneca, have additional or more recent contact information, our understanding is that Counsel is also working to obtain this data.

24. Upon receiving all the Class Member contact information from Al Otro Lado, the U.S. government, and/or the Benefit Administrators, JND will promptly load the information into a case-specific database for this matter. JND employs appropriate administrative, technical, and physical controls designed to ensure the confidentiality and protection of Class Member data, as well as to reduce the risk of loss, misuse, or unauthorized access, disclosure, or modification of the data. Once the data is loaded, JND assigns a unique identification number to each Class Member to identify them throughout the administration process.

25. ***Mailed Notice***. Prior to sending the Mailed Notice (both Generic Mailed Notice and Personalized Mailed Notice), attached as **Exhibit 3**, JND will translate it to Spanish. We will also update all addresses using the United States Postal Service ("USPS") National Change of Address ("NCOA") database.[7]

26. JND will (a) compare skip-traced addresses against records provided by Al Otro Lado, the U.S. government, and/or Benefit Administrators to further validate the information prior to outreach, and (b) utilize those addresses to mail an approved notice.

[7] The NCOA database is the official USPS technology product which makes changes of address information available to mailers to help reduce undeliverable mail pieces before mail enters the mail stream.

27. Where an address is corroborated through provided records and can be confidently associated with a specific Class Member, the mailed notice will include a case-specific Unique ID to facilitate access to the settlement website and online claim filing process (i.e., the Personalized Mailed Notice). Alternatively, if such validation is unavailable, JND may distribute a more general notice directing recipients to the settlement website, where they may determine their eligibility and submit their claim using their A-Number and Date of Birth (i.e., the Generic Mailed Notice).

28. JND will track all notices returned undeliverable by the USPS and will promptly re-mail notices that are returned with a forwarding address. We will also determine if it is possible to reach a Class Member for whom a notice is returned without a forwarding address by either mailing to a more recent mailing address or using skip-tracing tools to identify a new mailing address. JND typically works with TransUnion and/or LexisNexis, with whom we have had significant success, to conduct skip-tracing and other address research.

29. ***WhatsApp Notice***. Upon Court approval, JND will use a secure, high-deliverability communications infrastructure to notify Class Members through Programmable WhatsApp Utility Messaging, including pre-send number validation. Class Members may respond directly by WhatsApp or contact JND through WhatsApp calling.

30. JND has identified at least one phone number for approximately 2,605 associated with individuals who may be Class Members through skip-tracing and related location efforts using available identifying information, including names and dates of birth. JND will (a) compare those telephone numbers against records provided by Al Otro Lado, the U.S. government, and/or Benefit Administrators to further validate the information prior to outreach, and (b) utilize those telephone numbers to transmit an approved WhatsApp notice. The data from Al Otro Lado, the U.S. government, and/or

Benefit Administrators will likely provide many more additional phone numbers for Class Members. JND will also transmit an approved WhatsApp notice to the phone numbers obtained through from Al Otro Lado, the U.S. government, and/or Benefit Administrators, but not identified through skip tracing.

31. Where a telephone number is corroborated through provided records and can be confidently associated with a specific Class Member, the WhatsApp notice will include a case-specific Unique ID to facilitate access to the settlement website and online claim filing process (i.e., a Personalized WhatsApp Notice). Alternatively, if such validation is unavailable, JND will distribute a more general WhatsApp notice directing recipients to the settlement website, where they may determine their eligibility and submit their claim using their A-Number and Date of Birth (i.e., a Generic WhatsApp Notice).

32. The WhatsApp outreach will supplement the direct mailed notice, media, and outreach components of the Notice Plan and is intended to increase awareness among potential Class Members who may be difficult to locate through traditional notice methods.

33. A sample WhatsApp notice (both Generic WhatsApp Notice and Personalized WhatsApp Notice) is attached as **Exhibit 4**.

## DIGITAL/SOCIAL MEDIA

34. To support the direct notice effort, JND proposes serving targeted digital impressions[8] with GDN, Facebook, and Instagram.

35. Targeting will focus on adults 18 years of age (Adults 18+) with an emphasis on lower-income populations. Geographically, we recommend serving

[8] Impressions or Exposures are the total number of opportunities to be exposed to a media vehicle or combination of media vehicles containing a notice. Impressions are a gross or cumulative number that may include the same person more than once. As a result, impressions can and often do exceed the population size.

impressions to the United States with an emphasis on key states, as well as Mexico, El Salvador, Honduras, and Guatemala. Digital ads will run primarily in Spanish with some English.

36. A portion of the GDN effort will be served to: (1) feature content related to visas and immigration, immigration policy, border issues, family reunification, and related topics, as well as (2) Spanish-language websites such as univision.com/local, telemundo.com, telemundoareadelabahia.com, telemundoaustin.com, telemundo40.com, telemundodallas.com, telemundosanantonio.com, eldiariony.com, diariolasamericas.com.

37. The digital activity will be served across all devices, with a heavy emphasis on mobile. The digital ads will include an embedded link to the settlement website, where Class Members can receive more information about the case, as well as file a claim electronically.

38. Samples of the digital ads (in English) are attached as **Exhibit 5**.

## INTERNET SEARCH

39. Given that web browsers frequently default to a search engine page, search engines are a common source to get to a specific website (i.e., as opposed to typing the desired URL in the navigation bar). As a result, JND proposes a Google search effort to assist interested Class Members in finding the settlement website. A custom keyword and ad group list will be generated based on content on the settlement website landing page, as well as other case information. Keywords are words/phrases that are bid on when they match the search term (or a variation of the search term) a person types into their Google search bar. When a search term matches a keyword or phrase, a Responsive Search Ad (RSA) may be served, generating a tailored message relevant to the search term. RSAs utilize machine learning to pair various combinations of ad copy (headlines and descriptions) based on which groupings have worked well previously (i.e., produced a

strong CTR/conversion performance), and what the platform anticipates will generate the ideal results from the unique searcher. When the RSA is clicked on, the visitor will be redirected to the settlement website where they can get more information, as well as file a claim electronically.

40. Samples of RSAs are attached as **Exhibit 6**.

## PRESS RELEASE

41. To further assist in getting "word of mouth" out about the settlement, JND proposes the distribution of a Spanish and English press release at the start of the campaign to media outlets in the United States and Spanish Latin America.

42. A copy of the press release (in English) is attached as **Exhibit 7**.

## THIRD-PARTY OUTREACH

43. To increase awareness, JND will coordinate closely with Counsel and the third-party Benefit Administrators supporting the *Ms. L.* settlement to help notify potential Class Members about the settlement.

## ADDITIONAL MEDIA

44. Depending upon the amount of Class data obtained, additional media notice may include the following:

a. A 30-second audio spot may run on Spanish radio stations with potential vendors such as iHeart, Entravision, and/or Univision. Spots would run in various key markets and regions in the United States. Radio may also run in Mexico, Honduras, El Salvador, and Guatemala on a mix of talk-news-music formats/stations in key markets.

b. A 30-second video spot may run programmatically across premium Spanish over-the-top (OTT) inventory, including ad-supported FAST channels (Free Ad-Supported Streaming TV) on platforms such as Estrella Media, Telemundo, Fubo TV, Roku, FOX Sports, Peacock. A portion of this effort would

be targeted to multi-generational households and/or viewers who immigrated between 2017 and the present. A video effort with YouTube would emphasize webpages and/or apps that have content related to visa, immigration policy, and border issues.

c. A 30-second audio spot may run programmatically across premium Spanish audio vendors such as Univision, Spotify, Spanish Broadcasting System (SBS), Entravision, Uforia, and iHeartRadio. A portion of this effort would be targeted to multi-generational households and/or viewers who immigrated between 2017 and the present.

45. A copy of the 30-second audio script is attached as **Exhibit 8**.

## REMINDER NOTICE

46. Prior to the claim filing deadline, in consultation with Class Counsel, JND may initiate a reminder notice effort to encourage Class Members who have yet to submit a claim to do so before the impending claim deadline. The reminder notice effort could include phone calls, mailed notice, WhatsApp messaging, digital notice, and/or other forms of contact.

47. The notice will remind potential Class Members of the approaching claims deadline. The Reminder Notice (both Generic Reminder Notice and Personalized Reminder Notice) is attached as **Exhibit 9**.

## SETTLEMENT WEBSITE

48. JND will develop and deploy an informational case-specific settlement website, where Class Members may obtain more information about the case in both Spanish and English. The settlement website will have an easy-to-navigate design that will be formatted to emphasize important information and deadlines; will provide links to essential case documents, including the Long Form Notice; and will allow Class Members to file an online claim or print a Claim Form, attached as **Exhibit 10**, to submit

by mail. The settlement website will also post audio clips in the various languages that will communicate to Class Members how to get more information in their language.

49. The settlement website will be prominently displayed in all printed notice documents and accessible through WhatsApp and the digital notices.

50. The settlement website will be ADA-compliant and optimized for mobile visitors so that information loads quickly on mobile devices. It will be designed to maximize search engine optimization through Google and other search engines.

51. The settlement website will inform Class Members of the terms of the Settlement Agreement, their rights under the Settlement Agreement, and dates (including for the Fairness Hearing), deadlines, and other case information. It will post copies of all relevant documents filed with the Court.

**TOLL-FREE NUMBER, WHATSAPP, EMAIL, AND POST OFFICE BOX**

52. JND will establish and maintain an automated toll-free telephone line and WhatsApp contact number, that Class Members may call for information related to the settlement. Both will have an English and Spanish IVR available 24 hours a day, seven days a week.

53. JND will also establish and maintain a settlement email address through which Class Members may send inquiries and other correspondence. Messages may also be sent through WhatsApp.

54. Finally, JND will establish and maintain a dedicated post office box for this matter.

**NOTICE DESIGN**

55. JND designed the proposed notice documents so that they are written in plain language and comply with the requirements of Rule 23, the Due Process Clause of the United States Constitution, and the FJC's *Checklist*.

56. The notice documents contain plain and easy-to-read summaries of the settlement and the options available to Class Members. Additionally, the notice documents provide instructions on how to obtain more information about the settlement.

57. Courts routinely approve notices that have been written and designed in a similar manner.

## REACH

58. JND anticipates that the proposed direct notice effort, digital/social media effort, internet search campaign, press release distribution, and third-party outreach will effectively reach the Class; however, additional media including broadcast radio, video streaming, and audio streaming may also be considered to meet the reach standard set forth by the FJC.

## CONCLUSION

59. In my opinion, the proposed Settlement Notice Plan described above provides the best notice practicable under the circumstances; it is consistent with the requirements of Rule 23 and other similar court-approved notice programs. The Settlement Notice Plan is designed to provide Class Members with the opportunity to review the notice and the ability to easily take next steps to learn more about the settlement.

60. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 18, 2026 at Stone Harbor, New Jersey.

Gina Intrepido-Bowden

# EXHIBIT 1

# GINA INTREPIDO-BOWDEN

VICE PRESIDENT

JND



## I. INTRODUCTION

Gina Intrepido-Bowden is a Vice President at JND Legal Administration ("JND"). She is a court recognized legal notice expert who has been involved in the design and implementation of hundreds of legal notice programs reaching class members/claimants throughout the U.S., Canada, and the world, with plain language notices in over 35 languages. Some notable cases in which Gina has been involved include:

- *Brach Family Found. v. AXA Equitable Life Ins. Co.*, a $307.5 million COI settlement
- *FTC v. Reckitt Benckiser Grp. PLC*, the $50 million Suboxone branded drug antitrust settlement
- *In re Blue Cross Blue Shield Antitrust Litig.*, a $2.67 billion antitrust settlement providing notice to class members via an extensive direct notice effort supplemented by a media campaign consisting of print, television, radio, internet, and more
- *In re Packaged Seafood Products Antitrust Litigation*, the $152.2 million end purchaser settlements, involving two robust media programs, as well as the direct purchaser settlements, involving two extensive direct notice efforts
- *In re General Motors LLC Ignition Switch Litig.*, the $120 million GM Ignition Switch economic settlement
- *In re Home Depot, Inc., Customer Data Sec. Breach Litig.*, a security breach impacting over 40 million consumers who made credit/debit card purchases in a Home Depot store
- *In re Residential Schools Litig.*, a complex Canadian class action incorporating a groundbreaking notice program to remote aboriginal persons qualified to receive benefits in the multi-billion-dollar settlement

- *In re Royal Ahold Sec. and "ERISA"*, a $1.1 billion securities settlement involving a comprehensive international notice effort
- *In re Skelaxin (Metaxalone) Antitrust Litig.*, a prescription antitrust involving notice to both third party payor and consumer purchasers
- *In re TJX Cos., Inc. Retail Sec. Breach Litig.*, this $200 million settlement impacted 45 million credit/debit cards in the U.S. and Canada making it the then-largest theft of consumer data
- *In re Trans Union Corp. Privacy Litig.*, a $75 million data breach settlement involving persons with a credit history
- *Senne v. Office of the Comm'r of Baseball*, a $185 million settlement providing compensation to nearly 25,000 minor league baseball players
- *The National Association of Realtors Settlements*, involving multiple antitrust settlements with various realtors totaling over $1 billion thus far
- *Thompson v Metropolitan Life Ins. Co.*, a large race-based pricing settlement involving 25 million policyholders
- *USC Student Health Ctr. Settlement*, a $215 million settlement providing compensation to women who were sexually assaulted, harassed and otherwise abused by Dr. George M. Tyndall
- *Williams v. Weyerhaeuser Co.*, a consumer fraud litigation involving exterior hardboard siding on homes and other structures

With more than 30 years of advertising research, planning and buying experience, Gina began her career working for one of New York's largest advertising agency media departments (BBDO), where she designed multi-million-dollar media campaigns for clients such as Gillette, GE, Dupont, and HBO. Since 2000, she has applied her media skills to the legal notification industry, working for several large legal notification firms. Gina is an accomplished author and speaker on class notice issues including effective reach, notice dissemination, as well as noticing trends and innovations. She earned a Bachelor of Arts in Advertising from Penn State University, graduating *summa cum laude*.

II.

# JUDICIAL RECOGNITION

Courts have favorably recognized Ms. Intrepido-Bowden's work as outlined by the sampling of Judicial comments below:

## 1. Honorable Linda S. Jamieson, J.S.C.

***Goldstein v. Houlihan/Lawrence Inc.***, (August 13, 2025)
No. 60767/2018 (N.Y. Super. Ct.):

*At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. (Dkt. 2307) . . . Now at the final approval stage, Plaintiffs submitted with their motion a declaration of Gina Intrepido-Bowden from JND summarizing the notice that was given to Settlement Class members and the resulting opt-outs and objections . . . As shown in the Intrepido-Bowden Declaration, the direct notice program was extremely successful, reaching more than 93% of the Settlement Class members . . . Based on the record, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied the requirements of due process, CPLR § 908, and all applicable law.*

## 2. Honorable Terrence G. Berg

***Chapman v Gen. Motors, LLC***, (May 6, 2025)
No. 19-CV-12333-TGB-DRG (E.D. Mich.):

*The Settlement Claims Administrator, JND Legal Administration LLC ("JND"), also placed the Notice on the settlement website. The direct notice effort successfully delivered notice to 375,728 Class Members, or 96 percent of the known Class. The direct notice effort alone reached virtually all potential Class Members. The supplemental digital effort, internet search campaign, and press release further enhance that reach. Thus, notice has been given in an adequate and sufficient manner, constitutes the best notice practicable under the circumstances, and satisfies all requirements of Rule 23(e) and due process.*

## 3. Honorable Joseph H. Rodriguez

***Cohen v. Subaru Corp.***, (July 11, 2024)
No. 20-cv-8442-JHR-AMD (D.N.J.):

*The Court appoints JND Legal Administration as the Settlement Administrator ("Settlement Administrator")...The notices and Notice Program satisfy all applicable requirements of law, including, but not limited to, Rule 23 and the constitutional requirement of due process.*

## 4. Judge Stephen R. Bough

***Burnett v. Nat'l Assoc. of Realtors* - Partial Settlement with Nat'l Assoc. of Realtors,** (November 27, 2024)

No. 19-CV-00332-SRB (W.D. Mo.):

*At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator…As directed by the Court, JND implemented the Class Notice Plan. Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication. As stated in that declaration, nearly 40 million direct notices were mailed or emailed to the Class. JND's digital notice effort delivered more than 300 million impressions. More than 500 news stories addressed the litigation and settlement, including full articles in outlets such as the ABC News, CBS News, NBC News, and the New York Times. The Court finds that the direct notice program was adequate and reached more than 99% of identified Settlement Class members.*

## 5. Honorable Dana M. Sabraw

***In re Packaged Seafood Prods. Antitrust Litig.* (EPP Class),** (November 22, 2024)

No. 15-md-02670 (S.D. Cal.):

*The EPPs again retained JND, an experienced and well-respected claims administrator. The Court previously approved JND as Claims Administrator for the COSI Settlement and to disseminate the Class Notice…The Settlement Notice Plan, approved by the Court's Preliminary Approval Order, was robust and provided the Settlement Class Notice (in various forms) to Settlement Class Members…The digital and print efforts alone reached more than 70% of potential Settlement Class Members and further extended by Mail Notice.*

## 6. Judge Stephen R. Bough

***Gibson v. The Nat'l Assoc. of Realtors,*** (November 4, 2024)

No. 23-cv-00788-SRB (W.D. Miss.):

*At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. As directed by the Court, JND implemented the Class Notice Plan. Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication…the direct notice program was extremely successful and reached more than 97% of identified Settlement Class members. Nearly 40 million direct notices were mailed or emailed to the Class. JND's digital effort alone delivered more than 300 million impressions, and its press release was picked up at least 495 times with a potential audience of 113 million. In addition to the formal class notice process, and beyond the paid press release, more than 470 news stories addressed the litigation and settlement, including full articles in outlets such as the New York Times, USAToday, and CNN…Based on the record, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and fully satisfied*

*the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. The Court further finds that the notice given to the Settlement Class was adequate and reasonable.*

## 7. Honorable Philip S. Gutierrez

***Grey Fox, LLC v. Plains All Am. Pipeline, L.P.,*** (September 17, 2024)
No. 16-cv-03157-PSG-JEM (C.D. Cal.):

*The Court finds that the Notice set forth in Article XI of the Settlement Agreement, detailed in the Notice Plan attached to the Declaration of Gina Intrepido-Bowden of JND Legal Administration, and effectuated pursuant to the Preliminary Approval Order: (a) constitutes the best notice practicable under the circumstances of this Action; (b) constitutes due and sufficient notice to the Classes of the terms of the Settlement Agreement and the Final Approval Hearing; and (c) fully complied with the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and any other applicable law, including the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.*

## 8. Honorable Joanna Seybert

***Natale v. 9199-4467 Quebec Inc.,*** (May 14, 2024)
21-cv-6775-JS-SIL (E.D.N.Y.):

*The Court further finds that the method of dissemination of notice to the Settlement Class…satisfies Rule 23, due process, and constitutes the best notice practicable under the circumstances…The Court appoints JND Legal Administration as the Settlement Administrator.*

## 9. Honorable Philip S. Gutierrez

***Grey Fox, LLC v. Plains All Am. Pipeline, L.P.,*** (May 1, 2024)
No. 16-cv-03157-PSG-JEM (C.D. Cal.):

*The Court appoints JND Legal Administration as Settlement Administrator and directs it to carry out all duties and responsibilities of the Settlement Administrator as specified in the Settlement Agreement Section VI (B) and herein…The Court approves, as to form and content, the class notices attached as Exhibits C, D, and E to the Agreement and Exhibits B, C, and D to the Declaration of Gina Intrepido-Bowden In Support of Motion for Preliminary Approval of Class Action Settlement and Direction of Notice ("Intrepido-Bowden Declaration").*

## 10. Honorable Daniel J. Calabretta

***Weiner v. Ocwen Fin. Corp.,*** (March 28, 2024)
No. 14-cv-02597-DJC-DB (E.D. Cal.):

*The Court hereby appoints JND Legal Administration as Settlement Administrator… the Court finds that the proposed Notice program meets the requirements of due process under the U.S. Constitution and Rule 23; and that such Notice program, which*

*includes direct notice to Settlement Class Members via e-mail and/or mail to the extent practicable, the establishment of a settlement website, the establishment of a toll-free telephone helpline, and the notice provided via internet search platforms and other online advertisements, is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.*

## 11. Judge Barbara J. Rothstein

***Moore v Robinhood Fin. LLC,*** (February 13, 2024)

No. 21-cv-01571-BJR (W.D. Wash.):

*The Court appoints JND Legal Administration as the Settlement Administrator…The Court finds this manner of giving notice fully satisfies the requirements of Fed. R. Civ. P. 23 and due process, constitutes the best notice practicable under the circumstances, including its use of individual notice to all Settlement Class Members who can be identified with the available data and reasonable effort, and shall constitute due and sufficient notice to all persons entitled thereto.*

## 12. Honorable Jon S. Tigar

***Aberin v. Am. Honda Motor Co., Inc.,*** (February 1, 2024)

No. 16-cv-04384-JST (N.D. Cal.):

*The proposed Class Notice Program consists of (a) a mailed notice ("Class Notice," attached as Exhibit 1 to Plaintiffs' Preliminary Approval Motion), sent to the last known address of Settlement Class Members; (b) email follow-ups to each Settlement Class Member for whom email addresses are known; (c) a social-media component; (d) targeted notice based on search terms used by persons on Google; and (e) a website publication of the Settlement Agreement and Class Notice and other case-related documents at a public website with a domain name related to the action With respect to such Class Notice Program, the Court finds that such Class Notice is fair and adequate. The Court further reaffirms its findings in support of the appointment of JND Legal Administration as Notice Administrator, ECF No. 326, and now appoints JND Legal Administration to serve as Settlement Notice Administrator.*

## 13. Judge Stephen R. Bough

***Burnett v. Nat'l Assoc. of Realtors*** **- first round of settlements with Keller Williams, Anywhere, and RE/MAX,** (May 9, 2024)

No. 19-CV-00332-SRB (W.D. Mo.):

*At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. As directed by the Court, JND implemented the parties' Class Notice Plan…Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication…The media effort alone reached at least 71 percent of the Settlement Class members….Based on the record, the Court finds that the notice given to the Settlement Class constituted the best notice practicable under the circumstances and*

*fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. The Court further finds that the notice given to the Settlement Class was adequate and reasonable.*

## 14. Judge Cormac J. Carney

***Doe v. MindGeek USA Incorp.***, (January 26, 2024)

No. 21-cv-00338 (C.D. Cal.):

*...the Court finds that the notice and plan satisfy the statutory and constitutional requirements because, given the nature and complexity of this case, "a multi-faceted notice plan is the best notice that is practicable under the circumstances."*

## 15. Honorable Jesse M. Furman

***City of Philadelphia v. Bank of Am. Corp.***, (October 12, 2023)

No. 19-CV-1608 (JMF) (S.D.N.Y.):

*The Court approves the form and contents of the Short-Form and Long-Form Notices (collectively, the "Notices") attached as exhibits to the Intrepido-Bowden Declaration... In addition to directly mailing notice, JND will run digital ads targeting a custom audience using the Google Display Network (GDN) and LinkedIn in an effort to target likely Class Members...JND will cause the publication notice, attached as Exhibit F to the Intrepido-Bowden Declaration to be published in the Wall Street Journal and Investor's Business Daily. JND will also cause an informational press release, attached as Exhibit G to the Intrepido-Bowden Declaration, to be distributed to approximately 11,000 media outlets nationwide.*

## 16. Honorable David O. Carter

***Gutierrez, Jr. v. Amplify Energy Corp.***, (September 14, 2023)

No. 21-cv-01628-DOC-JDE (C.D. Cal.):

*The Court finds that the Notice set forth in the Settlement Agreement, detailed in the Notice Plan attached to the Declaration of Gina Intrepido-Bowden of JND Legal Administration, and effectuated pursuant to the Preliminary Approval Order: (a) constitutes the best notice practicable under the circumstances of this Action; (b) constitutes due and sufficient notice to the Classes of the terms of the Settlement Agreement and the Final Approval Hearing; and (c) fully complied with the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and any other applicable law, including the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.*

## 17. Chief Judge Stephanie M. Rose

***PHT Holding II LLC v. N. Am. Co. for Life and Health Ins.***, (August 25, 2023)

No. 18-CV-00368 (S.D. Iowa):

*The Court appoints JND Legal Administration LLC ("JND") as the Settlement Administrator...Pursuant to Rule 23(e)(1)(B), the Court directs that notice be provided*

*to Class Members through the Notices, attached as Exhibits B and C to the Declaration of Gina M. Intrepido-Bowden ("Intrepido-Bowden Declaration"), and through the notice program described in described in Section 4 of the Agreement and Paragraphs 15–20 and 31–37 of the Intrepido-Bowden Declaration. The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances as well as valid, due and sufficient notice to the Class and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

## 18. Judge Mary Kay Vyskocil

***Advance Trust & Life Escrow Serv., LTA v. PHL Variable Ins. Co.,*** (August 9, 2023)
No. 18-cv-03444 (MKV) (S.D.N.Y.):

*The Court appoints JND Legal Administration LLC ("JND"), which is a competent firm, as the Settlement Administrator…Pursuant to Rule 23(e)(1)(B), the Court directs that notice be provided to class members through the Notices, attached as Exhibits B-C to the Declaration of Gina M. Intrepido-Bowden (the "Intrepido-Bowden Declaration"), and through the notice program described in described in Paragraph 63 of the Agreement and Paragraphs 7-11 and 24-31 of the Intrepido-Bowden Declaration. The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances, as well as valid, due, and sufficient notice to the Class, and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

## 19. Honorable Terrence G. Berg

***Chapman v. Gen. Motors, LLC,*** (June 29, 2023)
No. 19-CV-12333-TGB-DRG (E.D. Mich.):

*Pursuant to Federal Rules of Civil Procedure 23(c)(2)(B), the Court finds that the content, format, and method of disseminating Class Notice set forth in the Intrepido-Bowden Declaration, including the form and content of the proposed forms of Class Notice attached as Exhibits B (Short Form Notice), C (digital advertisements), and D (Long Form Notice) to the Intrepido-Bowden Declaration, is the best notice practicable under the circumstances and satisfies all legal requirements, including Federal Rule of Civil Procedure 23(c)(2)(B) and the Due Process Clause.*

## 20. Honorable Jesse M. Furman

***Brach Family Found. v. AXA Equitable Life Ins. Co.,*** (June 22, 2023)
No. 16-cv-00740 (JMF) (S.D.N.Y.):

*The Court appoints JND Legal Administration LLC ("JND") a competent firm, as the Settlement Administrator…Pursuant to Rule 23(e)(1)(B), the Court directs that notice be provided to Class Members through the Notices, attached as Exhibits B-D to the Declaration of Gina M. Intrepido-Bowden (the "Intrepido-Bowden Declaration"), and*

*through the notice program described in Section 5 of the Agreement and Paragraphs 18-23 and 34-40 of the Intrepido-Bowden Declaration. The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances as well as valid, due and sufficient notice to the Classes and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

## 21. Honorable David O Carter

***Gutierrez, Jr. v. Amplify Energy Corp.,*** (June 16, 2023)
No. 21-cv-01628-DOC-JDE (C.D. Cal.):

*The Court appoints JND Legal Administration as the Settlement Administrator in this Action…The Court approves, as to form and content, the Direct Notices, Long Form Notices, and Email notices substantially in the forms attached as Exhibits B-J to the Declaration of Gina Intrepido-Bowden Regarding Proposed Shipping Defendants Settlement Notice Plan ("Intrepido-Bowden Declaration").*

## 22. Honorable Virginia M. Kendall

***In re Local TV Advert. Antitrust Litig.,*** (June 14, 2023)
MDL No. 2867 (N.D. Ill.):

*JND Legal Administration is hereby appointed as the Settlement Administrator with respect to the CBS, Fox, Cox Entities, and ShareBuilders Settlements. The Court approves the proposed Notice Program, including the, Email Notice, Postcard Notice, Print Notice, Digital Notice, Long Form Notice and the Claim Form, attached to the Declaration of Gina M. Intrepido-Bowden as Exhibits B to G.*

## 23. Honorable Daniel D. Domenico

***Advance Trust & Life Escrow Serv., LTA v. Sec. Life of Denver Ins. Co.,*** (April 18, 2023)
No. 18-cv-01897-DDD-NYW (D. Colo.):

*The Court appoints JND Legal Administration LLC ("JND") a competent firm, as the Settlement Administrator…Pursuant to Rule 23(e)(1)(B), the Court directs that notice be provided to class members through the Notices, attached as Exhibits B-C to the Declaration of Gina M. Intrepido-Bowden (the "Intrepido-Bowden Declaration"), and through the notice program described in Section 4 of the Agreement and Paragraphs 32-38 of the Intrepido-Bowden Declaration. The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances as well as valid, due and sufficient notice to the Class and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

## 24. Honorable Dana M. Sabraw

***In re Packaged Seafood Prods. Antitrust Litig.* (EPP Class),** (July 15, 2022)
No. 15-md-02670 (S.D. Cal.):

*An experienced and well-respected claims administrator, JND Legal Administration LLC ("JND"), administered a comprehensive and robust notice plan to alert Settlement Class Members of the COSI Settlement Agreement…The Notice Plan surpassed the 85% reach goal…The Court recognizes JND's extensive experience in processing claims especially for millions of claimants…The Court finds due process was satisfied and the Notice Program provided adequate notice to settlement class members in a reasonable manner through all major and common forms of media.*

## 25. Judge Fernando M. Olguin

***Gupta v. Aeries Software, Inc.*,** (July 7, 2022)
No. 20-cv-00995 (C.D. Cal.):

*Under the circumstances, the court finds that the procedure for providing notice and the content of the class notice constitute the best practicable notice to class members and complies with the requirements of due process…The court appoints JND as settlement administrator.*

## 26. Judge Cormac J. Carney

***Gifford v. Pets Global, Inc.*,** (June 24, 2022)
No. 21-cv-02136-CJC-MRW (C.D. Cal.):

*The Settlement also proposes that JND Legal Administration act as Settlement Administrator and offers a provisional plan for Class Notice… The proposed notice plan here is designed to reach at least 70% of the class at least two times. The Notices proposed in this matter inform Class Members of the salient terms of the Settlement, the Class to be certified, the final approval hearing and the rights of all parties, including the rights to file objections or to opt-out of the Settlement Class… This proposed notice program provides a fair opportunity for Class Members to obtain full disclosure of the conditions of the Settlement and to make an informed decision regarding the Settlement.*

## 27. Judge David J. Novak

***Brighton Tr. LLC, as Tr. v. Genworth Life & Annuity Ins. Co.*,** (June 3, 2022)
No. 20-cv-240-DJN (E.D. Va.):

*The Court appoints JND Legal Administration LLC ("JND"), a competent firm, as the Settlement Administrator…The Court approves the Notice Plan, as set forth in…paragraphs 9-15 and Exhibits B-C of the May 9, 2022 Declaration of Gina Intrepido-Bowden ("Intrepido-Bowden Declaration").*

## 28. Judge Cecilia M. Altonaga

***In re Farm-raised Salmon and Salmon Prod. Antitrust Litig.*,** (May 26, 2022)
No. 19-cv-21551-CMA (S.D. Fla.):

*The Court approves the form and content of: (a) the Long Form Notice, attached as Exhibit B to the Declaration of Gina Intrepido-Bowden of JND Administration; and (b) the Informational Press Release (the "Press Release"), attached as Exhibit C to that Declaration. The Court finds that the mailing of the Notice and the Press Release in the manner set forth herein constitutes the best notice that is practicable under the circumstances, is valid, due, and sufficient notice to all persons entitled thereto and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the Constitution of the United States.*

## 29. Judge William M. Conley

***Bruzek v. Husky Oil Operations Ltd.*,** (January 31, 2022)
No. 18-cv-00697 (W.D. Wis.):

*The claims administrator estimates that at least 70% of the class received notice… the court concludes that the parties' settlement is fair, reasonable and adequate under Rule 23(e).*

## 30. Honorable Dana M. Sabraw

***In re Packaged Seafood Prods. Antitrust Litig. (DPP Class)*,** (January 26, 2022)
No. 15-md-02670 (S.D. Cal.):

*The rigorous notice plan proposed by JND satisfies requirements imposed by Rule 23 and the Due Process clause of the United States Constitution. Moreover, the content of the notice satisfactorily informs Settlement Class members of their rights under the Settlement.*

## 31. Honorable Dana M. Sabraw

***In re Packaged Seafood Prods. Antitrust Litig. (EPP Class)*,** (January 26, 2022)
No. 15-md-02670 (S.D. Cal.):

*Class Counsel retained JND, an experienced notice and claims administrator, to serve as the notice provider and settlement claims administrator. The Court approves and appoints JND as the Claims Administrator. EPPs and JND have developed an extensive and robust notice program which satisfies prevailing reach standards. JND also developed a distribution plan which includes an efficient and user-friendly claims process with an effective distribution program. The Notice is estimated to reach over 85% of potential class members via notice placements with the leading digital network (Google Display Network), the top social media site (Facebook), and a highly read consumer magazine (People)… The Court approves the notice content and plan for providing notice of the COSI Settlement to members of the Settlement Class.*

## 32. Judge Alvin K. Hellerstein

***Leonard v. John Hancock Life Ins. Co. of NY,*** (January 10, 2022)

No. 18-CV-04994 (S.D.N.Y.):

*The Court appoints Gina Intrepido-Bowden of JND Legal Administration LLC, a competent firm, as the Settlement Administrator…the Court directs that notice be provided to class members through the Notices, attached as Exhibits B-C to the Declaration of Gina M. Intrepido-Bowden (the "Intrepido-Bowden Declaration"), and through the notice program described in described in Section 5 of the Agreement and Paragraphs 24-33 of the Intrepido-Bowden Declaration. The Court finds that the manner of distribution of the Notices constitutes the best practicable notice under the circumstances as well as valid, due and sufficient notice to the Class and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the United States Constitution.*

## 33. Honorable Nelson S. Roman

***Swetz v. GSK Consumer Health, Inc.,*** (November 22, 2021)

No. 20-cv-04731 (S.D.N.Y.):

*The Notice Plan provided for notice through a nationwide press release; direct notice through electronic mail, or in the alternative, mailed, first-class postage prepaid for identified Settlement Class Members; notice through electronic media—such as Google Display Network and Facebook—using a digital advertising campaign with links to the dedicated Settlement Website; and a toll-free telephone number that provides Settlement Class Members detailed information and directs them to the Settlement Website. The record shows, and the Court finds, that the Notice Plan has been implemented in the manner approved by the Court in its Preliminary Approval Order.*

## 34. Honorable Nathanael M. Cousins

***Malone v. Western Digital Corp.,*** (July 21, 2021)

No. 20-cv-03584-NC (N.D. Cal.):

*The Court hereby appoints JND Legal Administration as Settlement Administrator… The Court finds that the proposed notice program meets the requirements of Due Process under the U.S. Constitution and Rule 23; and that such notice program-which includes individual direct notice to known Settlement Class Members via email, mail, and a second reminder email, a media and Internet notice program, and the establishment of a Settlement Website and Toll-Free Number-is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.*

## 35. Judge Vernon S. Broderick, Jr.

***In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,** (June 7, 2021) No. 14-md-02542 (S.D.N.Y.):

*The Notice Plan provided for notice through a nationwide press release, print notice in the national edition of People magazine, and electronic media—Google Display Network, Facebook, and LinkedIn—using a digital advertising campaign with links to a settlement website. Proof that Plaintiffs have complied with the Notice Plan has been filed with the Court. The Notice Plan met the requirements of due process and Federal Rule of Civil Procedure 23; constituted the most effective and best notice of the Agreement and fairness hearing practicable under the circumstances; and constituted due and sufficient notice for all other purposes to all other persons and entities entitled to receive notice.*

## 36. Judge R. David Proctor

***In re Blue Cross Blue Shield Antitrust Litig.*,** (November 30, 2020) Master File No. 13-CV-20000-RDP (N.D. Ala.):

*After a competitive bidding process, Settlement Class Counsel retained JND Legal Administration LLC ("JND") to serve as Notice and Claims Administrator for the settlement. JND has a proven track record and extensive experience in large, complex matters… JND has prepared a customized Notice Plan in this case. The Notice Plan was designed to provide the best notice practicable, consistent with the latest methods and tools employed in the industry and approved by other courts…The court finds that the proposed Notice Plan is appropriate in both form and content and is due to be approved.*

## 37. Honorable Louis L. Stanton

***Rick Nelson Co. v. Sony Music Ent.*,** (September 16, 2020) No. 18-cv-08791 (S.D.N.Y.):

*The parties have designated JND Legal Administration ("JND'') as the Settlement Administrator. Having found it qualified, the Court appoints JND as the Settlement Administrator and it shall perform all the duties of the Settlement Administrator as set forth in the Stipulation…The form and content of the Notice, Publication Notice and Email Notice, and the method set forth herein of notifying the Class of the Settlement and its terms and conditions, meet the requirements of Rule 23 of the Federal Rules of Civil Procedure, due process. and any other applicable law, constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons and entities entitled thereto.*

## 38. Judge Kathleen M. Daily

***Podawiltz v. Swisher Int'l, Inc.***, (February 7, 2019)

No. 16CV27621 (Or. Cir. Ct.):

*The Court appoints JND Legal Administration as settlement administrator…The Court finds that the notice plan is reasonable, that it constitutes due, adequate and sufficient notice to all persons entitled to receive notice, and that it meets the requirements of due process, ORCP 32, and any other applicable laws.*

## 39. Judge John Bailey

***In re Monitronics Int'l, Inc. TCPA Litig.***, (September 28, 2017)

No. 11-cv-00090 (N.D. W.Va.):

*The Court carefully considered the Notice Plan set forth in the Settlement Agreement and plaintiffs' motion for preliminary approval. The Court finds that the Notice Plan constitutes the best notice practicable under the circumstances, and satisfies fully the requirements of Rule 23, the requirements of due process and any other applicable law, such that the terms of the Settlement Agreement, the releases provided therein, and this Court's final judgment will be binding on all Settlement Class Members.*

## 40. Honorable James Ashford

***Nishimura v. Gentry Homes, LTD.***, (September 14, 2017)

No. 11-11-1-1522-07-RAN (Haw. Super. Ct.):

*The Court further finds that the mailing and distribution of the Class Notice and the publication of the Class Notices substantially in the manner and form set forth in the Notice Plan and Settlement Agreement meets the requirements of the laws of the State of Hawai'i (including Hawai'i Rule of Civil Procedure 23), the United States Constitution (including the Due Process Clause), the Rules of the Court, and any other applicable law, constitutes the best notice practicable under the circumstances, and constitutes due and sufficient notice to all potential Class Members.*

## 41. Judge Cecilia M. Altonaga

***Flaum v. Doctor's Assoc., Inc.***, (March 22, 2017)

No. 16-cv-61198 (S.D. Fla.):

*The Court approves the notice program in all respects (including the proposed forms of notice, Summary Notice, Full Notice for the Settlement Website, Publication Notice, Press Release and Settlement Claim Forms, and orders that notice be given in substantial conformity therewith.*

## 42. Judge Joan A. Leonard

***Barba v. Shire U.S., Inc.***, (December 2, 2016)

No. 13-cv-21158 (S.D. Fla.):

*… the Court finds that the Notice was given to potential Settlement Class members who were identified through reasonable efforts, published using several publication dates in Better Homes and Gardens, National Geographic, and People magazines; placed on targeted website and portal banner advertisements on general Run of Network sites; included in e-newsletter placements with ADDitude, a magazine dedicated to helping children and adults with attention deficit disorder and learning disabilities lead successful lives, and posted on the Settlement Website which included additional access to Settlement information and a toll-free number. Pursuant to, and in accordance with, Federal Rule of Civil Procedure 23, the Court hereby finds that the Notice provided Settlement Class members with due and adequate notice of the Settlement, the Settlement Agreement, these proceedings, and the rights of Settlement Class members to make a claim, object to the Settlement or exclude themselves from the Settlement.*

## 43. Judge Marco A. Hernandez

***Kearney v. Equilon Enter. LLC***, (October 25, 2016)

No. 14-cv-00254 (D. Ore.):

*The papers supporting the Final Approval Motion, including, but not limited to, the Declaration of Robert A. Curtis and the two Declarations filed by Gina Intrepido-Bowden, describe the Parties' provision of Notice of the Settlement. Notice was directed to all members of the Settlement Classes defined in paragraph 2, above. No objections to the method or contents of the Notice have been received. Based on the above-mentioned declarations, inter alia, the Court finds that the Parties have fully and adequately effectuated the Notice Plan, as required by the Preliminary Approval Order, and, in fact, have achieved better results than anticipated or required by the Preliminary Approval Order.*

## 44. Judge Fernando M. Olguin

***Chambers v. Whirlpool Corp.***, (October 11, 2016)

No. 11-cv-01733 (C.D. Cal.):

*Accordingly, based on its prior findings and the record before it, the court finds that the Class Notice and the notice process fairly and adequately informed the class members of the nature of the action, the terms of the proposed settlement, the effect of the action and release of claims, their right to exclude themselves from the action, and their right to object to the proposed settlement.*

## 45. Judge Mary M. Rowland

***In re Home Depot, Inc., Customer Data Sec. Breach Litig.***, (August 23, 2016)
No. 14-md-02583 (N.D. Ga.):

*The Court finds that the Notice Program has been implemented by the Settlement Administrator and the parties in accordance with the requirements of the Settlement Agreement, and that such Notice Program, including the utilized forms of Notice, constitutes the best notice practicable under the circumstances and satisfies due process and the requirements of Rule 23 of the Federal Rules of Civil Procedure.*

## 46. Honorable Lynn Adelman

***Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd., (Indirect Purchaser),*** (July 7, 2016)
No. 09-cv-00852 (E.D. Wis.):

*The Court further finds that the mailing and publication of Notice in the manner set forth in the Notice Program is the best notice practicable under the circumstances; is valid, due and sufficient notice to all Settlement Class members; and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the Constitution of the United States. The Court further finds that the forms of Notice are written in plain language, use simple terminology, and are designed to be readily understandable by Settlement Class members.*

## 47. Judge Marco A. Hernandez

***Kearney v. Equilon Enter. LLC,*** (June 6, 2016)
No. 14-cv-00254 (Ore. Dist. Ct.):

*The Court finds that the Parties' plan for providing Notice to the Settlement Classes as described in paragraphs 35-42 of the Settlement Agreement and as detailed in the Settlement Notice Plan attached to the Declaration of Gina Intrepido-Bowden: (a) constitutes the best notice practicable under the circumstances of this Action; (b) constitutes due and sufficient notice to the Settlement Classes of the pendency of the Action, certification of the Settlement Classes, the terms of the Settlement Agreement, and the Final Approval Hearing; and (c) complies fully with the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and any other applicable law. The Court further finds that the Parties' plan for providing Notice to the Settlement Classes, as described in paragraphs 35-42 of the Settlement Agreement and as detailed in the Settlement Notice Plan attached to the Declaration of Gina Intrepido-Bowden, will adequately inform members of the Settlement Classes of their right to exclude themselves from the Settlement Classes so as not to be bound by the Settlement Agreement.*

## 48. Judge Joan A. Leonard

***Barba v. Shire U.S., Inc.***, (April 11, 2016)

No. 13-cv-21158 (S.D. Fla.):

*The Court finds that the proposed methods for giving notice of the Settlement to members of the Settlement Class, as set forth in this Order and in the Settlement Agreement, meet the requirements of Federal Rule of Civil Procedure Rule 23 and requirements of state and federal due process, is the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons entitled thereto.*

## 49. Honorable Mitchell D. Dembin

***Lerma v. Schiff Nutrition Int'l, Inc.***, (November 3, 2015)

No. 11-CV-01056 (S.D. Cal.):

*According to Ms. Intrepido-Bowden, between June 29, 2015, and August 2, 2015, consumer publications are estimated to have reached 53.9% of likely Class Members and internet publications are estimated to have reached 58.9% of likely Class Members...The Court finds this notice (i) constituted the best notice practicable under the circumstances, (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise the putative Class Members of the pendency of the action, and of their right to object and to appear at the Final Approval Hearing or to exclude themselves from the Settlement, (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice, and (iv) fully complied with due process principles and Federal Rule of Civil Procedure 23.*

## 50. Honorable Sara I. Ellis

***Thomas v. Lennox Indus. Inc.***, (July 9, 2015)

No. 13-CV-07747 (N.D. Ill.):

*The Court approves the form and content of the Long-Form Notice, Summary Notice, Postcard Notice, Dealer Notice, and Internet Banners (the "Notices") attached as Exhibits A-1, A-2, A-3, A-4 and A-5 respectively to the Settlement Agreement. The Court finds that the Notice Plan, included in the Settlement Agreement and the Declaration of Gina M. Intrepido-Bowden on Settlement Notice Plan and Notice Documents, constitutes the best practicable notice under the circumstances as well as valid, due and sufficient notice to all persons entitled thereto, and that the Notice Plan complies fully with the requirements of Federal Rule of Civil Procedure 23 and provides Settlement Class Members due process under the United States Constitution.*

## 51. Honorable David O. Carter

***Cobb v. BSH Home Appliances Corp.***, (December 29, 2014)

No. 10-CV-0711 (C.D. Cal.):

*The Notice Program complies with Rule 23(c)(2)(B) because it constitutes the best notice practicable under the circumstances, provides individual notice to all Class Members who can be identified through reasonable effort, and is reasonably calculated under the circumstances to apprise the Class Members of the nature of the action, the claims it asserts, the Class definition, the Settlement terms, the right to appear through an attorney, the right to opt out of the Class or to comment on or object to the Settlement (and how to do so), and the binding effect of a final judgment upon Class Members who do not opt out.*

## 52. Honorable José L. Linares

***Demmick v. Cellco P'ship***, (November 19, 2014)

No. 06-CV-2163 (D.N.J.):

*The Court finds that the Parties' plan for providing Notice to the Settlement Classes as described in Article V of the Settlement Agreement and as detailed in the Settlement Notice Plan attached to the Declaration of Gina M. Intrepido-Bowden: (a) constitutes the best notice practicable under the circumstances of this Action; (b) constitutes due and sufficient notice to the Settlement Classes of the pendency of the Action, certification of the Settlement Classes, the terms of the Settlement Agreement, and the Final Approval Hearing; and (c) complies fully with the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and any other applicable law.*

*The Court further finds that the Parties' plan for providing Notice to the Settlement Classes as described in Article V of the Settlement Agreement and as detailed in the Settlement Notice Plan attached to the Declaration of Gina M. Intrepido-Bowden, will adequately inform members of the Settlement Classes of their right to exclude themselves from the Settlement Classes so as to not be bound by the Settlement Agreement.*

## 53. Judge Gregory A. Presnell

***Poertner v. Gillette Co.***, (November 5, 2013)

No. 12-CV-00803 (M.D. Fla.):

*The Court finds that compliance with the Notice Plan is the best practicable notice under the circumstances and constitutes due and sufficient notice of this Order to all persons entitled thereto and is in full compliance with the requirements of Rule 23, applicable law, and due process.*

## 54. Judge Marilyn L. Huff

***Beck-Ellman v. Kaz USA, Inc.***, (June 11, 2013)

No. 10-cv-02134 (S.D. Cal.):

*The Notice Plan has now been implemented in accordance with the Court's Preliminary Approval Order…The Notice Plan was specially developed to cause class members to see the Publication Notice or see an advertisement that directed them to the Settlement Website…The Court concludes that the Class Notice fully satisfied the requirements of Rule 23(c)(2) of the Federal Rules of Civil Procedure and all due process requirements.*

## 55. Judge Tom A. Lucas

***Stroud v. eMachines, Inc.***, (March 27, 2013)

No. CJ-2003-968 L (W.D. Okla.):

*The Notices met the requirements of Okla. Stat. tit. 12 section 2023(C), due process, and any other applicable law; constituted the best notice practicable under the circumstances; and constituted due and sufficient notice to all persons and entities entitled thereto. All objections are stricken. Alternatively, considered on their merits, all objections are overruled.*

## 56. Honorable Michael M. Anello

***Shames v. Hertz Corp.***, (November 5, 2012)

No. 07-cv-02174 (S.D. Cal.):

*…the Court is satisfied that the parties and the class administrator made reasonable efforts to reach class members. Class members who did not receive individualized notice still had opportunity for notice by publication, email, or both…The Court is satisfied that the redundancies in the parties' class notice procedure—mailing, e-mailing, and publication—reasonably ensured the widest possible dissemination of the notice…The Court OVERRULES all objections to the class settlement…*

## 57. Judge Ann D. Montgomery

***In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.***, (July 9, 2012)

No. 11-MD-2247 (D. Minn.):

*The objections filed by class members are overruled; The notice provided to the class was reasonably calculated under the circumstances to apprise class members of the pendency of this action, the terms of the Settlement Agreement, and their right to object, opt out, and appear at the final fairness hearing.*

## 58. Judge Ann D. Montgomery

***In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.,*** (January 18, 2012) No. 11-MD-2247 (D. Minn.):

*The Notice Plan detailed in the Affidavit of Gina M. Intrepido-Bowden provides the best notice practicable under the circumstances and constitutes due and sufficient notice of the Settlement Agreement and the Final Fairness Hearing to the Classes and all persons entitled to receive such notice as potential members of the Class…The Notice Plan's multi-faceted approach to providing notice to Class Members whose identity is not known to the Settling Parties constitutes 'the best notice that is practicable under the circumstances' consistent with Rule 23(c)(2)(B)…Notice to Class members must clearly and concisely state the nature of the lawsuit and its claims and defenses, the Class certified, the Class member's right to appear through an attorney or opt out of the Class, the time and manner for opting out, and the binding effect of a class judgment on members of the Class. Fed. R. Civ. P. 23(c)(2)(B). Compliance with Rule 23's notice requirements also complies with Due Process requirements. 'The combination of reasonable notice, the opportunity to be heard, and the opportunity to withdraw from the class satisfy due process requirements of the Fifth Amendment.' Prudential, 148 F.3d at 306. The proposed notices in the present case meet those requirements.*

## 59. Judge Jeremy Fogel

***Ko v. Natura Pet Prod., Inc.,*** (June 24, 2011) No. 09cv2619 (N.D. Cal.):

*The Court approves, as to form and content, the Long Form Notice of Pendency and Settlement of Class Action ("Long Form Notice"), and the Summary Notice attached as Exhibits to the Settlement Agreement, and finds that the e-mailing of the Summary Notice, and posting on the dedicated internet website of the Long Form Notice, mailing of the Summary Notice post-card, and newspaper and magazine publication of the Summary Notice substantially in the manner as set forth in this Order meets the requirements of Rule 23 of the Federal Rules of Civil Procedure, and due process, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled to notice.*

## 60. Judge M. Joseph Tiemann

***Billieson v. City of New Orleans,*** (May 27, 2011) No. 94-19231 (La. Civ. Dist. Ct.):

*The plan to disseminate notice for the Insurance Settlements (the "Insurance Settlements Notice Plan") which was designed at the request of Class Counsel by experienced Notice Professionals Gina Intrepido-Bowden… IT IS ORDERED as follows: 1. The Insurance Settlements Notice Plan is hereby approved and shall be executed by the Notice Administrator; 2. The Insurance Settlements Notice Documents, substantially in the form included in the Insurance Settlements Notice Plan, are hereby approved.*

## 61. Judge Robert W. Gettleman

***In re Trans Union Corp.*,** (September 17, 2008)

MDL No. 1350 (N.D. Ill.):

*The Court finds that the dissemination of the Class Notice under the terms and in the format provided for in its Preliminary Approval Order constitutes the best notice practicable under the circumstances, is due and sufficient notice for all purposes to all persons entitled to such notice, and fully satisfies the requirements of the Federal Rules of Civil Procedure, the requirements of due process under the Constitution of the United States, and any other applicable law…Accordingly, all objections are hereby OVERRULED.*

## 62. Judge William G. Young

***In re TJX Cos. Retail Security Breach Litig.*,** (September 2, 2008)

MDL No. 1838 (D. Mass.):

*…as attested in the Affidavit of Gina M. Intrepido…The form, content, and method of dissemination of notice provided to the Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The Notice, as given, provided valid, due, and sufficient notice of the proposed settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings to all Persons entitled to such notice, and said Notice fully satisfied the requirements of Fed. R. Civ. P. 23 and due process.*

## 63. Judge David De Alba

***Ford Explorer Cases*,** (May 29, 2008)

JCCP Nos. 4226 & 4270 (Cal. Super. Ct.):

*[T]he Court is satisfied that the notice plan, design, implementation, costs, reach, were all reasonable, and has no reservations about the notice to those in this state and those in other states as well, including Texas, Connecticut, and Illinois; that the plan that was approved -- submitted and approved, comports with the fundamentals of due process as described in the case law that was offered by counsel.*

# III. SPEAKING ENGAGEMENTS

1. ***AI Issues Raised in the Settlement Claims Fraud Context***, NEW JERSEY STATE BAR ASSOCIATION (NJSBA) Annual Meeting, presenter (May 2026).

2. ***'Marching to Their Own Drumbeat.' What Lawyers Don't Understand About Notice and Claims Administration***, AMERICAN BAR ASSOCIATION, (ABA) 23rd Annual National Institute on Class Actions, panelist (October 2019).

3. ***Rule 23 Amendments and Digital Notice Ethics, accredited CLE Program***, presenter at Terrell Marshall Law Group PLLC, Seattle, WA (June 2019); Severson & Werson, San Francisco, CA and broadcast to office in Irvine (June 2019); Greenberg Traurig, LLP, Los Angeles, CA (May 2019); Chicago Bar Association, Chicago, IL (January 2019); Sidley Austin LLP, Century City, CA and broadcast to offices in Los Angeles, San Francisco, New York, Chicago, Washington D.C. (January 2019); Burns Charest LLP, Dallas, TX (November 2018); Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN (October 2018); Zimmerman Reed LLP, Minneapolis, MN (October 2018); Gustafson Gluek PLLC, Minneapolis, MN (October 2018).

4. ***Ethics in Legal Notification,* accredited CLE Program**, presenter at Kessler Topaz Meltzer & Check LLP, Radnor, PA (September 2015); The St. Regis Resort, Deer Valley, UT (March 2014); and Morgan Lewis & Bockius, New York, NY (December 2012).

5. ***Pitfalls of Class Action Notice and Settlement Administration,* accredited CLE Program**, PRACTISING LAW INSTITUTE (PLI), Class Action Litigation 2013, presenter/panelist (July 2013).

6. ***The Fundamentals of Settlement Administration,* accredited CLE Program**, presenter at Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, IL (January 2013); Wexler Wallace LLP, Chicago, IL (January 2013); Hinshaw & Culbertson LLP, Chicago, IL (October 2012); and Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA (December 2011).

7. ***Class Action Settlement Administration Tips & Pitfalls on the Path to Approval,* accredited CLE Program**, presenter at Jenner & Block, Chicago, IL and broadcast to offices in Washington DC, New York and California (October 2012).

8. ***Reaching Class Members & Driving Take Rates***, CONSUMER ATTORNEYS OF SAN DIEGO, 4th Annual Class Action Symposium, presenter/panelist (October 2011).

9. ***Legal Notice Ethics, accredited CLE Program***, presenter at Heins Mills & Olson, P.L.C., Minneapolis, MN (January 2011); Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN (January 2011); Chestnut Cambronne, Minneapolis, MN (January 2011); Berger & Montague, P.C., Anapol Schwartz, Philadelphia, PA (October 2010); Lundy Law, Philadelphia, PA (October 2010); Dechert LLP, Philadelphia, PA and broadcast to offices in California, New Jersey, New York, North Carolina, Texas, Washington D.C., and London and sent via video to their office in China (October 2010); Miller Law LLC, Chicago, IL (May 2010); Cohen Milstein Sellers & Toll PLLC, New York, NY (May 2010); and Milberg LLP, New York, NY (May 2010).

10. ***Class Actions 101: Best Practices and Potential Pitfalls in Providing Class Notice, accredited CLE Program***, presenter, Kansas Bar Association (March 2009).

# IV. ARTICLES

1. Jennifer Keough and Gina M. Intrepido-Bowden, *Simulated Engagement: Using AI-Generated Audiences to Strengthen Legal Notice Strategy*, law.com (2025).

2. Gina M. Intrepido-Bowden, *Time to Allow More Streamlined Class Action Notice Formats – Adapting Short Form Notice Requirements to Accommodate Today's Fast Paced Society*, LAW360 (2021).

3. Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006); reprinted in course materials for: CENTER FOR LEGAL EDUCATION INTERNATIONAL, Class Actions: Prosecuting and Defending Complex Litigation (2007); AMERICAN BAR ASSOCIATION, 10th Annual National Institute on Class Actions (2006); NATIONAL BUSINESS INSTITUTE, Class Action Update: Today's Trends & Strategies for Success (2006).

4. Gina M. Intrepido, *Notice Experts May Help Resolve CAFA Removal Issues, Notification to Officials*, 6 CLASS ACTION LITIG. REP. 759 (2005).

5. Todd B. Hilsee, Shannon R. Wheatman, & Gina M. Intrepido, *Do You Really Want Me to Know My Rights? The Ethics Behind Due Process in Class Action Notice Is More Than Just Plain Language: A Desire to Actually Inform*, 18 GEORGETOWN JOURNAL LEGAL ETHICS 1359 (2005).

V.

# CASE EXPERIENCE

Ms. Intrepido-Bowden has been involved in the design and implementation of hundreds of notice programs throughout her career. A partial listing of her case work is provided below.

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *A.B. v. Regents of the Univ. of California* | 20-cv-09555-RGK-E | C.D. Cal. |
| *Abante Rooter & Plumbing, Inc. v. New York Life Ins. Co.* | 16-cv-03588 | S.D.N.Y. |
| *Aberin v. Am. Honda Motor Co., Inc.* | 16-cv-04384-JST | N.D. Cal. |
| *Advance Trust & Life Escrow Serv., LTA v. PHL Variable Ins. Co.* | 18-cv-03444 (MKV) | S.D.N.Y. |
| *Advance Trust & Life Escrow Serv., LTA v. Sec. Life of Denver Ins. Co.* | 18-cv-01897-DDD-NYW | D. Colo. |
| *Ahmed v. HSBC Bank USA, NA* | 15-cv-2057-FMO-SPx | N.D. Ill. |
| *Allen v. UMB Bank, N.A.* | 1016-CV34791 | Mo. Cir. Ct. |
| *Anderson v. Canada (Phase I)* | 2008NLTD166 | NL Sup. Ct. |
| *Anderson v. Canada (Phase II)* | 2007 01T4955CP | NL Sup. Ct. |
| *Andrews v. Plains All Am. Pipeline, L.P.* | 15-cv-04113-PSG-JEM | C.D. Cal. |
| *Angel v. U.S. Tire Recovery* | 06-C-855 | W. Va. Cir. Ct. |
| *Baiz v. Mountain View Cemetery* | 809869-2 | Cal. Super. Ct. |
| *Baker v. Jewel Food Stores, Inc. & Dominick's Finer Foods, Inc.* | 00-L-9664 | Ill. Cir. Ct. |
| *Banks v. R.C. Bigelow, Inc.* | 20-cv-06208-DDP (RAOx) | C.D. Cal. |
| *Barba v. Shire U.S., Inc.* | 13-cv-21158 | S.D. Fla. |
| *Beck-Ellman v. Kaz USA Inc.* | 10-cv-2134 | S.D. Cal. |
| *Beringer v. Certegy Check Serv., Inc.* | 07-cv-1657-T-23TGW | M.D. Fla. |
| *Bibb v. Monsanto Co. (Nitro)* | 041465 | W. Va. Cir. Ct. |
| *Billieson v. City of New Orleans* | 94-19231 | La. Civ. Dist. Ct. |
| *Bland v. Premier Nutrition Corp.* | RG19-002714 | Cal. Super. Ct. |
| *Boskie v. Backgroundchecks.com* | 2019CP3200824 | S.C. C.P. |
| *Brach Family Found. v. AXA Equitable Life Ins. Co.* | 16-cv-00740 (JMF) | S.D.N.Y. |
| *Brighton Tr. LLC, as Tr. v. Genworth Life & Annuity Ins. Co.* | 20-cv-240-DJN | E.D. Va. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Brookshire Bros. v. Chiquita* | 05-CIV-21962 | S.D. Fla. |
| *Brown v. Am. Tobacco* | J.C.C.P. 4042 No. 711400 | Cal. Super. Ct. |
| *Bruzek v. Husky Oil Operations Ltd.* | 18-cv-00697 | W.D. Wis. |
| *Burnett v. Nat'l Assoc. of Realtors* | 19-CV-00332-SRB | W.D. Mo. |
| *Campos v. Calumet Transload R.R., LLC* | 13-cv-08376 | N.D. Ill. |
| *Cappalli v. BJ's Wholesale Club, Inc.* | 10-cv-00407 | D.R.I. |
| *Carter v. Monsanto Co. (Nitro)* | 00-C-300 | W. Va. Cir. Ct. |
| *Chambers v. Whirlpool Corp.* | 11-cv-01733 | C.D. Cal. |
| *Chapman v. Gen. Motors, LLC* | 19-CV-12333-TGB-DRG | E.D. Mich. |
| *City of Philadelphia v. Bank of Am. Corp.* | 19-CV-1608 (JMF) | S.D.N.Y. |
| *Cobb v. BSH Home Appliances Corp.* | 10-cv-00711 | C.D. Cal. |
| *Cohen v. Subaru Corp.* | 20-cv-8442-JHR-AMD | D.N.J. |
| *Davis v. Am. Home Prods. Corp.* | 94-11684 | La. Civ. Dist. Ct., Div. K |
| *DC 16 v. Sutter Health* | RG15753647 | Cal. Super. Ct. |
| *Defrates v. Hollywood Ent. Corp.* | 02L707 | Ill. Cir. Ct. |
| *de Lacour v. Colgate-Palmolive Co.* | 16-cv-8364-KW | S.D.N.Y. |
| *Demereckis v. BSH Home Appliances Corp.* | 8:10-cv-00711 | C.D. Cal. |
| *Demmick v. Cellco P'ship* | 06-cv-2163 | D.N.J. |
| *Desportes v. Am. Gen. Assurance Co.* | SU-04-CV-3637 | Ga. Super. Ct. |
| *Doe v. MasterCorp, Inc.* | 24-cv-678 | E.D. Va. |
| *Doe v. MindGeek USA Incorp.* | 21-cv-00338 | C.D. Cal. |
| *Dolen v. ABN AMRO Bank N.V.* | 01-L-454 & 01-L-493 | Ill. Cir. Ct. |
| *Donnelly v. United Tech. Corp.* | 06-CV-320045CP | Ont. S.C.J. |
| *Duffy v. Mazda Motor of Am., Inc.* | 24-cv-388-BJB | W.D. Ky. |
| *Eck v. City of Los Angeles* | BC577028 | Cal. Super. Ct. |
| *Elec. Welfare Trust Fund v. United States* | 19-353C | Fed. Cl. |
| *Engquist v. City of Los Angeles* | BC591331 | Cal. Super. Ct. |
| *Ervin v. Movie Gallery Inc.* | CV-13007 | Tenn. Ch. Fayette Co. |
| *Express Freight Int'l v Hino Motors, LTD.* | 22-cv-22483 | S.D. Fla. |
| *First State Orthopaedics v. Concentra, Inc.* | 05-CV-04951-AB | E.D. Pa. |
| *Fisher v. Virginia Electric & Power Co.* | 02-CV-431 | E.D. Va. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Fishon v. Premier Nutrition Corp.* | 16-CV-06980-RS | N.D. Cal. |
| *Flaum v. Doctor's Assoc., Inc. (d/b/a Subway)* | 16-cv-61198 | S.D. Fla. |
| *Fond du Lac Bumper Exch. Inc. v. Jui Li Enter. Co. Ltd. (Direct & Indirect Purchasers Classes)* | 09-cv-00852 | E.D. Wis. |
| *Ford Explorer Cases* | JCCP Nos. 4226 & 4270 | Cal. Super. Ct. |
| *Friedman v. Microsoft Corp.* | 2000-000722 | Ariz. Super. Ct. |
| *FTC v. Reckitt Benckiser Grp. PLC* | 19CV00028 | W.D. Va. |
| *Gagnon v. Gen. Motors of Canada Co. and Gen. Motors LLC* | 500-06-000687-141 and 500-06-000729-158 | Quebec Super. Ct. |
| *Gardner v. Stimson Lumber Co.* | 00-2-17633-3SEA | Wash. Super. Ct. |
| *Gibson v. Nat'l Assoc. of Realtors* | 23-cv-00788-SRB | W.D. Mo. |
| *Gifford v. Pets Global, Inc.* | 21-cv-02136-CJC-MRW | C.D. Cal. |
| *Goldstein v. Houlihan/Lawrence Inc.* | 60767/2018 | N.Y. Super. Ct. |
| *Gordon v. Microsoft Corp.* | 00-5994 | D. Minn. |
| *Grays Harbor v. Carrier Corp.* | 05-05437-RBL | W.D. Wash. |
| *Grey Fox, LLC v. Plains All Am. Pipeline, L.P.* | 16-cv-03157-PSG-JEM | C.D. Cal. |
| *Griffin v. Dell Canada Inc.* | 07-CV-325223D2 | Ont. Super. Ct. |
| *Gunderson v. F.A. Richard & Assoc., Inc.* | 2004-2417-D | La. 14th Jud. Dist. Ct. |
| *Gupta v. Aeries Software, Inc.* | 20-cv-00995 | C.D. Cal. |
| *Gutierrez, Jr. v. Amplify Energy Corp.* | 21-cv-01628-DOC-JDE | C.D. Cal. |
| *Hanks v. Lincoln Life & Annuity Co. of New York* | 16-cv-6399 PKC | S.D.N.Y. |
| *Herrera v. Wells Fargo Bank, N.A.* | 18-cv-00332-JVS-MRW | C.D. Cal. |
| *Hill-Green v. Experian Info. Solutions, Inc.* | 19-cv-708-MHL | E.D. Va. |
| *Huntzinger v. Suunto Oy* | 37-2018-00027159-CU-BT-CTL | Cal. Super. Ct. |
| *In re Anthem, Inc. Data Breach Litig.* | 15-md-02617 | N.D. Cal. |
| *In re Arizona Theranos, Inc. Litig.* | 16-cv-2138-DGC | D. Ariz. |
| *In re Babcock & Wilcox Co.* | 00-10992 | E.D. La. |
| *In re Blue Cross Blue Shield Antitrust Litig.* | 13-CV-20000-RDP | N.D. Ala. |
| *In re Broiler Chicken Antitrust Litig.* | 16-cv-08637 | N.D. Ill. |
| *In re Countrywide Fin. Corp. Customer Data Sec. Breach* | MDL 08-md-1998 | W.D. Ky. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *In re Farm-raised Salmon and Salmon Prod. Antitrust Litig.* | 19-cv-21551-CMA | S.D. Fla. |
| *In re Gen. Motors LLC Ignition Switch Litig. (economic settlement)* | 2543 (MDL) | S.D.N.Y. |
| *In re High Sulfur Content Gasoline Prod. Liab.* | MDL No. 1632 | E.D. La. |
| *In re Home Depot, Inc., Customer Data Sec. Breach Litig.* | 14-md-02583 | N.D. Ga. |
| *In re Hypodermic Prod. Antitrust Litig.* | 05-cv-01602 | D.N.J. |
| *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig. (Indirect-Purchasers)* | 14-md-02542 | S.D.N.Y. |
| *In re Lidoderm Antitrust Litig.* | 14-md-02521 | N.D. Cal. |
| *In re Local TV Advert. Antitrust Litig.* | MDL No. 2867 | N.D. Ill. |
| *In re Lupron Mktg. & Sales Practices* | MDL No.1430 | D. Mass. |
| *In re Mercedes-Benz Emissions Litig.* | 16-cv-881 (KM) (ESK) | D.N.J. |
| *In re Monitronics Int'l, Inc., TCPA Litig.* | 11-cv-00090 | N.D. W.Va. |
| *In re Packaged Seafood Prods. Antitrust Litig. (DPP and EPP Class)* | 15-md-02670 | S.D. Cal. |
| *In re Parmalat Sec.* | 04-md-01653 (LAK) | S.D.N.Y. |
| *In re PVC Pipe Antitrust Litig.* | 24-cv-07639 | N.D. Ill. |
| *In re Residential Schools Litig.* | 00-CV-192059 CPA | Ont. Super. Ct. |
| *In re Ripple Labs Inc. Litig.* | 18-cv-06753-PJH | N.D. Cal. |
| *In re Royal Ahold Sec. & "ERISA"* | 03-md-01539 | D. Md. |
| *In re Rust-Oleum Restore Mktg. Sales Practices & Prod. Liab. Litig.* | 15-cv01364 | N.D. Ill. |
| *In re Sears, Roebuck & Co. Front-Loading Washer Prod. Liab. Litig.* | 06-cv-07023 | N.D. Ill. |
| *In re Serzone Prod. Liab.* | 02-md-1477 | S.D. W. Va. |
| *In re Skelaxin (Metaxalone) Antitrust Litig.* | 12-cv-194 | E.D. Ten. |
| *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig. (Direct Purchaser Class)* | 14-md-2503 | D. Mass. |
| *In re Subaru Battery Drain Prods. Liab. Litig.* | 20-cv-03095-JHR-MJS | D.N.J. |
| *In re TJX Cos. Retail Sec. Breach Litig.* | MDL No. 1838 | D. Mass. |
| *In re Trans Union Corp. Privacy Litig.* | MDL No. 1350 | N.D. Ill. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *In re TransUnion Rental Screening Sol. Inc. FCRA Litig.* | 20-md-02933-JPB | N.D. Ga. |
| *In re Uponor, Inc., F1807 Prod. Liab. Litig.* | 2247 | D. Minn. |
| *In re U.S. Dep't of Veterans Affairs Data Theft Litig.* | MDL 1796 | D.D.C. |
| *In re Volkswagen "Clean Diesel" Mktg., Sales Practice and Prods. Liab. Litig.* | MDL 2672 CRB | N.D. Cal. |
| *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.* | 19-ml-02905-JAK-JPR (MDL 2905 JAK) | C.D. Cal. |
| *In re Zurn Pex Plumbing Prod. Liab. Litig.* | MDL 08-1958 | D. Minn. |
| *In the Matter of GTV Media Grp. Inc.* | 3-20537 | SEC |
| *James v. PacifiCorp.* | 20cv33885 | Or. Cir. Ct. |
| *Johnson v. Yahoo! Inc.* | 14-cv02028 | N.D. Ill. |
| *Kearney v. Equilon Enter. LLC* | 14-cv-00254 | D. Ore. |
| *Ko v. Natura Pet Prod., Inc.* | 09cv02619 | N.D. Cal. |
| *Langan v. Johnson & Johnson Consumer Co.* | 13-cv-01471 | D. Conn. |
| *Lavinsky v. City of Los Angeles* | BC542245 | Cal. Super. Ct. |
| *Lee v. Stonebridge Life Ins. Co.* | 11-cv-00043 | N.D. Cal. |
| *Leonard v. John Hancock Life Ins. Co. of NY* | 18-CV-04994 | S.D.N.Y. |
| *Lerma v. Schiff Nutrition Int'l, Inc.* | 11-cv-01056 | S.D. Cal. |
| *Levy v. Dolgencorp, LLC* | 20-cv-01037-TJC-MCR | M.D. Fla. |
| *Lockwood v. Certegy Check Serv., Inc.* | 07-CV-587-FtM-29-DNF | M.D. Fla. |
| *LSIMC, LLC v. Am. Gen. Life Ins. Co.* | 20-cv-11518 | C.D. Cal. |
| *Luster v. Wells Fargo Dealer Serv., Inc.* | 15-cv-01058 | N.D. Ga. |
| *Malone v. Western Digital Corp.* | 20-cv-03584-NC | N.D. Cal. |
| *Markson v. CRST Int'l, Inc.* | 17-cv-01261-SB (SPx) | C.D. Cal. |
| *Martinelli v. Johnson & Johnson* | 15-cv-01733-MCE-DB | E.D. Cal. |
| *McCall v. Hercules Corp.* | 66810/2021 | N.Y. Super. Ct. |
| *McCrary v. Elations Co., LLC* | 13-cv-00242 | C.D. Cal. |
| *Microsoft I-V Cases* | J.C.C.P. No. 4106 | Cal. Super. Ct. |
| *Moehrl v. Nat'l Assoc. of Realtors* | 19-cv-01610-ARW | N.D. Ill. |
| *Molina v. Intrust Bank, N.A.* | 10-cv-3686 | Ks. 18th Jud. Dist. Ct. |
| *Moore v Robinhood Fin. LLC* | 21-cv-01571-BJR | W. D. Wash. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Morrow v. Conoco Inc.* | 2002-3860 | La. Dist. Ct. |
| *Mullins v. Direct Digital LLC.* | 13-cv-01829 | N.D. Ill. |
| *Myers v. Rite Aid of PA, Inc.* | 01-2771 | Pa. C.P. |
| *Naef v. Masonite Corp.* | CV-94-4033 | Ala. Cir. Ct. |
| *Natale v. 9199-4467 Quebec Inc., d/b/a Earth Rated* | 21-cv-6775-JS-SIL | E.D.N.Y. |
| *Nature Guard Cement Roofing Shingles Cases* | J.C.C.P. No. 4215 | Cal. Super. Ct. |
| *Newton v. R.C. Bigelow Inc.* | 22-cv-5660 | E.D.N.Y. |
| *Nichols v. SmithKline Beecham Corp.* | 00-6222 | E.D. Pa. |
| *Nishimura v. Gentry Homes, LTD.* | 11-11-1-1522-07-RAN | Haw. Super. Ct. |
| *Novoa v. The GEO Grp., Inc.* | 17-cv-02514-JGB-SHK | C.D. Cal. |
| *Nwauzor v. GEO Grp., Inc.* | 17-cv-05769 | W.D. Wash. |
| *Oberski v. Gen. Motors LLC and Gen. Motors of Canada Ltd.* | CV-14-502023-00CP | Ont. Super. Ct. |
| *Ocana v. Renew Fin. Holdings, Inc.* | BC701809 | Cal. Super. Ct. |
| *Palace v. DaimlerChrysler* | 01-CH-13168 | Ill. Cir. Ct . |
| *Peek v. Microsoft Corp.* | CV-2006-2612 | Ark. Cir. Ct. |
| *PHT Holding I LLC v. ReliaStar Life Ins. Co.* | 18-cv-2863-DWF-ECW | D. Minn. |
| *PHT Holding II LLC v. N. Am. Co. for Life and Health Ins.* | 18-CV-00368 | S.D. Iowa |
| *Plubell v. Merck & Co., Inc.* | 04CV235817-01 | Mo. Cir. Ct. |
| *Podawiltz v. Swisher Int'l, Inc.* | 16CV27621 | Or. Cir. Ct. |
| *Poertner v. Gillette Co.* | 12-cv-00803 | M.D. Fla. |
| *Prather v. Wells Fargo Bank, N.A.* | 15-cv-04231 | N.D. Ga. |
| *Q+ Food, LLC v. Mitsubishi Fuso Truck of Am., Inc.* | 14-cv-06046 | D.N.J. |
| *Richison v. Am. Cemwood Corp.* | 005532 | Cal. Super. Ct. |
| *Rick Nelson Co. v. Sony Music Ent.* | 18-cv-08791 | S.D.N.Y. |
| *Roberts v. Electrolux Home Prod., Inc.* | 12-cv-01644 | C.D. Cal. |
| *Russell v. Kohl's Dep't Stores, Inc.* | 15-cv-01143 | C.D. Cal. |
| *Sandoval v. Merlex Stucco Inc.* | BC619322 | Cal. Super. Ct. |
| *Scott v. Blockbuster, Inc.* | D 162-535 | 136th Tex. Jud. Dist. |
| *Senne v. Office of the Comm'r of Baseball* | 14-cv-00608-JCS | N.D. Cal. |

| CASE NAME | CASE NUMBER | LOCATION |
|---|---|---|
| *Shames v. Hertz Corp.* | 07cv2174-MMA | S.D. Cal. |
| *Sidibe v. Sutter Health* | 12-cv-4854-LB | N.D. Cal. |
| *Silverstein v. Genworth Life Ins. Co.* | 23-cv-684 | E.D. Va. |
| *Staats v. City of Palo Alto* | 2015-1-CV-284956 | Cal. Super. Ct. |
| *Soders v. Gen. Motors Corp.* | CI-00-04255 | Pa. C.P. |
| *Sonner v. Schwabe North America, Inc.* | 15-cv-01358 VAP (SPx) | C.D. Cal. |
| *Stroud v. eMachines, Inc.* | CJ-2003-968-L | W.D. Okla. |
| *Swetz v. GSK Consumer Health, Inc.* | 20-cv-04731 | S.D.N.Y. |
| *Talalai v. Cooper Tire & Rubber Co.* | MID-L-8839-00 MT | N.J. Super. Ct. |
| *Tech. Training Assoc. v. Buccaneers Ltd. P'ship* | 16-cv-01622 | M.D. Fla. |
| *Thibodeaux v. Conoco Philips Co.* | 2003-481 | La. 4th Jud. Dist. Ct. |
| *Thomas v. Lennox Indus. Inc.* | 13-cv-07747 | N.D. Ill. |
| *Thompson v. Metropolitan Life Ins. Co.* | 00-CIV-5071 HB | S.D.N.Y. |
| *Turner v. Murphy Oil USA, Inc.* | 05-CV-04206-EEF-JCW | E.D. La. |
| *USC Student Health Ctr. Settlement* | 18-cv-04258-SVW | C.D. Cal. |
| *Vance v. Mazda Motor of Am., Inc.* | 01890-CJC-KES | C.D. Cal. |
| *Walker v. Rite Aid of PA, Inc.* | 99-6210 | Pa. C.P. |
| *Weiner v. Ocwen Fin. Corp.* | 14-cv-02597-DJC-DB | E.D. Cal. |
| *Wells v. Abbott Lab., Inc. (AdvantEdge/ Myoplex nutrition bars)* | BC389753 | Cal. Super. Ct. |
| *Wener v. United Tech. Corp.* | 500-06-000425-088 | QC. Super. Ct. |
| *West v. G&H Seed Co.* | 99-C-4984-A | La. 27th Jud. Dist. Ct. |
| *Williams v. Weyerhaeuser Co.* | CV-995787 | Cal. Super. Ct. |
| *Yamagata v. Reckitt Benckiser, LLC* | 17-cv-03529-CV | N.D. Cal. |
| *Zarebski v. Hartford Ins. Co. of the Midwest* | CV-2006-409-3 | Ark. Cir. Ct. |

# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF CALIFORNIA

## FAMILY SEPARATION SETTLEMENT
## $3,000 minimum payment with a valid claim form

***This notice is about receiving payments that are unrelated to benefits you may have already received from the Ms. L. case.***

# If you were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021, a $48,750,000 settlement may affect your rights

*Please read this notice carefully. A federal court authorized this notice.*
*This is **not** a message from immigration enforcement.*
*This is **not** an advertisement or a solicitation from a lawyer.*
*You are **not** being sued.*

*Para una notificación en español, visite www.FamilySeparationSettlement.com*

- This notice is to inform you about a proposed settlement in a class action lawsuit called *Padre v. MVM, Inc*., Case No. 3:24-cv-01265-DMS-AHG (S.D. Cal.). This notice is **<u>NOT</u>** about the *Ms. L.* case. If you applied for benefits under *Ms. L.*, you **CAN** still get money from the proposed settlement discussed in this notice.
- In a class action lawsuit, one or more people, known as "Plaintiffs" sue on behalf of other people, known as "Class Members," who have similar allegations.
- Plaintiffs allege that Defendant MVM, Inc. ("MVM") was involved in actions related to the transportation, custody, supervision, and/or treatment of certain individuals who Plaintiffs allege were separated from family members during the period of March 7, 2017 through January 20, 2021.
- MVM denies all allegations of wrongdoing, liability, causation, injury, damages, and entitlement to relief. The Court has not decided who is right or wrong. The settlement is simply a compromise to avoid the burden, expense, uncertainty, and disruption of continued litigation and is not an admission of liability, wrongdoing, fault, damages, or the validity of any allegation or defense.
- You are a Class Member if you:
  - ✓ Qualify for inclusion as a class member in the settlement class certified in *Ms. L. v. I.C.E.*, No. 3:18-cv-00428-DMS-AHG; and
  - ✓ Were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021.
- If the Court approves the settlement, Class Members who file a valid and timely claim form will receive a payment of **at least $3,000**. You may also get more money

depending on the circumstances of the separation from your family member. You must submit a valid claim form by **Month x, 2027** to get money. Payments will be made if the Court approves the settlement, and after appeals, if any, are resolved. Please be patient.

- This notice explains your legal rights and options and the deadlines to act.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | | |
|---|---|---|
| **FILE A CLAIM FORM** | • Get payment (**minimum of $3,000**) from the settlement<br>• Give up your right to sue MVM and other Released Parties for the allegations covered by the settlement<br>• Be bound by the settlement | File by **Month x, 2027** |
| **ASK TO BE EXCLUDED (OPT OUT)** | • Get no payment from the settlement<br>• This is the only option that allows you to keep your right to file your own lawsuit concerning the allegations in this case. | Postmarked by **Month x, 2026** |
| **COMMENT OR OBJECT** | • Tell the Court what you like or do not like about the settlement<br>• You will still be bound by the settlement, and you may still submit a claim form for payment from the settlement<br>• You may also ask to speak at the Fairness Hearing about your comment or objection, but you don't have to | Postmarked by **Month x, 2026** |
| **ATTEND THE FAIRNESS HEARING** | • Ask to speak in Court about the settlement — You or your own attorney is welcome to come at your own expense<br>• File your Notice of Intention to Appear by Month x, 202x | **Month x, 202x at x:xx x.m. PT** |
| **DO NOTHING** | • Get no payment from the settlement<br>• Give up your right to sue MVM and other Released Parties for the allegations covered by the settlement<br>• Be bound by the settlement | |

- This notice is a summary. For the precise terms and conditions of the settlement, please see the Settlement Agreement available at www.xxxxxxxxxxxxxxxxxxxxxx.com.

**Payment subject to Court approval of Settlement.*

**PLEASE DO NOT CONTACT THE COURT ABOUT THIS NOTICE.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION ........................................................................ PAGE 4**

1. Why was this notice issued?
2. What is this lawsuit about?
3. Why is this a class action and who is involved?
4. Why is there a settlement?
5. Is this settlement different from the *Ms. L.* settlement?

**WHO IS INCLUDED IN THE CLASS? ................................................ PAGE 5**

6. Am I a Class Member?
7. I am still not sure if I am included.
8. What if I move or my contact information changes?
9. What are my rights as a Class Member?

**SETTLEMENT MONEY FOR PARTICIPATING CLASS MEMBERS .................. PAGE 6**

10. What does the settlement provide?
11. How do I get a payment?
12. How much money can I get from the settlement?
13. Can each separated parent and child get a payment?
14. When will I get my payment?
15. What am I giving up under the settlement?

**THE LAWYERS REPRESENTING YOU ................................................ PAGE 8**

16. Who represents the Class?
17. Should I get my own lawyer?
18. How will the lawyers be paid?

**EXCLUDING YOURSELF FROM THE SETTLEMENT ............................ PAGE 9**

19. How do I opt out of the settlement?
20. If I do not exclude myself, can I sue MVM for the same thing later?
21. If I exclude myself, can I get money from the settlement?

**COMMENTING ON OR OBJECTING TO THE SETTLEMENT ........................ PAGE 10**

22. How do I tell the Court that I like or do not like the proposed settlement, and may I speak at the Fairness Hearing?

**THE COURT'S FAIRNESS HEARING................................................PAGE 11**

23. When and where will the Court decide whether to approve the settlement?
24. Do I have to come to the Fairness Hearing?

**IF YOU DO NOTHING ........................................................................PAGE 11**

25. What happens if I do nothing at all?

**GETTING MORE INFORMATION............................................................ PAGE 12**

26. Where can I get more information?

## BASIC INFORMATION

### 1. Why was this notice issued?

This notice was issued to inform you about a proposed settlement in a class action lawsuit called *Padre v. MVM, Inc.*, Case No. 3:24-cv-01265-DMS-AHG (S.D. Cal.). This notice explains:

- what the lawsuit is about;
- who may be included in the settlement;
- what the settlement provides;
- what rights you may be giving up;
- what choices you have; and
- what deadlines you must follow.

The Court will hold a Fairness Hearing on Month x, 202x to decide whether the proposed settlement is fair, reasonable, and adequate. The Court will also consider Class Counsel's request for payment of attorneys' fees and expenses, and service awards.

### 2. What is this lawsuit about?

Plaintiffs allege that MVM was involved in actions connected to the transportation, custody, supervision, and/or treatment of certain individuals who Plaintiffs allege were separated from family members during the period of March 7, 2017 through January 20, 2021.

MVM denies all allegations of wrongdoing, liability, causation, injury, damages, and entitlement to relief. The Court has not decided who is right or wrong. The settlement is simply a compromise to avoid the burden, expense, uncertainty, and disruption of continued litigation and is not an admission of liability, wrongdoing, fault, damages, or the validity of any allegations or defense.

### 3. Why is this a class action and who is involved?

In a class action lawsuit, one or more people, known as "Plaintiffs" (here, Padre, Junior, I.V.S., and A.V.L., using aliases) sue on behalf of other people who have similar allegations. The people with similar allegations are known together are a "Class" and each individually is called a "Class Member." In a class action, the court resolves the issues for all class members, except for those who exclude themselves (or "opt out") from the class.

### 4. Why is there a settlement?

The Court has not yet found in favor of Plaintiffs or MVM. Plaintiffs and MVM have agreed to a settlement that, if approved, will bring the allegations against MVM to an end. This way, Plaintiffs and MVM avoid the uncertainty of continuing the case between them. They

also avoid the cost and delay of further litigation, and Class Members will receive the payments from the settlement.

## 5. Is this settlement different from the *Ms. L.* settlement?

Yes. This settlement gives *Ms. L*. class members who were separated from their parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021 an opportunity to get a payment, ***in addition*** to any benefits received in the *Ms. L.* settlement.

## WHO IS INCLUDED IN THE CLASS?

## 6. Am I a Class Member?

You are a Class Member if you:

- ✓ Qualify for the settlement class certified in *Ms. L. v. I.C.E.*, No. 3:18-cv-00428-DMS-AHG (the "*Ms. L.*" case); and
- ✓ Were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021.

Qualifying Additional Family Members ("QAFMs") from the *Ms. L.* case are not Class Members in this case.

## 7. I am still not sure if I am included.

If you are still not sure whether you are included in the Class, you can get help by contacting the Settlement Administrator by phone at 1-xxx-xxx-xxxx, by WhatsApp at xxx-xxx-xxxx, or by email at info@x.com. Please have your A-Number and date of birth ready for a quick look up.

Any information you provide will be kept private and used only for settlement-related purposes. You do **NOT** have to be a U.S. citizen or legal resident or live in the U.S. to qualify for payment.

## 8. What if I move or my contact information changes?

If your mailing address, phone number, or email address changes, please contact the Settlement Administrator.

Family Separation Settlement
c/o JND Legal Administration
P.O. Box xxxxx
Seattle, WA 98111
Email: info@FamilySeparationSettlement.com
Call: xxx-xxx-xxxx
WhatsApp: xxx-xxx-xxxx

This is important. If the Settlement Administrator does not have your correct contact information, you may miss important updates or payment information.

## 9. What are my rights as a Class Member?

You have several rights and options as a Class Member:

1. *File a Claim Form*. Stay in the Class and file a claim form to get a payment of **at least $3,000** from the settlement (see Question 11 and Question 12).
2. *Object*. Stay in the Class **AND** comment on or object to the settlement and/or the request for attorneys' fees and expenses (see Question 22). You may also attend the Court's Fairness Hearing to speak in support of or against the Court's final approval of the proposed settlement and the request for attorneys' fees and expenses, and Plaintiffs' service awards. If you object, you may still file a claim form to get a payment from the settlement.
3. *Exclude Yourself or "Opt Out."* You may exclude yourself from the settlement (*see* Question 19). **You will not get any payment from the settlement**, but this is the only option that will allow you to keep your right to file your own lawsuit concerning the legal allegations in this case against MVM and the other Released Parties.
4. *Do Nothing*. Stay in the Class but don't get any payment from the settlement and still be bound by the settlement (*see* Question 25).

**SETTLEMENT MONEY FOR PARTICIPATING CLASS MEMBERS**

## 10. What does the settlement provide?

The settlement establishes a **$48,750,000** Settlement Fund. After deductions for Court-approved attorneys' fees and expenses, settlement administration expenses, any Court-approved service awards, taxes, and other approved costs, the remaining "Net Settlement Fund" will be distributed to eligible Class Members who submit valid claim forms.

No part of the Settlement Fund will reimburse eligible Plaintiffs for medical expenses or lost income.

As a Class Member, you will give up, or "release," the allegations against MVM and other Released Parties. This release includes any allegations made or that could have been made arising from the facts alleged in this class action lawsuit.

All of the specific terms of the settlement and the releases are described in more detail in the Settlement Agreement, available at www.FamilySeparationSettlement.com.

## 11. How do I get a payment?

To be eligible to get a payment, Class Members must complete and submit a valid claim form received online or postmarked by **Month x, 2027**. Claim forms received or postmarked after **Month x, 2027** may be rejected.

***The fastest and easiest way to submit a claim form is online at [www.FamilySeparationSettlement.com](http://www.FamilySeparationSettlement.com).***

You can also submit your claim form by mail to:

Family Separation Settlement
c/o JND Legal Administration
P.O. Box xxxxx
Seattle, WA 98111

If you need help filling out the claim form, call xxx-xxx-xxxx or call or text via WhatsApp at xxx-xxx-xxxx.

## 12. How much money can I get from the settlement?

If the Court approves the settlement, there are three award levels.

**(1)** **Baseline Award**: All Class Members who submit a valid claim form are guaranteed a payment of at least **$3,000**.

**(2)** **Criteria - Based Award**: You may receive additional money if you provide information showing:

- ✓ date of when the separation happened;
- ✓ approximate length of the separation; and/or
- ✓ whether a parent did not know where the child was for two months or more.

**(3)** **Extraordinary Injury Award**: To be considered for an Extraordinary Injury Award, you may need to provide a written statement describing your experience. If literacy, language, or other barriers make that difficult, the Settlement Administrator may allow information to be provided by phone or recorded statement if feasible. Families who were separated for more than two years or who are still separated from their parent or child will automatically be considered for an Extraordinary Injury Award and do not need to provide a narrative.

For more information on the process for submitting a claim form and the Court-approved Plan of Allocation, please visit www.FamilySeparationSettlement.com.

## 13. Can each separated parent and child get a payment?

Yes. There will be awards for both the child and parent who were separated at or near the U.S.-Mexico border. If you are a parent who was separated from your child, both you and your child can get money from the settlement.

## 14. When will I get my payment?

Class Members who submit a valid and timely claim form will get payments *after* the Court grants "final approval" to the settlement and, if there are any appeals, after all appeals are resolved. If there are any appeals, resolving them can take time. Please be patient.

## 15. What am I giving up under the settlement?

If you are a Class Member, unless you exclude yourself from the settlement, you will stay in the Class. By staying in the Class, you cannot sue, or be part of any other lawsuit against MVM or the other Released Parties regarding allegations made or that could have been made arising from the facts alleged in this case. In addition, all of the Court's orders will apply to you and legally bind you. You will also agree to the releases in the Settlement Agreement available at www.FamilySeparationSettlement.com.

# THE LAWYERS REPRESENTING YOU

## 16. Who represents the Class?

The Court appointed the law firm of Hausfeld LLP as Class Counsel to represent the Class. The non-profit Al Otro Lado has also been involved in this matter.

## 17. Should I get my own lawyer?

You do not need to hire your own lawyer, because Class Counsel is working on your behalf. If you want your own lawyer, you may hire one, but you will be responsible for any payment for that lawyer's services. For example, you can ask your lawyer to appear in Court for you if you want someone other than Class Counsel to speak for you. You may also appear for yourself without a lawyer.

## 18. How will the lawyers be paid?

At the Fairness Hearing, Class Counsel will seek payment of up to 25% of the Settlement Fund for legal fees for the work they have done in this case as well as reimbursement of their expenses. If the Court awards these payments, they will be made from the Settlement Fund along with administrative fees and expenses related to the provision of notice to Class Members, administrating the settlement payments, and distributing Settlement Funds to Class Members. Class Counsel will also ask the Court to approve service awards in the amount of $15,000 to each of the four Plaintiffs. You personally do not have to pay any of Class Counsel's fees and expenses.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

### 19. How do I opt out of the settlement?

If you are a Class Member (see Question 6) but wish to keep the right to sue MVM (at your own expense) about the legal issues in this case, then you must take steps to remove yourself from the Class. This is called excluding yourself from, or opting out of, the settlement.

To exclude yourself from (or opt out of) the settlement, you must send a written request to the Settlement Administrator. Your request must include:

- Your full name, current mailing address, and your phone number or email address, if you have one;
- Your A-Number and Date of Birth;
- A statement that you want to be excluded from the settlement in *Padre v. MVM*; and
- Your signature (or equivalent) and date.

Only one individual Class Member can be excluded per submitted request. If you ask to be excluded from the settlement, you will not get any money from the settlement, and you can't object to the settlement because it no longer affects you.

Your exclusion request must be sent to the address below postmarked no later than **Month x, 2026**:

Family Separation Settlement. – Exclusion Request
c/o JND Legal Administration
P.O. Box xxxxx
Seattle, WA 98111

### 20. If I do not exclude myself, can I sue MVM for the same thing later?

No. Unless you exclude yourself from the settlement, you give up the right to sue MVM for the allegations that the settlement resolves (see Question 2).

If you have a pending lawsuit against MVM, speak to your lawyer in that lawsuit immediately, because you may need to exclude yourself from the Class to file your own lawsuit. The process for excluding yourself from the settlement is described in Question 19.

### 21. If I exclude myself, can I get money from the settlement?

No. If you exclude yourself from the settlement, **you will <u>not</u> get money** from the settlement.

## COMMENTING ON OR OBJECTING TO THE SETTLEMENT

### 22. How do I tell the Court that I like or do not like the proposed settlement, and may I speak at the Fairness Hearing?

You can ask the Court to deny approval of the settlement by filing an objection. You can't ask the Court to order a different settlement. The Court can only approve or reject the settlement. If the Court denies approval, no settlement payment will be sent out and the lawsuit will continue. Your objection should include:

- Your full name, current mailing address, and your phone number or email address, if you have one;
- The name of the case, *Padre v. MVM, Inc*., Case No. 3:24-cv-01265-DMS-AHG;
- The reasons you object;
- Whether the objection applies only to you, to a specific subset of the Class, or to the entire Class;
- Whether you plan to speak at the Fairness Hearing;
- Copies of any documents you want the Court to consider; and
- Your signature (or equivalent).

Objections must be sent to the Court, Class Counsel, Defense Counsel and the Settlement Administrator at the addresses below postmarked or received by **Month x, 2026**:

| **The Court** | **Settlement Administrator** |
|---|---|
| United States District Court for the<br>Southern District of California,<br>James M. Carter and Judith N. Keep<br>United States Courthouse,<br>333 West Broadway<br>San Diego, CA 92101 | Family Separation Settlement<br>c/o JND Legal Administration<br>P.O. Box xxxxx<br>Seattle, WA 98111 |
| **Class Counsel** | **Counsel for MVM** |
| Amanda Lee-DasGupta<br>Mary S. Van Houten Harper<br>Mandy V. Boltax<br>Shana R. Herman<br>Katie R. Beran<br>James Gotz<br>Erika A. Inwald<br>**Hausfeld LLP**<br>1200 17th Street NW, Suite 600<br>Washington, DC 20036<br>Tel.: (202) 540-7200<br>familyseparationsettlement@hausfeld.com | Dylan Aste<br>Paul Fraidenburgh<br>**Pillsbury Winthrop Shaw Pittman LLP**<br>11682 El Camino Real, Suite 200<br>San Diego, CA 92130-2092<br>Tel.: (858) 847-4188<br>dylan.aste@pillsburylaw.com<br>paul.fraidenburgh@pillsburylaw.com |

If you file a timely written objection, you do not need to attend or speak at the Fairness Hearing for your comments or objections to be considered (see Question 23). If you or your attorney would like to speak at the Fairness Hearing about your comments or objections to the settlement, you must add to your objection a statement that you intend to appear and speak at the hearing (for example, by stating "This is my Notice of Intention to Appear in *Padre v. MVM, Inc.*"). If you appear through your own attorney, you are responsible for hiring and paying that attorney.

You can't object if you choose to exclude yourself from the settlement, because the settlement no longer affects you if you opt out of it.

## THE COURT'S FAIRNESS HEARING

### 23. When and where will the Court decide whether to approve the settlement?

The Court will hold a Fairness Hearing on ________ at _______ in Courtroom 13A of the United States District Court for the Southern District of California, James M. Carter and Judith N. Keep United States Courthouse, 333 West Broadway, San Diego, CA 92101. At the Fairness Hearing, the Court will consider:

- whether the settlement is fair, reasonable, and adequate;
- whether to approve attorneys' fees and expenses;
- whether to approve service awards to the Plaintiffs; and
- any objections from Class Members.

The Court may reschedule the Fairness Hearing or change any of the deadlines described in this notice. Please check www.FamilySeparationSettlement.com for news of any such changes.

### 24. Do I have to come to the Fairness Hearing?

No. Class Counsel will be present at the Fairness Hearing to answer any questions the Court may have. You are welcome to come at your own expense. If you send comments or objections to the proposed settlement, you don't have to come to Court to talk about them. If you mailed your written comments or objections on time, the Court will consider them. You may also pay your own lawyer to attend, but such attendance is not necessary.

## IF YOU DO NOTHING

### 25. What happens if I do nothing at all?

If you are a Class Member and you do nothing, you will not get money from the settlement. You will remain a Class Member and you will be bound by the settlement. You will give up your right to sue MVM for the legal allegations in this case.

## GETTING MORE INFORMATION

### 26. Where can I get more information?

This notice is only a summary. For more information:

- Visit www.FamilySeparationSettlement.com
- Email info@FamilySeparationSettlement.com
- Call xxx-xxx-xxxx
- Call or Text via WhatsApp at xxx-xxx-xxxx
- Write Family Separation Settlement, c/o JND Legal Administration, P.O. Box x, Seattle, WA 98111
- Access the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.casd.uscourts.gov.
- Visit the office of the Clerk of the Court for the United States District Court for the Southern District of California,
  James M. Carter and Judith N. Keep United States Courthouse,
  333 West Broadway
  San Diego, CA 92101

You may also seek the advice and counsel of your own attorney at your own expense if you desire.

**PLEASE DO NOT CONTACT THE COURT ABOUT THIS NOTICE.**

# EXHIBIT 3a

COURT ORDERED LEGAL NOTICE

# $48,750,000 FAMILY SEPARATION SETTLEMENT

## You may be eligible for a payment of at least $3,000

**YOU MUST TAKE ACTION TO BE ELIGIBLE TO GET A PAYMENT**

## Who is affected?

You are a Class Member in a proposed settlement in a class action lawsuit called *Padre v. MVM, Inc*., Case No. 3:24-cv-01265-DMS-AHG (S.D. Cal.), if you:

- ✓ Qualify for inclusion as a class member in the settlement class certified in *Ms. L. v. I.C.E*., No. 3:18-cv-00428-DMS-AHG; and
- ✓ Were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021.

This settlement is **NOT** for the *Ms. L.* case. If you applied for benefits under *Ms. L.*, you **CAN** still get money from this settlement.

## What can I get?

If the Court approves the settlement and you **file a valid claim form** by **Month x, 2027:**

- You will get **at least $3,000**.
- You may qualify for additional money based on:
  - ✓ age of the child at the time of separation at or near the border;
  - ✓ approximate length of separation from your family member(s);
  - ✓ length of time a parent did not know the location of their child; and/or
  - ✓ an additional **Extraordinary Injury Award**.
- Separate payments may be available for parents and children

File your claim now at www.FamilySeparationSettlement.com using either your Unique ID or your A-Number and Date of Birth. If you need help, call x or contact us via WhatsApp at xxx-xxx-xxxx.

Any information you provide will be kept private and used only for settlement-related purposes.

You do **NOT** have to be a U.S. citizen or legal resident or live in the U.S. to qualify for payment.

## Your Rights and Options

- File a claim form by **Month x, 2027** to qualify for at least $3,000 from the settlement. You will be bound by the settlement.
- Exclude yourself ("Opt Out") by **Month x, 2026** and get no payment, but this is the only option that allows you to keep your right to file your own lawsuit concerning the allegations in this case.
- Object by **Month x, 2026** to tell the Court what you don't like about the settlement. You will still be bound by the settlement and may still submit a claim form for payment.
- Attend the Fairness Hearing on Month x, 202x for you or your own attorney to come and speak at your own expense
- Do Nothing and get no payment from the settlement and still be bound by the settlement.

## Questions?

This notice is only a summary. For more information:

Visit www.FamilySeparationSettlement.com

Email info@FamilySeparationSettlement.com

Call xxx-xxx-xxxx

Call or text via WhatsApp at xxx-xxx-xxxx

You may also seek the advice and counsel of your own attorney at your own expense if you desire.

*MVM denies liability and settled to avoid the cost of litigation. The Court has not decided who is right or wrong.*

**Please Do Not Contact The Court Regarding This Notice**

# EXHIBIT 3b

COURT ORDERED LEGAL NOTICE

# $48,750,000 FAMILY SEPARATION SETTLEMENT

## You may be eligible for a payment of at least $3,000

| USE THIS NUMBER TO FILE A CLAIM FORM | |
|---|---|
| **YOUR UNIQUE ID:** | [Unique ID] |

**YOU MUST TAKE ACTION TO BE ELIGIBLE TO GET A PAYMENT**

### Who is affected?

You are a Class Member in a proposed settlement in a class action lawsuit called *Padre v. MVM, Inc*., Case No. 3:24-cv-01265-DMS-AHG (S.D. Cal.), if you:

- ✓ Qualify for inclusion as a class member in the settlement class certified in *Ms. L. v. I.C.E*., No. 3:18-cv-00428-DMS-AHG; and
- ✓ Were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021.

This settlement is **NOT** for the *Ms. L.* case. If you applied for benefits under *Ms. L.*, you **CAN** still get money from this settlement.

### What can I get?

If the Court approves the settlement and you **file a valid claim form** by **Month x, 2027:**

- You will get **at least $3,000**.
- You may qualify for additional money based on:
  - ✓ age of the child at the time of separation at or near the border;
  - ✓ approximate length of separation from your family member(s);
  - ✓ length of time a parent did not know the location of their child; and/or
  - ✓ an additional **Extraordinary Injury Award**.
- Separate payments may be available for parents and children

File your claim now at www.FamilySeparationSettlement.com using either your Unique ID (above) or your A-Number and Date of Birth. If you need help, call x or contact us via WhatsApp at xxx-xxx-xxxx.

Any information you provide will be kept private and used only for settlement-related purposes.

You do **NOT** have to be a U.S. citizen or legal resident or live in the U.S. to qualify for payment.

### Your Rights and Options

- File a claim form by **Month x, 2027** to qualify for at least $3,000 from the settlement. You will be bound by the settlement.
- Exclude yourself ("Opt Out") by **Month x, 2026** and get no payment, but this is the only option that allows you to keep your right to file your own lawsuit concerning the allegations in this case.
- Object by **Month x, 2026** to tell the Court what you don't like about the settlement. You will still be bound by the settlement and may still submit a claim form for payment.
- Attend the Fairness Hearing on Month x, 202x for you or your own attorney to come and speak at your own expense
- Do Nothing and get no payment from the settlement and still be bound by the settlement.

### Questions?

This notice is only a summary. For more information:

Visit www.FamilySeparationSettlement.com

Email info@FamilySeparationSettlement.com

Call xxx-xxx-xxxx

Call or text via WhatsApp at xxx-xxx-xxxx

You may also seek the advice and counsel of your own attorney at your own expense if you desire.

*MVM denies liability and settled to avoid the cost of litigation. The Court has not decided who is right or wrong.*

**Please Do Not Contact The Court Regarding This Notice**

# EXHIBIT 4a

**COURT ORDERED LEGAL NOTICE REGARDING YOUR RIGHTS**

# $48,750,000 FAMILY SEPARATION SETTLEMENT

## You may be eligible for a payment of at least $3,000

***Padre v. MVM, Inc.*, Case No. 3:24-cv-01265-DMS-AHG (S.D. Cal.)**

***Para una notificación en español, visite www.FamilySeparationSettlement.com***

You may be eligible to get money if you were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021.

You may file a claim form using your A-Number and Date of Birth.

**Please visit www.FamilySeparationSettlement.com to file a claim form and to learn more about your rights and other options available to you:**

- File a claim form by **Month x, 2027**
- Exclude yourself ("Opt Out") by **Month x, 2026**
- Object by **Month x, 2026**
- Attend the Fairness Hearing on **Month x, 202x**
- Do Nothing (no payment and still bound by settlement)

Any information you provide will be kept private and used only for settlement-related purposes.

You do **NOT** have to be a U.S. citizen or legal resident or live in the U.S. to qualify for payment.

*MVM denies liability and settled to avoid the cost of litigation. The Court has not decided who is right or wrong.*

**Questions?** Reply to this message, call through WhatsApp, or visit www.FamilySeparationSettlement.com.

# EXHIBIT 4b

COURT ORDERED LEGAL NOTICE REGARDING YOUR RIGHTS

# $48,750,000 FAMILY SEPARATION SETTLEMENT

## You may be eligible for a payment of at least $3,000

***Padre v. MVM, Inc.*, Case No. 3:24-cv-01265-DMS-AHG (S.D. Cal.)**

***Para una notificación en español, visite www.FamilySeparationSettlement.com***

You may be eligible to get money if you were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021.

You may file a claim form using either:

- Your Unique ID (XXXXXXX); or
- Your A-Number and Date of Birth.

**Please visit www.FamilySeparationSettlement.com to file a claim form and to learn more about your rights and other options available to you:**

- File a claim form by **Month x, 2027**
- Exclude yourself ("Opt Out") by **Month x, 2026**
- Object by **Month x, 2026**
- Attend the Fairness Hearing on **Month x, 202x**
- Do Nothing (no payment and still bound by settlement)

Any information you provide will be kept private and used only for settlement-related purposes.

You do **NOT** have to be a U.S. citizen or legal resident or live in the U.S. to qualify for payment.

*MVM denies liability and settled to avoid the cost of litigation. The Court has not decided who is right or wrong.*

**Questions?** Reply to this message, call through WhatsApp, or visit www.FamilySeparationSettlement.com.

# EXHIBIT 5

# Banner Ads 1

### 728 x 90




### 300 x 600




### 300 x 250




### 320 x 50



# Facebook Ads 2

## Desktop Feed




## Mobile Stories




## Mobile Feed



## Instagram Ads 3

### Mobile Feed




### Mobile Stories



# EXHIBIT 6

# Search Response Ads

1






# Search Response Ads





# Search Response Ads 3






# EXHIBIT 7

**Family Separation Settlement**

**If you were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017, and January 20, 2021, a $48,750,000 settlement may affect your rights**

Seattle/Month x, 2026/JND Legal Administration---

A proposed settlement has been reached in a class action lawsuit called *Padre v. MVM, Inc.*, Case No. 3:24-cv-01265-DMS-AHG (S.D. Cal.).

You are a Class Member if you:

- Qualify for inclusion as a class member in the settlement class certified in *Ms. L. v. I.C.E.*, No. 3:18-cv-00428-DMS-AHG; and
- Were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021.

This settlement is **NOT** related to the *Ms. L.* case. If you applied for benefits under *Ms. L.*, you **CAN** still get money from the proposed settlement discussed here.

MVM denies all allegations of wrongdoing, liability, causation, injury, damages, and entitlement to relief. The Court has not decided who is right or wrong. The settlement is simply a compromise to avoid the burden, expense, uncertainty, and disruption of continued litigation and is not an admission of liability, wrongdoing, fault, damages, or the validity of any allegation or defense.

**What does the settlement provide?**

If the Court approves the settlement, Class Members who file a valid claim form by **Month x, 2027** will get:

- **At least $3,000**.
- Possible additional money based on factors such as the approximate age of the child at the time of separation, the approximate length of separation from your family member(s), and the length of time a parent did not know the location of their child.
- Possible **Extraordinary Injury Award**.

Separate payments may be available for parents and children.

Claim forms can be filed at www.FamilySeparationSettlement.com using a Unique ID (if you received a notice directly) or your A-Number and Date of Birth. If you need help, call xxx-xxx-xxxx, or contact us via WhatsApp at xxx-xxx-xxxx.

**Your rights and Options**

Class Members have several options including the following:

- Submit a valid claim form by **Month x, 2027** to qualify for a payment of at least $3,000 from the settlement. If you file a claim form, you will be bound by the settlement.

- Ask to be excluded ("Opt-Out") from the settlement by **Month x, 2026** and get no payment. This is the only option that allows you to keep your right to file your own lawsuit concerning the allegations in this case.
- Object to the settlement by **Month x, 2026**. This means you tell the Court what you don't like about the settlement. You will still be bound by the settlement and you may still submit a claim form for payment.
- Do nothing and get no payment from the settlement and still be bound by the settlement.

The Court will hold a Fairness Hearing on Month x, 202x to consider:

- Whether the settlement is fair, reasonable, and adequate;
- Whether to approve attorneys' fees and expenses;
- Whether to approve service awards of $15,000 to each of the four Plaintiffs; and
- Any objections from Class Members.

The Court appointed the law firm of Hausfeld LLP as Class Counsel to represent the Class. The non-profit Al Otro Lado has also been involved in this matter.

If you wish, you may ask to appear at the Fairness Hearing on your own behalf or through your counsel at your own expense.

**Questions?**

- Visit: www.FamilySeparationSettlement.com
- Email: info@FamilySeparationSettlement.com
- Call: xxx-xxx-xxxx
- WhatsApp: xxx-xxx-xxxx
- Write: Family Separation Settlement, c/o JND Legal Administration, P.O. Box x, Seattle, WA 98111

# EXHIBIT 8

**Padre v. MVM – English Radio Script**

**Length: :30 (to be translated for Spanish broadcast only)**

**RED TEXT included only if time permits**

---

If you were separated from your parent or child at or near the U.S.-Mexico border between March 7, 2017 and January 20, 2021, you may get **at least three thousand dollars** from a class action settlement. Go to FamilySeparationSettlement.com and file a claim by MONTH DAY YEAR. That's FamilySeparationSettlement.com. Or contact us via WhatsApp at XXX-XXX-XXXX to learn more. That's XXX-XXX-XXXX or FamilySeparationSettlement.com.

# EXHIBIT 9a

# $48,750,000 Family Separation Settlement

TIME IS RUNNING OUT

File a claim form by **Month x, 2027**

To get a payment of at least $3,000

You were previously sent a notice regarding the $48,750,000 Family Separation Settlement. If you file a valid claim form by **Month x, 2027**:

- You will get at least $3,000.
- You may qualify for additional money based on:
  - age of the child at the time of separation at or near the border;
  - approximate length of separation from your family member(s);
  - length of time a parent did not know the location of their child; and/or
  - an additional Extraordinary Injury Award.

Separate payments may be available for parents and children. By filing a claim, you will be bound by the Settlement.

File your claim now at www.FamilySeparationSettlement.com using either your Unique ID or your A-Number and Date of Birth. If you need help, call xxx-xxx-xxxx or contact us via WhatsApp at xxx-xxx-xxxx.

Any information you provide will be kept private and used only for settlement-related purposes.

You do NOT have to be a U.S. citizen or legal resident or live in the U.S. to qualify for payment.

Go to www.FamilySeparationSettlement.com to learn more.

If you already filed a claim form, disregard this reminder.

# EXHIBIT 9b

# $48,750,000 Family Separation Settlement

TIME IS RUNNING OUT

File a claim form by **Month x, 2027**

To get a payment of at least $3,000

| USE THIS NUMBER TO FILE A CLAIM FORM | |
|---|---|
| YOUR UNIQUE ID: | [Unique ID] |

You were previously sent a notice regarding the $48,750,000 Family Separation Settlement. If you file a valid claim form by **Month x, 2027**:

- You will get at least $3,000.
- You may qualify for additional money based on:
  - age of the child at the time of separation at or near the border;
  - approximate length of separation from your family member(s);
  - length of time a parent did not know the location of their child; and/or
  - an additional Extraordinary Injury Award.

Separate payments may be available for parents and children. By filing a claim, you will be bound by the Settlement.

File your claim now at www.FamilySeparationSettlement.com using either your Unique ID (above) or your A-Number and Date of Birth. If you need help, call xxx-xxx-xxxx or contact us via WhatsApp at xxx-xxx-xxxx.

Any information you provide will be kept private and used only for settlement-related purposes.

You do NOT have to be a U.S. citizen or legal resident or live in the U.S. to qualify for payment.

Go to www.FamilySeparationSettlement.com to learn more.

If you already filed a claim form, disregard this reminder.

# EXHIBIT 10a

# FAMILY SEPARATION SETTLEMENT

## HOW TO FILL OUT YOUR CLAIM FORM

**Please read the below information before you fill out your claim form.** It explains *who* needs to fill out a claim form and *how* many forms your family needs to submit.

## WHAT EACH PART OF THE CLAIM FORM MEANS

| | |
|---|---|
| **Part A** | **Your Information** ***(Required)***<br>Give us the contact information for the adult filling out the claim form — name, address, phone, email, date of birth, and A-Number. |
| **Part B** | **Parent or Child?** ***(Required)***<br>Tell us if you were separated from your parent(s) or from your child(ren). |
| **Part C** | **Separated From Your Parent(s)** ***(Optional)***<br>Fill this out if you were separated from a parent. Tell us when and how long you were apart. |
| **Part D** | **Separated From Your Child(ren)** ***(Partially Required)***<br>Fill this out if you were separated from your child(ren). Identify each child under the age of 18 now to **submit a valid claim form on their behalf.** Enter additional optional information to be considered for a higher payment. |
| **Part E** | **Tell Us More** ***(Optional)***<br>Share how being separated harmed you or your child. Additional hardships could increase the amount you get paid. |
| **Part F** | **Signature** ***(Required)***<br>Sign and date the form. Your signature is required to get a payment. |

## COMMON QUESTIONS

- **Who can fill out a claim form?**
  Anyone 18 years old or older can fill out their own claim form.
- **Can a child who is under 18 now fill out their own claim form?**
  No. A child who is under 18 now cannot fill out their own form. A parent or guardian must include a child who is under 18 now on their claim form in Part D.
- **Can a child who is 18 or older now fill out their own claim form?**
  Yes. A child who is 18 or older now must fill out their own claim form.
- **I am a parent who was separated from my child. Should I fill out a claim form?**
  Yes. Fill out one claim form for yourself. Include each child who is under 18 now on that same claim form in Part D. If your child is 18 or older now, they must fill out their own claim form.

**Need help?** Not sure how many forms you need, or who should fill them out? We can help. Call [PHONE NUMBER] or message us on WhatsApp at [WHATSAPP NUMBER]. We speak English and Spanish.

# EXHIBIT 10b

# FAMILY SEPARATION SETTLEMENT

## CLAIM FORM

Any information you provide in this claim form will be kept private and used only for settlement-related purposes. The fastest and easiest way to submit a claim form is online at www.FamilySeparationSettlement.com.com.

If you are a Class Member and you fill out Parts A, B, and F and mail this claim form postmarked by Month x, 2027, you will get **at least $3,000**.

If you are a parent of a minor child(ren) filling out a claim for them as well, you must enter their identifying information in **Part D** for them to also claim **at least $3,000.**

**You may get more money if you also complete all fields of Parts C *or* D, and E.**

**Who can fill out this claim form?** Anyone 18 years old or older can fill out this claim form. If you are under 18 years of age, your parent or guardian must fill out this claim form for you.

## PART A – YOUR INFORMATION (*Required for payment*)

| | |
|---|---|
| **Unique ID** (If you received a settlement notice) | |

| | |
|---|---|
| **Full Name** (First, Middle, Last) | |
| **Street Address** (house or building number and street name) | |
| **Apartment / Unit Number** (if you have one) | |
| **City** | |
| **State / Province** | |
| **ZIP / Postal Code** | |
| **Country** | |
| **Phone Number** (cell number preferred; include country code if applicable) | |
| **Email Address** (optional) | |
| **Date of Birth** (Month/Day/Year) | |
| **A-Number** (Government-issued Alien Number) | A-________________ |

# FAMILY SEPARATION SETTLEMENT

## CLAIM FORM

## PART B – ARE YOU A PARENT OR A CHILD? (*Required for payment*)

**Please check one of the following options:**

☐ I was separated from my parent(s). Please complete Part C to possibly get more money.

☐ I was separated from my child(ren). Please complete Part D to:

- Submit basic information to verify your minor child(ren)'s claims. This is **required** for your minor children to receive compensation.
- Enter additional optional information to possibly get more money. If your child(ren) is/are no longer a minor, completing Part D is optional.

If you checked both boxes above, please contact us so that we can help.

## PART C – IF YOU WERE SEPARATED FROM YOUR PARENT(S) *(Optional)*

Please tell us as much as you can. Your parent(s) must fill out their own claim form.

**What date were you separated from your parent(s)?**

Approximate date is okay: Month ___________________ Day __________ Year __________

**How long were you separated? Please select one.**

☐ Under 1 week

☐ 1 week to 2 months

☐ 3 to 5 months

☐ 6 to 11 months

☐ 1 to 2 years

☐ More than 2 years

☐ We are still separated

# FAMILY SEPARATION SETTLEMENT

## CLAIM FORM

## PART D – IF YOU WERE SEPARATED FROM YOUR CHILD(REN)

Please enter your minor child(ren)'s name, date of birth and A-number to submit their claim. Enter information for the *"optional"* categories to be considered for more money. A child who is now an adult must fill out their own claim form.

**How many children were you separated from?**

☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 or more

If you were separated from more than 6 children, call us toll-free from the U.S. at 1-xxx-xxx-xxxx or contact us via WhatsApp xxx-xxx-xxxx.

| Child's Full Name | Date of Birth (Month/Day/Year) | A-Number (A-XXXXXXXX) | How old was the child at the time of separation and how long were you separated?* (*Optional*) | Was there a time of 2-months or more when you did not know where this child was? (*Optional*) | Does this child live at the same address listed in Part A of the claim form? (*Optional*) |
|---|---|---|---|---|---|
| | | | Age:<br>Length of Separation: | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | Age:<br>Length of Separation: | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | Age:<br>Length of Separation: | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | Age:<br>Length of Separation: | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | Age:<br>Length of Separation: | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | Age:<br>Length of Separation: | ☐ Yes ☐ No | ☐ Yes ☐ No |

* For the "Length of Separation", please write in one of the time ranges below:

- Under 1 week
- 6-11 months
- 1 week to 2 months
- 1 to 2 years
- 3 to 5 months
- More than 2 years
- We are still separated

# FAMILY SEPARATION SETTLEMENT

## CLAIM FORM

## PART E – TELL US MORE (*Optional*)

Part E is your choice. You do not have to write anything to get a payment of at least $3,000. If being separated caused you or your child very serious harm, you can tell us about it to possibly get more money. If you were separated for more than 2 years, or are still separated, you can still get more money even if you leave Part E blank.

**If you would like, please describe the harm that being separated caused you or your child, during the time separated and/or after:**

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

## PART F – SIGNATURE AND CERTIFICATION (*Required*)

Please sign below to finish your claim form. If you are signing for a child or someone else, please sign and tell us who you are to that person.

Everything I have written in this claim form is true and correct, to the best of my knowledge. I am signing under penalty of perjury, which means it is against the law to write something I know is not true.

______________________________
Signature

______________________________
Print Name Date

______________________________
Your relationship to the person (if signing for a child or someone else)

Mail your claim form postmarked by Month x, 2027 to:

*Family Separation Settlement*
c/o JND Legal Administration
P.O. Box xxxxx
Seattle, WA 98111

*Keep a copy of this claim form for your records.*

# EXHIBIT G

HAUSFELD

# HAUSFELD FIRM RESUME

**Human Rights**



## About Hausfeld

Renowned for skillful prosecution and resolution of complex and class-action litigation, Hausfeld attorneys have won landmark trials, negotiated complex settlements among dozens of defendants, and recovered billions of dollars for clients both in and out of court.

From our locations in Washington, D.C., Boston, New York, Philadelphia, San Francisco, Amsterdam, Berlin, Düsseldorf, Hamburg, Stockholm, and London, Hausfeld contributes to the development of law in the United States and abroad in the areas of Human Rights, Antitrust/Competition, Environmental and Product Liability, Commercial and Financial Disputes, and Technology and Data Breach. With a focus on human rights, Hausfeld attorneys apply innovative legal approaches to hold accountable those responsible for harm and to secure remedies for communities globally.

**Outstanding Class Action Experience**

Having prosecuted more than 50 antitrust class actions, Hausfeld attorneys have earned their reputation for groundbreaking class action work—**litigating and managing cases with dozens of defendants** (*In re Blue Cross Blue Shield Antitrust Litigation*, with more than thirty defendants, and *In re National Football League's "Sunday Ticket" Antitrust Litigation's* $4.7 billion trial victory), **negotiating favorable settlements for class members and clients** (*In re Air Cargo Shipping Services Antitrust Litigation*, settlements of more than $1.2 billion, and *In re Blue Cross Blue Shield Antitrust Litigation*, $2.67 billion settlement), **taking on the financial services industry** (*In re Foreign Exchange Antitrust Litigation*, with settlements of more than $2.3 billion), **taking cartelists to trial** (*In re Vitamin C Antitrust Litigation*, trial victory of $162 million against Chinese manufacturers of Vitamin C), and **pushing legal boundaries where others have not** (*O'Bannon v. NCAA*, another trial victory in which the court found that NCAA rules prohibiting additional scholarship payments to players as part of the recruiting process are unlawful)

This experience has lent itself to impactful class action work in the human rights space. In *Kashef v. BNP Paribas*, Hausfeld attorneys, including Amanda Lee-DasGupta and Mary Sameera Van Houten Harper, represent a certified class of Sudanese refugees and asylees who allege that BNP Paribas enabled the Sudanese government's campaign of genocide by providing the regime with access to billions of U.S. dollars. In fall of 2025, a jury in the Southern District of New York awarded three representative plaintiffs, of a class of over 23,000, $20.75 million.

A further discussion of Hausfeld's background in class action and human rights work follows, supporting Hausfeld attorneys' appointment of Class Counsel.

**Hausfeld, which 'commits extensive resources to the most difficult cases,' widely hails as one of the few market-leading plaintiff firms.**
*The Legal 500*

HAUSFELD
FOR THE CHALLENGE

“

**Ranked for 'Environment, Social & Governance Risk': International claimant-side law firm Hausfeld is known for its pursuit of social justice and corporate accountability.**
*Chambers Global Crisis & Risk Management*

**Human Rights**

Human rights are in the DNA of Hausfeld. Our commitment to pursue justice and fairness informs how we practice law and how we vindicate the rights of our clients around the world—from antitrust to antiracism.

For decades, Hausfeld lawyers have pioneered the field of human rights litigation, standing up to authoritarian regimes and powerful corporations on behalf of victims of genocide, terrorism, trafficking, torture, censorship, systemic racism, and plundered art works and assets. Hausfeld works to defend and advance human dignity globally—confronting oppression, exposing abuse of power, and holding complicit entities accountable.

As a global firm, we are uniquely positioned to litigate complex cross-border cases under domestic and international law. Hausfeld lawyers have tackled some of the world’s most challenging issues—exposing the nexus of money laundering and mass atrocities; combatting corrupt practices that harm our planet or victims of climate change; contesting the persecution of migrants, including unlawful enforcement practices and abuses; supporting whistleblowers; challenging institutional involvement in gender-based violence, human trafficking, or racial or ethnic discrimination in all forms; and confronting emerging online threats to human rights. Drawing on comparative legal traditions and international norms, we develop innovative strategies in courts, legislative fora, and international diplomatic bodies. We empower survivors by pursuing creative remedies, designed to go beyond individual relief and promote systemic reform.

We are committed to practicing law with integrity, courage, and solidarity—ensuring no entity is above the law and working toward a world in which every person can live free from violence, discrimination, and exploitation.

**REPRESENTATIVE EXPERIENCE: HUMAN RIGHTS**

***Kashef v. BNP Paribas:*** Hausfeld represents a certified class of Sudanese refugees and asylees who allege that BNP Paribas enabled the Sudanese government’s campaign of genocide by deliberately violating U.S. sanctions and providing the regime with access to billions of U.S. dollars. After BNP Paribas pled guilty to related sanctions violations, plaintiffs defeated multiple attempts to dismiss or relocate the case, secured class certification of over 23,000 victims, and overcame summary judgment through extensive evidence linking the bank’s dollar-clearing services to atrocities in Sudan. In October 2025, following a five-week trial, a Manhattan federal jury found BNP Paribas liable and awarded damages to three bellwether plaintiffs, marking one of the first civil verdicts holding a global bank accountable for financially facilitating human rights abuses. The jury awarded $20.75 million to the three representative plaintiffs, setting a precedent that paves the way for additional recovery by thousands of class members. The case is now proceeding on appeal, with the core findings of liability firmly established.

***Children v. the Climate Crisis: Sacchi et al. v. Argentina, Brazil, France, Germany, and Turkey:*** Hausfeld, together with co-counsel at Earthjustice, represented 16 young climate activists from 12 countries, including Greta Thunberg and Alexandria Villaseñor, in a landmark complaint before the United Nations Committee on the Rights of the Child under the Third Optional Protocol to the Convention on the Rights of the Child. The petition alleged that five G20 member states’ failure to curb greenhouse gas emissions violated children’s rights to life, health, culture, and a healthy environment. Although the Committee declined to hear the petition in 2021 on procedural grounds, the case had a profound and lasting impact. In response, the Committee undertook extensive global consultations—including engagement with more than 16,000 children worldwide—which culminated in the adoption of *General Comment No. 26 on Children’s Rights and the Environment with a Special Focus on Climate Change* in May 2023. The General Comment authoritatively recognizes climate change as a children’s rights crisis and sets out states’ obligations to prevent environmental harm, protect children from climate impacts, ensure children’s participation in climate decision-making, and enable accountability through domestic courts. Widely viewed as a watershed moment in international human rights and climate law, the General Comment reflects the

HAUSFELD
FOR THE CHALLENGE

Committee's embrace of the core legal arguments advanced in the Sacchi petition and has significantly strengthened the global framework for holding governments accountable for climate-related harms to children.

***Inter-American Court Amicus Brief*:** Hausfeld represented the Center for Human Rights and Environment and its youth-led initiative FACE in helping to secure a landmark Inter-American Court of Human Rights advisory opinion affirming that States have binding obligations to urgently address climate change, including limiting warming to 1.5°C and rapidly reducing short-lived climate pollutants, in line with the arguments raised in their amicus brief.

***In re Holocaust Victim Assets Litigation:*** In the late 1990s, on behalf of Holocaust survivors and their heirs, Michael Hausfeld led a class action against Swiss banks alleging they knowingly retained and concealed Nazi-looted assets and profited from related wartime conduct. The consolidated litigation, known as In re Holocaust Victim Assets Litigation, resulted in a landmark settlement of approximately $1.25 billion, providing restitution to hundreds of thousands of victims and setting an important precedent in Holocaust justice efforts.

***Japanese "Comfort Women":*** Hausfeld represented former "comfort women," a title given to women and girls who were forced into sexual slavery during World War II.

**REPRESENTATIVE EXPERIENCE: SOCIAL JUSTICE**

***City of Philadelphia, Commonwealth of Pennsylvania v. Glock Corp.:*** Hausfeld represents the City of Philadelphia and the Commonwealth of Pennsylvania, by and through the Philadelphia District Attorney's Office, in state law claims against Glock Corp. arising from the company's marketing and promotion of fully automatic machine guns. Although Pennsylvania law prohibits civilian possession of automatic weapons, the lawsuit alleges that Glock has deceptively marketed machine guns to young consumers through social media and other channels, misrepresenting their legality and recreational legitimacy while targeting teens and young men.

***City of Philadelphia v. Polymer80, Inc. and JSD Supply, Inc.:*** Hausfeld served as lead counsel to the City of Philadelphia, in partnership with the Giffords Law Center, in a lawsuit against defendants Polymer80, Inc. and JSD Supply, which are among the largest suppliers of ghost guns confiscated in Philadelphia, alleging that the named distributors have contributed to the gun violence crisis and threatened the public's right to health and safety by marketing, selling, and dispersing unserialized ghost guns into Philadelphia. The case settled in less than a year and achieved the broadest injunctive relief in any ghost gun case in the country, as well as $1.3M in compensation for the City, which will be directed towards efforts to remediate the harms caused by the gun violence epidemic.

***Roberts v. Texaco, Inc.:*** In a landmark employment discrimination class action filed in 1994 by six African American employees alleging systemic race discrimination in promotions and compensation at Texaco, affecting approximately 1,500 employees, Hausfeld played a central role in the case, leading an extensive investigation that uncovered severe underrepresentation of African Americans in senior management, discriminatory promotion practices—including a secret "high potential" list excluding Black employees—and failures to implement effective affirmative action policies. After the case gained national attention through the release of secret recordings revealing racially offensive remarks by senior executives—prompting public outrage and a nationwide boycott—Texaco agreed to what was then the largest settlement in U.S. employment race discrimination history: $115 million in cash relief, significant salary increases, and sweeping corporate reforms, including independent oversight, company-wide diversity training, and the appointment of an external ombudsman, setting enduring precedents for workplace accountability.

***Williams v. Saxbe:*** Michael Hausfeld helped establish that quid pro quo sexual harassment is a form of sex discrimination prohibited by Title VII of the Civil Rights Act. Representing Diane Williams, an African American employee who was harassed and ultimately terminated after refusing her supervisor's sexual advance, Mr. Hausfeld advanced a legal theory not yet recognized by the courts. Despite skepticism from the legal community, the court ruled in Ms. Williams's favor, creating a foundational precedent that enabled future victims of workplace sexual harassment to seek relief under federal law.

***Colbourne et al. v. Odin Properties LLC et al.:*** Hausfeld represents tenants of Bentley Manor in a class

action lawsuit against one of Philadelphia's largest landlords, challenging unsafe conditions and unlawful rent collection despite known safety violations.

***Alexander et al. v. State of Oklahoma:*** In 2002, survivors and descendants of persons affected by the Tulsa Race Massacre of 1921, which destroyed the African American community of Greenwood and continues to affect race relations in Tulsa and the State of Oklahoma to this day, brought claims against the State, the City of Tulsa, the Chief of Police, the Tulsa Police Department, and John Does 1 through 100 for damages they sustained in the Massacre. The plaintiffs, represented by a team of law professors and lawyers including Mr. Hausfeld, accused the defendants of participating in a "conspiracy of silence" and sought reparations for the deaths of family members and the losses of homes and businesses, as well as other relief including a declaration that a state grand jury exonerating all white people after the Massacre was a fraud. Although the case was dismissed on procedural grounds, the Oklahoma Legislature responded by passing statutes admitting accountability for the massacre, expunging the white grand jury indictment of the Tulsa black community for promoting a riot, issuing a public apology, and creating a memorial in honor of the black lives lost and community destroyed.

***Birch v. Twin Valley, Vermont Human Rights Commission:*** Hausfeld attorneys, together with co-counsel at the ACLU Foundation of Vermont, represented a former student who was subjected to severe, racially motivated bullying and harassment at Twin Valley Middle High School during the 2020–2021 school year. Despite repeated reports by the student, her family, and teachers, school administrators allegedly failed to take meaningful corrective action, forcing her to remain in classes with students engaging in racist slurs, white supremacist references, and threats of violence. The complaint alleged violations of the student's right to a school environment free from racial discrimination and challenges school policies that disproportionately impact Black students. The defendants' motion to dismiss was denied in May 2022. The parties reached a confidential settlement shortly thereafter.

**ADDITIONAL EXPERIENCE**

Hausfeld lawyers have achieved precedent-setting legal decisions and historic trial victories, negotiated some of the world's most complex settlement agreements, and recovered billions of dollars for clients and the classes they represented. Key highlights include:

***Porter Ranch Gas Leak*:** Hausfeld represented residents in a California community who suffered chronic exposures to methane from a gas line leak and sought compensation for injuries to property, business losses, and personal injury. The case was litigated in dual tracks as both a class action and a mass tort, which combined have reached settlements exceeding **$1.8 billion** total.

***Dioxane Water Contamination:*** Hausfeld represents the Suffolk County Water Authority, the largest groundwater provider in the country, in a landmark case over widespread 1,4-dioxane contamination of Long Island's drinking water, alleging that the manufacturer defendants knowingly distributed products that would pollute groundwater and threaten public health. This was the first major 1,4-dioxane contamination lawsuit filed by a public water provider and has since been followed by more than two dozen similar actions. Having prevailed at summary judgment and defeated numerous *Daubert* challenges, the case team is currently preparing the case for trial.

***Dioxane Water Contamination – New Jersey:*** Hausfeld also serves as Special Counsel to the New Jersey Attorney General in a statewide dioxane contamination case, where the State alleges that major manufacturers knowingly sold products that would contaminate groundwater and threaten public health. After defendants removed the case to federal court, the State prevailed on remand, and that victory was affirmed by the Third Circuit.

***State of Maine Climate:*** Hausfeld represents the State of Maine in climate deception litigation alleging that major fossil fuel companies misled the public about the dangers of climate change, causing significant environmental and public health harms across the state.

***South African Silicosis*:** Hausfeld lawyers collaborated with South African law firm Abrahams Kiewitz to obtain justice and compensation for current and former mineworkers who worked in South African gold mines, the pillar of the South African state. The team brought the first class action case on behalf of gold miners who suffered lung disease against 32 domestic and international gold mining companies based on a combination of new law created by the post-Apartheid South African Constitution (which created protections of life, health, and dignity for all citizens and also

established the class action as a Constitutional procedural right), and traditional negligence law. In 2016, a unanimous South African judicial panel certified the class, reasoning that certification was not only appropriate on the merits, but also necessary to give meaning to the fundamental principles of access to the courts and the rule of law: "the vast majority of [class members] who cannot sue individually would have to live with the fact that the law, with all its promises, offers them no remedy for the pain and suffering endured while battling the growth of fibrotic forests in their depleting lungs. If the legal system is inaccessible to them then the constitutional gift of a right to access the court is illusory." Following the resounding and powerful certification decision, the parties reached a groundbreaking global settlement in 2018.

***Bhopal, India Union Carbide Plant*:** Hausfeld attorneys represented residents of Bhopal, India, who were exposed to toxic wastes. These wastes contaminated the soil and drinking water surrounding the infamous Union Carbide Plant, which was the site of the 1984 gas leak that killed and injured thousands of residents.

***In re National Football League's "Sunday Ticket" Antitrust Litigation:*** Hausfeld served as co-lead class counsel and trial counsel in the NFL "Sunday Ticket" **$4.7 billion trial victory**. Hausfeld, along with co-counsel, represented purchasers of DirecTV's Sunday Ticket who alleged that the NFL, the NFL teams, and DirecTV (in coordination with the broadcast networks) suppressed the availability of out-of-market telecasts of NFL games through a series of interlocking agreements that made these games available only through a single product offered by just one satellite television provider, DirecTV. Through this arrangement, the NFL and its co-conspirators inflated the price of Sunday Ticket and protected the networks from competition. In 2023, the court certified two classes of Sunday Ticket purchasers: commercial businesses and individuals. In early 2024, the court denied summary judgment. And in June 2024, after nine years and a month-long trial, Hausfeld and their co-counsel achieved a $4.7 billion jury verdict. Following trial, the NFL filed a motion for judgment as a matter of law, which the court granted. That decision will be the subject of a second appeal in this matter.

***In re Blue Cross Blue Shield Antitrust Litigation:*** The Court appointed Hausfeld attorneys as co-lead counsel in this historic case against Blue Cross Blue Shield entities. The plaintiffs sued over thirty Blue Cross Blue Shield companies, as well as its trade association, alleging that they illegally agreed not to compete with each other for health insurance subscribers across the United States. After defeating motions to dismiss, Hausfeld marshalled evidence from a record that consisted of over **14 million documents** from more than thirty defendants and won a landmark ruling, with the district court holding that the *per se* standard would be applied to the defendants' conduct. In August 2022, the court approved a proposed settlement agreement resolving the claims of Blue Cross Blue Shield subscribers for **$2.67 billion**. In addition to monetary relief, the settlement includes systemic injunctive relief that will change the landscape of competition in healthcare.

***O'Bannon v. NCAA*:** In the landmark *O'Bannon* litigation, Hausfeld represented college athletes who collectively alleged that the NCAA, its members, and its commercial partners violated federal antitrust law by unlawfully foreclosing former players from receiving any compensation related to the use of their names, images, and likenesses in television broadcasts, rebroadcasts, and video games. In 2013, the plaintiffs announced a **$40 million settlement** agreement with defendant Electronic Arts, Inc., leaving the NCAA as the sole remaining defendant. Following trial in 2014, the district court determined that the NCAA had violated the antitrust laws and issued a permanent injunction. The Ninth Circuit affirmed the NCAA's violation of the antitrust laws and upheld significant injunctive relief, transforming college athletics going forward and resulting in a wave of litigation against the NCAA.

These cases are just a few examples of dozens of landmark achievements across our practice areas.

HAUSFELD
FOR THE CHALLENGE

# Reputation and Leadership

## Court Commendations

Judges across the country have taken note of Hausfeld's experience and results achieved in class action litigation.

**This has just been an absolute gem of an experience from the standpoint of having the opportunity to have just great lawyers fighting over something that's really important and significant.**

**–Judge R. David Proctor**

**All class actions generally are more complex than routine actions… But this one is a doozy. This case is now, I guess, nearly more than ten years old. The discovery as I've noted has been extensive. The motion practice has been extraordinary… The recovery by the class is itself extraordinary. The case, the international aspect of the case is extraordinary. Chasing around the world after all these airlines is an undertaking that took enormous courage.**

**–Judge Brian M. Cogan**

**The class is represented by what I would describe as an all-star group of litigators…**

**–Judge David R. Herdon**

**Hausfeld lawyers achieved 'really, an outstanding settlement in which a group of lawyers from two firms coordinated the work… and brought an enormous expertise and then experience in dealing with the case.' Hausfeld lawyers are 'more than competent. They are outstanding.'**

**–Judge Charles R. Breyer**

**Hausfeld has 'the breadth of experience, resources and talent necessary to navigate a case of this import.' Hausfeld 'stands out from the rest.'**

**–Judge Morrison C. England Jr.**

**Comparing Hausfeld's work through trial to *Game of Thrones*: 'where individuals with seemingly long odds overcome unthinkable challenges… For plaintiffs, their trial victory in this adventurous, risky suit, while more than a mere game, is nothing less than a win…'**

**–Magistrate Judge Nathanael M. Cousins**

# Awards and Recognition

### The Legal 500

In 2025, for the 16th consecutive year, *The Legal 500* ranked Hausfeld in the top tier nationally for class action firms. Hausfeld is one of only five firms in this top tier. The publication notes that “Hausfeld LLP has a successful record in high-stakes cases,” and that “the firm has a great deal of experience in handling class actions and individual cases asserting claims in the US and abroad.” The publication also previously stated that Hausfeld lawyers are “pragmatic, smart and focused litigation experts,” and that the firm is “at the top of its game,” with “a number of heavyweight practitioners”; that Hausfeld is a “market transformer,” “[d]riven by excellence,” that “anticipates the evolving needs of clients,” and delivers “outstanding advice not only in legal terms but also with a true entrepreneurial touch. . .”; and that Hausfeld, which was “described by a client as ‘very tenacious and appropriately aggressive, with great client relations skills’” “enjoys a stellar reputation.”

### Benchmark Litigation

In 2025, for the seventh consecutive year, *Benchmark Litigation* highlighted Hausfeld as a leader in the domain of dispute resolution, recognizing the firm at the national level, as well as regionally on both coasts. *Benchmark* ranked Hausfeld as a “Recommended Top Plaintiff Firm” nationwide and described the firm as “an undisputed trailblazer, identified as a ubiquitous presence by peers on both the plaintiff and defense sides of the ‘V’.” A peer on the defense side commented, "many firms try to do what they do, but Hausfeld is one of the only ones that gets it right and one of the ones we take the most seriously."

### Chambers and Partners

In 2025, *Chambers and Partners* once again recognized Hausfeld “an outstanding firm with very wide and deep experience," stating that “Hausfeld brings so much to bear in litigation. On top of being very skilled litigators, they also bring an international bench.” The publication noted that Hausfeld’s team is “talented across the board” with “some of the hardest-working and smartest lawyers,” and stated that “[the] group does fantastic work.” The publication has also previously noted that Hausfeld “has fantastic lawyers who are out-of-the-box thinkers, client service-oriented and a pleasure to work with,” is “[a]ble to deploy a deep bench of trial attorneys with outstanding litigation experience,” and is “renowned for its abilities representing plaintiffs in multidistrict class action antitrust suits across the country.” Clients reported that “Hausfeld is a great partner that makes sure to understand our perspective,” and peers commended the firm’s “terrific, deep bench.”